UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

SHARON WEINSTOCK, et al.,

                Plaintiffs,

vs.                                        No. 17-cv-23272-RNS

ISLAMIC REPUBLIC OF IRAN, et al.,

                Defendants.
_____/

**MOTION FOR DEFAULT JUDGMENT
WITH INCORPORATED MEMORANDUM OF LAW**

Pursuant to Rule 55(b) of the Federal Rules of Civil Procedure and the Court's Order on Default Judgment Procedure (DE 26)[1], Plaintiffs hereby move for entry of default judgment against Defendant, Islamic Republic of Iran ("Iran"), and state as follows:

**INTRODUCTION**

This is a civil action under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602, et seq., the FSIA's terrorism exception, 28 U.S.C. § 1605A, and foreign law tort claims. The Plaintiffs' claims arise from the shooting murder (the "Terrorist Murder") of the 19-year old U.S. citizen Yitzchak Weinstock by the terrorist group Hamas – Islamic Resistance Movement ("Hamas") on December 1, 1993, near Jerusalem. The Plaintiffs are Yitzchak's estate, mother,

---

[1] This case involves two defendants. The liability of Defendant Iran depends in part upon the liability of co-defendant Hamas, which has not filed an answer or otherwise defended. Counsel has received confirmation from a process server that Hamas was served with a copy of the Summons and Complaint on August 28, 2018. As indicated in Plaintiffs' status report (DE 36), Plaintiffs are awaiting confirmation from the Israeli Ministry of Justice that the service was effective under Israeli domestic law. If so, Plaintiffs will receive confirmation of service pursuant to the Hague Convention and file it with the Court in support of a motion for entry of default against Hamas.

and siblings, and the estates of his late father and maternal grandparents[2]. Defendant, Iran, provided substantial material support to Hamas leading up to, and immediately before and including, the date of the Terrorist Murder. As discussed below, Iran's material support enabled, facilitated and caused the murder of Yitzchak Weinstock and the life-shattering emotional harm suffered by the Plaintiffs.

Iran, was served with process in this action as of April 10, 2018. *See* DE 22; Verified Motion for Clerk's Entry of Default, D.E. 24. However, Iran "failed to plead or otherwise defend" this action, Fed. R. Civ. P. 55(a). After its time to do so expired, the Clerk of the Court entered default against Iran on June 12, 2018. Plaintiffs now respectfully move for default judgment as to defendant Iran.

## I. Legal Standards for Entry of Default Judgment Against Foreign Sovereign Defendants.

The entry of default judgment is governed by Fed. R. Civ. P. 55. Despite a defendant's refusal to respond to the complaint, "the entry of a default judgment is not automatic." *Mwani v. Bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). Rather, a plaintiff seeking a default judgment must establish both subject matter and personal jurisdiction. *See e.g. TracFone Wireless v. Anadisk LLC*, 685 F. Supp. 2d 1304, 1310 (S.D. Fla. 2010); *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 157 (D.D.C. 2017); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016). Additionally, under the FSIA, plaintiffs must also prove their claims or right to

---

[2] Plaintiffs have established that under the law of the relevant domicile (Israel), plaintiffs Sharon Weinstock and Moshe Weinstock are authorized to bring this action on behalf of the estates of Yitzchak Weinstock and Dov Weinstock and on behalf of Yitzchak's disabled sister, plaintiff Geula Weinstock, and that Sharon Weinstock is authorized to bring this action on behalf of the estates of Simon and Shirley Dolgin. See Declaration of Jeremy Stern, filed in *Weinstock v. Abu Marzook*, Civ. 17-23202 (S.D. Fla.). Similarly, claims that non-U.S. national, Dov Weinstock, would have had while alive passed to his estate upon his death. Shnoor ¶¶ 41, 43 and n.2.

relief by proffering evidence that is "satisfactory to the court." 28 U.S.C. § 1608(e); *Compania Interamericana Exp.-Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 951 (11th Cir. 1996); *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court . . . has an obligation to satisfy itself that plaintiffs have established a right to relief.").

Plaintiffs submit herewith verified declarations of several plaintiffs, their relatives, family friends, others with knowledge of relevant facts and circumstances surrounding the events giving rise to this action, and expert witnesses.

### A. The standards as to the type and quantum of evidence required for default judgments are less rigorous than those required in contested cases.

The FSIA requires plaintiffs seeking default judgment against a foreign state to prove to establish their claims "by evidence satisfactory to the court." 28 U.S.C. §1608(e). Section 1608(e), however, does not provide guidance as to the type or quantum of evidence that is deemed "satisfactory to the court." Notwithstanding the statutory void, courts are to be guided by established principles found in case law.

*First*, neither § 1608(e) nor any other provision of the FSIA requires a court to base its decision upon a particular type of admissible evidence. *Owens v. Republic of Sudan*, 864 F.3d 751, 788 (D.C. Cir. 2017). For example, in *Owens* the D.C. Circuit held that expert testimony, regardless of its form or type is admissible to prove ultimate facts, and that such expert testimony, standing alone, may satisfy the evidentiary burden of §1608(e). The *Owens* court added that eyewitness testimony or other direct evidence are not necessary. Id. at 789.

Additionally, district courts have "an unusual degree of discretion over evidentiary rulings" in FSIA cases against a defaulting state sponsor of terrorism. *Id*. at 785. Because state sponsors of terrorism severely restrict the flow of information, including sources of admissible evidence, courts have allowed plaintiffs to prove their claims using evidence that might not be

3

admissible at trial. *Id., citing Han Kim v. Democratic Peoples Republic of Korea*, 774 F.3d 1044, 1048-51 (D.C. Cir. 2014). A plaintiff may not, however, rely exclusively upon inadmissible evidence. *Owens*, 864 F.3d at 785.

**Second**, § 1608(e) does not require a district court to conduct an evidentiary hearing so long as the plaintiff's allegations are supported by the evidence. *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994). Plaintiffs may carry their burden of production through the submission of documentary evidence including affidavits and declarations. *Id.*; *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 7 (D.D.C. 2011); s*ee also, Bluth v. Islamic Republic of Iran*, 203 F. Supp 3d 1, 17 (D.D.C. 2016); *Stansell v. Revolutionary Armed Forces of Colom. (FARC)*, No. 8:09-cv-2308-T-26MAP, 2010 U.S. Dist. LEXIS 149212 (M.D. Fla. 2010) (court may forego a hearing where the plaintiffs submit detailed affidavits describing the nature and extent of their damages). Moreover, "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015).

*Finally*, the quantum of evidence required for entry of summary judgment under § 1608(e) is the same as that required to defeat a defendant's motion for summary judgment. "To prevail in an FSIA default proceeding, the plaintiffs must present a legally sufficient *prima facie* case, in other words, a legally sufficient evidentiary basis for a reasonable jury to find for the plaintiff." *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 150 (D.D.C. 2010). The plaintiff need only present enough evidence "to satisfy the judge that her claim has some factual basis." *Owens*, 864 F.3d at 785. Thus, under section 1608(e) the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens*, 864 F.3d at 785.

    B. **The Court has subject matter and personal jurisdiction over this action and the plaintiffs have established the elements of their claims**.

### 1. Standards for subject matter jurisdiction.

28 U.S.C. 1330(a) provides district courts with *subject matter jurisdiction* over any non-jury civil action against a foreign states as to any claim for relief for which the foreign state is not immune under the FSIA. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *GDG Acquisitions LLC v. Gov't of Belize*, 849 F.3d 1299, 1305 (11th Cir. 2017). Thus, subject matter jurisdiction lies only where the plaintiffs establish the applicability of a statutory exception to the foreign state defendant's immunity. See 28 U.S.C. §§ 1604-1607.

The Court has subject matter jurisdiction under the terrorism exception to foreign sovereign immunity, which provides in part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). These elements are all satisfied. The Plaintiffs here seek money damages against Iran for personal injuries and death that were caused by Iran's provision of material support and resources for the extrajudicial killing of Yitzchak Weinstock.

### 2. The terrorism exception applies to Iran.

The terrorism exception allows claims to be heard only as against foreign states that were designated as state sponsors of terrorism at the time of the act of terrorism and that remain so designated. See 28 U.S.C. § 1605A(a)(2). The term "state sponsor of terrorism" refers to countries, the governments of which have been designated by the Secretary of State as having repeatedly provided support for acts of international terrorism. 28 U.S.C. § 1605A(h)(6). Iran is

5

presently designated a state sponsor of terrorism and has been so designated since 1984[3].

### 3. The murder of Yitzchak Weinstock was an extrajudicial killing.

Iran provided material support and resources to Hamas for the commission of acts of extrajudicial killing, including the Terrorist Murder of Yitzchak Weinstock. Complaint ¶ 17. Section 1605A adopts the definition of "extrajudicial killing," that is codified in the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note ("TVPA"). 28 U.S.C. § 1605A(h)(7). The TVPA defines "extrajudicial killing to mean:

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

28 U.S.C.S. § 1350.

"On its face, this definition contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770. The Terrorist Murder of Yitzchak Weinstock satisfies all three elements, and it "does not fall within the exception for killings carried out under the authority of a foreign nation acting in accord with international law." *See id*.

On the morning of December 1, 1993, Yitzchak hitched a ride to visit his teachers at his former school north of Jerusalem. He was picked up by Rabbi Yitzchak Shpatz and his adult daughter, Emunah. Two other hitchhikers entered the car with Yitzchak. One of them Shalva Ozanah, who had studied in the same teachers college as Emunah. Y. Shpatz 1; E. Shpatz 1-2. The third hitchhiker was dropped off in an industrial zone on the outskirts of Jerusalem. Y. Shpatz 1.

---

[3] See Clawson ¶ 27; see also U.S. Department of State Country Reports on Terrorism 2017, https://www.state.gov/j/ct/rls/crt/2017/282847.htm. *See also* 31 C.F.R. § 596.201 note

The car proceeded north on Highway 60. As the car approached the Palestinian town of Al-Bireh, approximately 20 minutes outside of Jerusalem, the car's exhaust pipe broke and was dragging under the car. Rabbi Shpatz stopped the car to attempt a simple, if temporary, repair, and Yitzchak exited the car to help. Y. Shpatz 2. The two were lying on their backs with their upper bodies under the chassis working on the car. Emunah and Shalva remained in the car and chatted. A second car slowly approached and suddenly, the sound of automatic gunfire erupted. Y. Shpatz 2. Rabbi Shpatz, who had previously served in a combat role in the military, recognized from the sound of the gunfire that there must have been at least two gunmen armed with automatic weapons. Y. Shpatz 2; E. Shpatz 2.

Rabbi Shpatz, was hit and injured in several places. Y. Shpatz 1. E. Shpatz 3. Fortunately, his injuries were not serious. Y. Shpatz 1. Inside the car, Emunah heard the shooting, and then she heard Shalva scream and saw her fall back on her seat. Emunah ducked for cover as close as she could to the floor of the car. Emunah covered her head with her hands and prayed. E. Shpatz 2.

When the shooting stopped, Rabbi Shpatz saw that Yitzchak had been badly wounded. He was gushing blood from a large wound next to his shoulder. Y. Shpatz. Rabbi Shpatz attempted to stop Yitzchak's bleeding while simultaneously trying to flag cars for help. Y. Shpatz 3. A few minutes later, a military jeep stopped and the officer radioed for additional forces and ambulances. The officer had a small first aid kit. Rabbi Shpatz applied a tourniquet and bandages to stop Yitzchak's bleeding.

Both Yitzchak Shpatz and Emunah Shpatz were lightly wounded. E. Shpatz 3. Shalva Ozanah died of her wounds. Yitzchak Weinstock was taken to a hospital in Jerusalem and was rushed into surgery. His extended family and several friends and neighbors, and even some com-

plete strangers who had heard about the shooting gathered at the hospital to await news and to pray. Sharon 2; Moshe 2; J. Dolgin 2; Horowitz 2. Yitzchak survived for 18 hours while the doctors fought to save his life. But he had multiple injuries and lost massive amounts of blood. Sharon 2. At approximately 1:00 am the following morning a doctor emerged from the operating room broke the horrific news to Yitzchak's family. Sharon 2.

The attack was "deliberated." The Eleventh Circuit has held that "deliberate" under the TVPA refers to killings that were "undertaken with studied consideration and purpose." *Mamani v. Berzaín*, 654 F.3d 1148 (11th Cir. 2011). Yitzchak Weinstock was shot at close-range from a car from which at least two shooters fired automatic weapons and had time and munitions to reload their weapons and to escape capture. An attack of this nature requires careful planning, funding of operational costs, including salaries, weapons, intelligence, logistical support, preparation, and training. Levitt ¶¶ 27.

In a proclamation issued by Hamas, the terrorist organization claimed responsibility for the attack. Spitzen ¶ 18 n.1. Plaintiffs submitted the verified report of Arieh Dan Spitzen, an expert on Palestinian affairs and society and the structure, leadership, personnel, and activities of various Palestinian terror groups, including Hamas. Spitzen ¶ 1. Mr. Spitzen explains in his detailed report that proclamations of this sort were routinely used by the various terrorist organizations, including Hamas, that the claims of responsibility for acts of terrorism made in these proclamations are credible; and that the proclamation he reviewed is what it purports to be – an authentic proclamation issued by Hamas's militant wing, the Izz al-Din al-Qassem Brigades claiming responsibility for the murder of Yitzchak Weinstock and Shalva Ozanah. Spitzen ¶¶ 21-23, 33, 34.

The attack was part of a broad conspiracy involving Iran and Hamas under which Hamas

was expressly required to increase its terrorist activities in exchange for increased support from Iran. Neither Hamas nor Iran made any effort to conceal the deliberate nature of their terrorism, and Hamas proudly claimed credit for the attack. Levitt ¶¶ 19-22; 32, 35, 37, 40-41, 43; Spitzen ¶¶ 23, 31, 32, 34. In December 1992, Hamas and Iran entered into an agreement under which Hamas would escalate attacks against Israel and Iran would provide Hamas financial and military assistance. Levitt ¶ 37. The State Department's annual report on terrorism stated that in 1992, "Iran [was] also the world's principal sponsor of extremist Islamic and Palestinian groups, providing them with funds, weapons, and training." Levitt ¶ 41. The 1992 State Department report (published in 1993) identified Hamas by name as one of the terrorist groups receiving support from Iran. Levitt ¶ 41.

In October 1992, "Tehran hosted a series of high-profile meetings with Hizballah and HAMAS with the stated goal of coordinating their efforts against Israel and bringing the Arab-Israeli peace talks to a halt." Levitt ¶ 41. Hamas leader Khaled Mishal maintained that terrorism was justified in its efforts to destroy Israel and create in its place an Islamic state. Levitt ¶ 20. The State Department's terrorism report for 1993, the year of the Terrorist Murder, stated: "The Izz al-Din al-Qassam Forces arm of the Islamic Resistance Movement (HAMAS) and the Palestinian Islamic Jihad (PIJ) have led the violent opposition to the peace efforts, with civilians serving as frequent targets." Levitt ¶ 44. And, the CIA recognized that "terrorism was a key component of Iranian foreign policy in 1992 and will remain so in the year ahead. Levitt ¶43. There is no doubt that the attack was "deliberated" and was a manifestation of Iran's and Hamas's explicit policy of using terrorism to achieve their goals.

The killing of Yitzchak Weinstock and Shalva Ozanah was not "authorized by a previous judgment pronounced by a regularly constituted court." See 28 U.S.C.S. § 1350; *Owens* 864 F.3d

9

at 770. This was a planned and professionally executed drive-by shooting attack directed at random civilians. "Clearly, this killing was not authorized by a prior judgment affording judicial guarantees or due process, nor is such deliberate killing lawful under any international law. It is a quintessentially extrajudicial killing." *See Estate of Hirshfeld v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 148416 (D.D.C. 2018).

### 4. Iran provided Hamas with material support and resources for the terrorist attack.

Iran provided Hamas with material support and resources for the extrajudicial killing of Yitzchak Weinstock and Shalva Ozanah. "Material support or resources" is a defined term under the FSIA's terrorism exception. Section 1605A(h)(3) incorporates the definition provided under the Anti-Terrorism Act (ATA), 18 U.S.C. § 2339A(b)(1):

> The term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials

As detailed by Plaintiffs' expert witnesses and in the Proposed Order filed with this Motion, Iran provided Hamas with substantial amounts of nearly every form of "material support or resources" included in the statutory definition. These were provided for the explicit purpose of promoting, enabling, assisting, and executing terrorist attacks like the murder of Yitzchak Weinstock and Shalva Ozanah.

### 5. Iran acted through its officials, employees, or agents who were acting within the scope of their offices, employment, or agencies.

Iran, provided the material support and resources to Hamas through its officials, employees and agents acting within the scope of their official duties. The cooperation between Iran and Hamas was a matter of Iranian government policy and was being directed from the highest levels

of the Iranian government. Levitt ¶ 42-44. These officials included, President Rafsanjani, Foreign Minister Velayati, and Supreme Leader Ayatollah Khamenei, among others. Clawson ¶ 42. The Iranian officials and represented acted in accordance with their "approved roles and pursuant to official Iranian government policy directives." Clawson ¶ 42. Additionally the brother of Iran's then-presented Rafsanjani headed the department of the Iranian foreign ministry that coordinated the funding of Hamas. The amount of arming, training, indoctrinating, and provision of logistical support Iran provided to Hamas could have only been carried out by the government through its officials, employees and agents (including foreign agents such as the Hizballah members who also provided substantial support and resources to Hamas at the direction of Iranian government officials).

      **6. Iranian material support and resources provided to Hamas caused the death of Yitzchak Weinstock and the Plaintiffs' injuries and damage**.

28 U.S.C. § 1605A(a) includes a proximate causation element. *See Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 54 (D.D.C. 2008) (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya,*, 376 F.3d 1123, 1128-29 (D.C. Cir. 2004)). The causation element of § 1605A, does not require that Plaintiffs prove that the injury would not have happened but for the defendant's actions. *Kilburn*, 376 F.3d at 1128. Neither must they establish a close temporal or spatial proximity between the harm and the action that caused it. *Rux v. Republic of Sudan*, 461 F.3d 461, 473 (4th Cir. 2006), citing *Kilburn*, 376 F.3d at 1128. Rather, proximate cause under §1605A is established by demonstrating "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017); *Valore v Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010). And, the mere fact that Hamas and its operatives may have themselves been but for causes of the Plaintiffs' injuries does not break the causal chain of Iran's actionable con-

duct. "Such a case, in which application of a 'but for' standard to joint tortfeasors could absolve them all, is precisely the one for which courts generally regard 'but for' causation as inappropriate." *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 346 (D.C. Cir. 2018) *citing Kilburn* 376 F.3d at 1129.

    Finally, proximate cause does not require the Plaintiffs to show the defendant specifically intended or directly advanced their injuries. *Owens*, 864 F.3d at 799; *Kilburn*, 376 F.3d at 1128-29. As the *Kilburn* court noted, material support is difficult to trace. 376 F.3d at 1128. Accordingly, the D.C. Circuit, in a unanimous decision by Judges Garland, Ginsburg, and then-Judge John Robert, adopted a flexible standard for causation under the terrorism exception to jurisdictional immunity[4]. *Kilburn*, 376 F.3d at 1128-29. The Court noted that material support is difficult to trace *Id*. at 1129c*f*., *Boim v. Holy Land Foundation for Relief and Development*, 596 F.3d 685, 695-698 (7th Cir. 2008) (*en banc*) (finding causation and liability under the Anti-Terrorism Act against a U.S.-based organization that provided funds to Hamas, which killed an American teenager in a drive-by shooting).

    In *Owens,* the D.C. Circuit held that proximate cause requires (a) that the defendant's actions must be a "substantial factor" in the sequence of events leading to the plaintiff's injury, and (b) that the injury must have been a reasonably foreseeable or anticipated consequence of the defendant's conduct. 864 F.3d at 794. Iranian material support was certainly a substantial factor in the sequence of events leading to the murder of Yitzchak Weinstock. Until 1992, Hamas had engaged in sporadic terrorist attacks and lacked the money, training, logistical support and other resources necessary to execute attacks of this nature. At the end of that year, Iran summoned

---

[4] *Kilburn* was decided under an earlier version of the terrorism exception that was then codified at 28 U.S.C. § 1605(a)(7). However, in *Owens*, 864 F.3d at 794, the D.C. Circuit reaffirmed *Kilburn*'s analysis of the causation standard for the jurisdictional immunity exception, and applied it to the current terrorism exception found in 1605A(a).

Hamas leaders for meetings in Iran and reached agreements pursuant to which Iran would provide material support for Hamas attacks, which Iran made clear it wanted to increase. Both Dr. Levitt and Dr. Clawson confirmed that the very extensive, all-encompassing Iranian support for Hamas was *at least* a substantial factor in the sequence of events leading to the Terrorist Murder. Levitt. ¶ 58, 59, 60.

The Terrorist Murder was also both a reasonably foreseeable *and* anticipated consequence of Iran's policy of providing material support to Hamas. The very purpose of the Iranian support was to enlist Hamas to engage in terrorist attacks against Israel in an attempt to scuttle the peace process, attack Israel and undermine the West. Levitt ¶¶56, 57. Iran passed a law that established an account used to fund Palestinian terrorism. Levitt ¶ 35. Iran entered into agreements with Hamas the purpose of which were to increase terrorist activities. Levitt ¶37; Clawson ¶ 35. This intent, coupled with the extensive efforts made by Iran through its officials, employees and agents to maintain Hamas as a menacing terrorist organization (as discussed at length above) easily demonstrates that the Terrorist Murder was a reasonably foreseeable and anticipated consequence of Iran's conduct.

> 7. **Iran conspired with Hamas to commit acts of terrorism including the Terrorist Murder**.

The agreements between Iran and Hamas (Levitt ¶ 37, Clawson ¶ 35) and Iran's comprehensive involvement with Hamas's development as a terrorist organization and its terrorist activities demonstrate that Iran was not only a supporter of Hamas, but that the two were co-conspirators. "The very sponsorship of terrorist activities inherently involves conspiracy to commit terrorist acts." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 21-22 (D.D.C. 2009) (quoting *Bodoff v. Islamic Republic of Iran*, 424 F.Supp.2d 74, 84 (D.D.C. 2006) and *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998)) (quotation marks

omitted)). See also Acosta v. Islamic Republic of Iran, 574 F. Supp. 2d 15, 26-27 (D.D.C. 2008) (same). Because Iran and Hamas were co-conspirators Iran is liable not only for providing material support and resources for the Terrorist Murder; it is also directly liable for the extrajudicial killing of Yitzchak Weinstock.

### 8. The Court may assert personal jurisdiction over Iran.

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject matter] jurisdiction … where service has been made under Section 1608 of this title." 28 U.S.C. § 1330(b); *S & Davis Int'l, Inc. v. Yemen*, 218 F.3d 1292 (11th Cir. 2000) (personal jurisdiction under the FSIA established by subject matter jurisdiction plus valid service of process); *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venez.*, 863 F.3d 96 (2d Cir. 2017) (same). "Neither compliance with the forum state's long-arm statute nor minimum contacts between the defendant and the forum state are required." *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1553 (11th Cir. 1993) (citations omitted).

Moreover, every federal court of appeals to have addressed the issue has held that "[t]he jurisdictional protections of the Due Process Clause do not apply to 'foreign states and their instrumentalities.'" *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002) (foreign states are not "persons" entitled to due process); *see also, Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 694 (7th Cir. 2012) (same); *Frontera Res. Azer. Corp. v. State Oil Co. of the Azer. Republic*, 582 F.3d 393, 399 (2d Cir. 2009) (same); *cf., People's Mojahedin Org. of Iran v. United States Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) ("No one would suppose that a foreign nation had a due process right to notice and a hearing before the Executive imposed an embargo on it for the purpose of coercing a change in policy."). The Eleventh Circuit has not expressly held whether foreign states have due process rights. For example, in *S & Davis*

*Int'l*, 218 F.3d, the court of appeals found it unnecessary to address the question because due process requirements were met.

The Court should follow the rulings of the Second, Seventh and District of Columbia Circuits and holds the personal jurisdiction inquiry as to foreign state defendants does not require due process analysis. However, even if a foreign state is deemed a "person" for purposes of due process analysis, "a foreign state that sponsors terrorist activities which causes the death or personal injury of a United States national will invariably have sufficient contacts with the United States to satisfy Due Process." *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 23 (D.D.C. 1998).

As recounted in Plaintiffs' several status reports on service of process, service upon Iran was made properly under 28 U.S.C. § 1608(a)(4). See Plaintiffs' Response to Notice of Upcoming Deadline to Serve under Federal Rule of Civil Procedure 4(m), D.E. 12; Clerk's Notice of International Service, D.E. 14; Status Report of Service Upon Defendants, D.E. 18 and exhibits thereto; Letter dated May 14, 2018, D.E. 22; Verified Motion for Clerk's Entry of Default, D.E. 24. Accordingly, the Court may personal jurisdiction over Iran.

**9. The Plaintiffs' substantive claims against Iran**.

The Plaintiffs' substantive claims arise ***primarily*** under the FSIA's statutory cause of action for state sponsorship of terrorism. *See* Complaint at 14, First Cause of Action; 28 U.S.C.§ 1605A(c). "There is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity.'" *Fritz v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 130008 (D.D.C. 2018), *quoting*, *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)[5].  Thus, "a plaintiff that offers proof sufficient to establish a

---

[5] As other courts have recognized, the vast majority of cases decided under the FSIA's terrorism

waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law." *Fritz*, 2018 U.S. Dist. LEXIS at *86.

Dov Weinstock, Yitzchak Weinstock's now-deceased father, was not a United States national, and therefore his estate cannot benefit from the private right of action of §1605A(c). *Leibovitch*, 697 F.3d at 572 n.6; *Owens*, 864 F.3d at 808-809. However the jurisdictional immunity exception enables Dov's estate to bring its claim under Israeli law. *Leibovitch*, 697 F.3d at 572 n.6; *Owens*, 864 F.3d at 808-809. The Estate of Dov Weinstock brings a claim under the Israeli law of negligence. Complaint 15, Second Cause of Action.

To establish Dov Weinstock's tort claim and the basis for relief for Dov's estate, Plaintiffs have filed the expert opinion of Dr. Boaz Shnoor, an Israeli tort law expert who holds LL.D, LL.M and LL.B degrees from the Hebrew University and has been a senior lecturer at the Academic Center of Law and Business in Ramat Gan, Israel. Shnoor ¶¶ 1, 3. Dr. Shnoor is a member of the Israeli Bar and is licensed to practice law in the State of Israel. Shnoor ¶ 3. Dr. Shnoor has previously served as an expert witness on matters relating to Israeli tort law and liability for terrorist attacks in numerous federal and state cases in the United States. Shnoor ¶ 4.

In a very thorough and balanced opinion, Dr. Shnoor opines that under Israeli law, Iran would be directly liable to Dov Weinstock under what is referred to in Israel as a "negligence" theory. Under Israeli law, the tort of "negligence" includes any unreasonable conduct that causes foreseeable harm, even where the conduct is intentional. Shnoor ¶ 12. Thus, the Israeli Supreme Court has found defendants directly liable under negligence for *assisting* a terrorist who carries out an attack. Shnoor ¶ 13, citing CA 2144/13 *Mentin v. The Palestinian Authority* ¶ 94

---

exception were adjudicated by the district court for the District of Columbia. Due to that court's experience interpreting the relevant provisions this Court will rely on that court's rulings for guidance. See *Leibovitch v. Islamic Republic of Iran,* 697 F.3d 561, 566 (7th Cir. 2012); *Saludes v. Republica De Cuba*, 577 F. Supp. 2d 1243, 1253 n.5 (S.D. Fla. 2008).

(12.6.2017). Dr. Shnoor also found that Iran would be liable under the secondary liability theories of vicarious liability and aiding and abetting the Hamas terrorist attack. Shnoor ¶¶ 10, 54-62. Finally, Dr. Shnoor concluded that Dov would be entitled to compensation for both pecuniary and non-pecuniary losses, including his mental anguish and suffering. Shnoor ¶ 40, 41. The Estate of Dov Weinstock does not seek pecuniary damages.

### C. The plaintiffs are entitled to damages as indicated in the accompanying Proposed Order.

In support of this Motion, Plaintiffs submit a Proposed Order, supported by verified declarations and other exhibits documenting all facts necessary to support a damages award and entry of judgment herein.

### A. The Estate of Yitzchak Weinstock is entitled to an award of $1,291,000 for lost earnings.

Based upon the verified report of Mark Berenblut, the Estate of Yitzchak Weinstock is entitled to a damages award for lost earnings in the realistic and conservative amount of $1,291,000 million. *See Estate of Hirshfeld v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 148416 (D.D.C. 2018).

### B. **The Remaining Plaintiffs are entitled to solatium damages**.

The remaining plaintiffs may recover damages for the severe emotional injuries they suffered, otherwise known as solatium damages. 28 U.S.C. § 1605(c); *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 84 (D.D.C. 2018); Shnoor ¶¶33-43. Solatium claims compensate plaintiffs for the "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as a result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort." *Braun*, 228 F. Supp. 3d at 84 (citations omitted). "Solatium damages are available to FSIA plaintiffs when extreme and outrageous conduct has

17

caused grief and anguish to plaintiffs closely related to a victim of terrorism. Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 273 (D.D.C. 2003).

Courts addressing the availability and amount of solatium damages in terrorism cases have traditionally looked to prior similar cases awarding solatium or emotional damages. *Braun*, 228 F. Supp. 3d at 85; *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010). Applying this methodology, courts have formulated a widely-accepted framework for calculations of damages awarded to victims of international terrorism. In *Heiser*, 466 F. Supp. 2d at 269 (D.D.C. 2006), the court surveyed past terrorism awards in the context of deceased victims of terrorism, and found that parents of those killed in terrorist attacks typically received damages awards of $5 million and siblings received $2.5 million. The court also specified "baseline" amounts awarded to other relatives, such as spouses. *See id.* In *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 86 (D.D.C. 2017), the court awarded $2.5 million in compensatory damages to each of the four grandparents of a baby killed in a terrorist attack. The D.C. Circuit recently agreed that that *Heiser* framework reflects reasonable baseline awards, and reaffirmed that "past solatium awards from comparable cases are appropriate sources of guidance for district courts." *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 361-62 (D.C. Cir. 2018). The *Fraenkel* court held that while *Heiser* is not binding on other courts, it provides a "useful reference point" to which courts may adhere or depart upwards or downwards in their damages awards, depending upon the circumstances of the case and the discretion of the judge. 892 F.3d at 351. This Court should apply the *Heiser* framework to the calculation of non-economic damages in the instant case.

18

1. **Sharon Weinstock and The Estate of Dov Weinstock**.

Under *Heiser* the Court should award Sharon Weinstock and the Estate of Dov Weinstock $5,000,000 in solatium damages, each, for the loss of their son to the terrorist murders. *See Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 85 (D.D.C. 2017); *Estate of Hirshfeld v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 148416 (D.D.C. 2018).

2. **Moshe, Geula, Aryeh, and Chaim Mishael Weinstock**.

Under Heiser the court should Yitzchak Weinstock's siblings (Moshe, Geula, Aryeh, and Chaim Mishael) $2,500,000 each in solatium damages for the loss of their brother to the terrorist murders. *See Estate of Hirshfeld*, 2018 U.S. Dist. LEXIS 148416 (D.D.C. 2018).

3. **The Estates of Rabbi Simon and Mrs. Shirley Dolgin.**

Under *Heiser* and the holding in *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d at 86, the Court should award to each of the estates of Rabbi and Mrs. Dolgin damages in the amount of $2.5 million.

## CONCLUSION

**WHEREFORE**, Plaintiffs respectfully request that the Court grant their Motion for Default Judgment and enter judgment in accordance with this Motion and the Proposed Order and Judgment submitted herewith.

Respectfully submitted October 9, 2018

Plaintiffs, by their attorney,

By: /s/ Asher Perlin
Asher Perlin, Esq.
Florida Bar No. 0979112
4600 Sheridan Street, Suite 303
Hollywood, Florida 33021
Tel. 954-284-0900 ext. 102
Fax. 954-284-0747
Email: asherperlin@gmail.com