# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

SHARON WEINSTOCK, et al.,

                        Plaintiffs,

        vs.                            No. 17-cv-23272-RNS

ISLAMIC REPUBLIC OF IRAN, et al.,

                        Defendants.

_____/

## PROPOSED ORDER GRANTING MOTION FOR DEFAULT JUDGMENT

This cause comes before the Court on Plaintiffs' Motion for Default Judgment as to Defendant Iran, and Incorporated Memorandum of Law filed on November 6, 2018 (the "Motion"). Defendant, the Islamic Republic of Iran ("Iran") has failed to file an answer or otherwise defend, and on June 12, 2018, the clerk entered default. The Court has considered the allegations of the Complaint, the Motion, and supporting evidence including, but not limited to, the declarations of the plaintiffs and other lay and expert witnesses. For the reasons that follow, the Court grants Plaintiffs' Motion for Default Judgment, and will enter a separate judgment in favor of each of the plaintiffs, reflecting these findings.

## INTRODUCTION

This is a civil action under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602, et seq., the FSIA's terrorism exception, 28 U.S.C. § 1605A, and foreign law tort claims. The Plaintiffs' claims arise from the shooting murder (the "Terrorist Murder") of the 19-year old U.S. citizen Yitzchak Weinstock by the terrorist group Hamas – Islamic Resistance Movement ("Hamas") on December 1, 1993, near Jerusalem. The Plaintiffs are Yitzchak's estate, mother,

1

and siblings, and the estates of his late father and maternal grandparents[1]. Defendant, Iran, pro-vided substantial material support to Hamas leading up to, and immediately before and including, the date of the Terrorist Murder. As discussed below, Iran's material support enabled, facilitated and caused the murder of Yitzchak Weinstock and the life-shattering emotional harm suffered by the Plaintiffs.

Iran, was served with process in this action as of April 10, 2018. *See* DE 22. However, Iran "failed to plead or otherwise defend" this action, Fed. R. Civ. P. 55(a). After its time to do so expired, the Clerk of the Court entered default against Iran on June 12, 2018 and Plaintiffs have now filed a Motion for Default Judgment as to Defendant Iran. For the reasons that follow the Court grants the Plaintiffs' Motion and enters judgment in accordance with the findings of fact and conclusions of law below.

Part I of this order outlines the legal standards that must be satisfied before the Court may enter default judgment against the foreign sovereign defendant. Part II sets forth the Court's find-ings of fact. Part III presents the Court's conclusions of law as to liability. And, Part IV presents the Court's conclusions of law as to damages.

## I.  Legal Standards for Entry of Default Judgment Against Foreign Sovereign Defendants.

The entry of default judgment is governed by Fed. R. Civ. P. 55. Despite a defendant's refusal to respond to the complaint, "the entry of a default judgment is not automatic." *Mwani*

---

[1] Plaintiffs have established that under the law of the relevant domicile (Israel),  plaintiffs Sharon Wein-stock and Moshe Weinstock are authorized to bring this action on behalf of the estates of Yitzchak Wein-stock and Dov Weinstock and on behalf of Yitzchak's disabled sister, plaintiff Geula Weinstock, and that Sharon Weinstock is authorized to bring this action on behalf of the estates of Simon and Shirley Dolgin. See Declaration of Jeremy Stern, filed in *Weinstock v. Abu Marzook*, Civ. 17-23202 (S.D. Fla.). Similarly, claims that non-U.S. national, Dov Weinstock, would have had while alive passed to his estate upon his death. Shnoor ¶¶ 41, 43 and n.2.

*v. Bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). Rather, a plaintiff seeking a default judgment must establish both subject matter and personal jurisdiction. *See e.g. TracFone Wireless v. Anadisk LLC*, 685 F. Supp. 2d 1304, 1310 (S.D. Fla. 2010); *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 157 (D.D.C. 2017); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016). Additionally, under the FSIA, plaintiffs must also prove their claims or right to relief by proffering evidence that is "satisfactory to the court." 28 U.S.C. § 1608(e); *Compania Interamericana Exp.-Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 951 (11th Cir. 1996); *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court . . . has an obligation to satisfy itself that plaintiffs have established a right to relief.").

A. **To obtain a default judgment, Plaintiffs must establish subject matter and personal jurisdiction and the elements of their claims**.

**1. Standards for subject matter jurisdiction**.

28 U.S.C. 1330(a) provides district courts with ***subject matter jurisdiction*** over any non-jury civil action against a foreign states as to any claim for relief for which the foreign state is not immune under the FSIA. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *GDG Acquisitions LLC v. Gov't of Belize*, 849 F.3d 1299, 1305 (11th Cir. 2017); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002). Thus, subject matter jurisdiction lies only where the plaintiffs establish the applicability of a statutory exception to the foreign state defendant's immunity. See 28 U.S.C. §§ 1604-1607.

The Plaintiffs here maintain that the Court has subject matter jurisdiction under the terrorism exception to foreign sovereign immunity. 28 U.S.C. § 1605A(a). That provision states:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such

> an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). The Plaintiffs here seek money damages against Iran for personal injuries and death that were caused by Iran's provision of material support and resources for the extrajudicial killing of Yitzchak Weinstock. If the Plaintiffs can establish facts supporting the elements of the terrorism immunity exception of § 1605A(a), the court has subject matter jurisdiction.

### 2. Standards for personal jurisdiction

The plaintiffs must also establish the Court's personal jurisdiction over defendant Iran. 28 U.S.C. § 1330(b) provides that **personal jurisdiction** over a foreign state defendant exists as to every claim for which the district court has subject matter jurisdiction so long as service has been made under 28 U.S.C. § 1608. Thus, personal jurisdiction against a foreign state is dependent upon a finding of subject matter jurisdiction and proper service.

### 3. The Plaintiffs' substantive claims against Iran.

The Plaintiffs' substantive claims arise **primarily** under the FSIA's statutory cause of action for state sponsorship of terrorism. *See* Complaint at 14, First Cause of Action; 28 U.S.C.§ 1605A(c). "There is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity.'" *Fritz v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 130008 (D.D.C. 2018), *quoting*, *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017); *see also Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d at 163; *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010)[2]. Thus, "a

---

[2] As other courts have recognized, the vast majority of cases decided under the FSIA's terrorism exception were adjudicated by the district court for the District of Columbia. Due to that court's experience interpreting the relevant provisions this Court will rely on that court's rulings for

plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law." *Fritz*, 2018 U.S. Dist. LEXIS at *86.

Accordingly, if the Plaintiffs establish that their claims are subject to the § 1605A(a) terrorism exception to foreign sovereign immunity, they will necessarily establish subject matter jurisdiction, personal jurisdiction[3], and their right to relief under the FSIA's statutory cause of action found in § 1605A(c). However, the immunity exception found in § 1605A(a) and the cause of action created by § 1605A(c) are not absolutely identical. *Fritz*, 2018 U.S. Dist. LEXIS at *86. The class of plaintiffs that benefit from the immunity exception is ***more*** inclusive than the class of plaintiffs that may assert the statutory cause of action.  *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 572 (7th Cir. 2012); *Owens v. Republic of Sudan*, 864 F.3d 751, 808-809 (D.C. Cir. 2017). Specifically, the statutory claim may be asserted only by plaintiffs who are, ***themselves***, (1) United States nationals, (2) members of the U.S. armed forces, (3) government employees or contractors, or (4) legal representatives of one of the above. See 28 U.S.C. § 1605A(c); *Leibovitch*, 697 F.3d at 572; *Owens*, 864 F.3d at 808-809. By contrast, the immunity exception of § 1605A(a) applies when the ***victim or the claimant*** is a U.S. national, a member of the armed forces, or the a government employee or contractor. *See id.*

All of the Plaintiffs with the exception of Yitzchak's father, Dov Weinstock, are U.S. nationals. See Plaintiffs' Declarations and attached proof of United States citizenship. These Plaintiffs benefit from ***both*** the jurisdictional immunity exception. However, Dov Weinstock was not a U.S. national, and therefore he cannot seek relief under the statutory private right of action of §

---

guidance. See *Leibovitch v. Islamic Republic of Iran,* 697 F.3d 561, 566 (7th Cir. 2012); *Saludes v. Republica De Cuba*, 577 F. Supp. 2d 1243, 1253 n.5 (S.D. Fla. 2008).
[3] To establish personal jurisdiction over Iran, Plaintiffs must also prove that service was properly effected. 28 U.S.C. § 1330(b). As discussed, below, Plaintiffs properly served Iran.

1605A(c). However, because he is a "claimant" suing for injuries suffered by his son, Yitzchak, a U.S. national "victim," Dov may bring claims based upon other causes of action pursuant to the jurisdictional immunity exception of § 1605A(a). *Leibovitch*, 697 F.3d at 572; *Owens*, 864 F.3d at 808-809. Accordingly, Dov's estate pursues a claim under Israeli tort law. Complaint at 15, Second Cause of Action.

B. **The standards as to the type and quantum of evidence required for default judgments are less rigorous than those required in contested cases**.

The FSIA requires plaintiffs seeking default judgment against a foreign state to prove to establish their claims "by evidence satisfactory to the court." 28 U.S.C. §1608(e). Section 1608(e), however, does not provide guidance as to the type or quantum of evidence that is deemed "satisfactory to the court." Notwithstanding the statutory void, courts are to be guided by established principles found in case law. ***First***, neither § 1608(e) nor any other provision of the FSIA requires a court to base its decision upon a particular type of admissible evidence. *Owens v. Republic of Sudan*, 864 F.3d 751, 788 (D.C. Cir. 2017). For example, in *Owens* the D.C. Circuit held that expert testimony, regardless of its form or type is admissible to prove ultimate facts, and that such expert testimony, standing alone, may satisfy the evidentiary burden of §1608(e). The Owens court added that eyewitness testimony or other direct evidence are not necessary. *Id*. at 789.

Additionally, district courts have "an unusual degree of discretion over evidentiary rulings" in FSIA cases against a defaulting state sponsor of terrorism. *Id*. at 785. Because state sponsors of terrorism severely restrict the flow of information, including sources of admissible evidence, courts have allowed plaintiffs to prove their claims using evidence that might not be admissible at trial. *Id*., *citing Han Kim v. Democratic Peoples Republic of Korea*, 774 F.3d 1044, 1048-51 (D.C. Cir. 2014). A plaintiff may not, however, rely exclusively upon inadmis-

6

sible evidence. *Owens,* 864 F.3d at 785.

*Second*, § 1608(e) does not require a district court to conduct an evidentiary hearing so long as the plaintiff's allegations are supported by the evidence. *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994). Plaintiffs may carry their burden of production through the submission of documentary evidence including affidavits and declarations. *Id.*; *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 7 (D.D.C. 2011). "Uncontroverted factual allegations that are supported by admissible evidence are taken as true." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015), citing, *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010).

*Third*, the district court need not make explicit findings of fact. A judgment will stand so long as the record contains an adequate basis for inferring that the district court was satisfied with the evidence submitted. *Owens*, 864 F.3d at 785, *citing Commercial Bank of Kuwait*, 15 F.3d at 242.

*Finally*, the quantum of evidence required for entry of summary judgment under § 1608(e) is the same as that required to defeat a defendant's motion for summary judgment. "To prevail in an FSIA default proceeding, the plaintiffs must present a legally sufficient *prima facie* case, in other words, a legally sufficient evidentiary basis for a reasonable jury to find for the plaintiff." *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 150 (D.D.C. 2010). This standard is identical to that applicable to default judgments against the United Sates under Fed. R. Civ. P. 55(d). *Owens*, 864 F.3d at 785; *Compania Interamericana*, 88 F.3d at 951. Under Rule 55(d), a plaintiff's burden is "not especially onerous." *Giampolo v. Califano*, 628 F.2d 1190, 1194 (9th Cir. 1980). The plaintiff need only present enough evidence "to satisfy the judge that her claim has some factual basis." *Owens*, 864 F.3d at 785, *citing Giampolo*, 628 F.2d at 1194.

Thus, under section 1608(e) the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens*, 864 F.3d at 785.

Based upon the above, and 28 U.S.C. § 1608(e), the Plaintiff must prove the elements of the terrorism exception to foreign sovereign immunity (which establishes subject matter and personal jurisdiction and the elements of the statutory cause of action), and the elements of Dov Weinstock's Israeli law tort claim by proffering evidence that is satisfactory to the Court. With these standards in mind, the Court makes the following findings of fact.

## II.    FINDINGS OF FACT

### A.  The Hamas terrorist attack and murder of Yitzchak Weinstock.

Yitzchak Weinstock was a 19-year old United States citizen who was born and raised in Israel. Sharon 1. Yitzchak came from a family that was warm, loving, and happy. Aryeh 4; T. Dolgin 1. Yitzchak shared an unusually strong bond with his maternal grandparents, Rabbi  Simon and Shirley Dolgin. He was "the apple of their eye," and Yitzchak "adored and admired" his grandfather and always treated his grandparents with the utmost respect.. Sharon 6. Horowitz 3; Harel 2. The Weinstocks often spent holidays and vacations with the Dolgin grandparents, and Yitzchak would often visit them in Jerusalem and help them in various ways. Sharon 6; Harel 2. It is not surprising then, that Yitzchak slept at his grandparents' home the night before he was murdered. Sharon 6.

On the morning of December 1, 1993, Yitzchak left his grandparents home to visit his former teachers at a post-high school yeshiva (religious academy) where he had studied the previous year. Moshe 2. The yeshiva was located north of Jerusalem, and, as was customary in Israel (and remains so), Yitzchak decided to hitchhike a ride to the yeshiva.

On November 30, 1993, Rabbi Yitzchak Shpatz and his adult daughter, Emunah, had spent the night at a Jerusalem hospital with the Rabbi's young son who was being treated for cancer. Y. Shpatz 1; E. Shpatz 1. They had rented a small car to make the hour-long trip between their home and the hospital more convenient. Y. Shpatz 1. Upon renting the car, Rabbi Shpatz decided to use the car to help others, and prayed that the merit of their good deeds, G-d would cure his son. Y. Shpatz 1.

Yitzchak waited at a hitchhiking station near the northern edge of the city and waited for a ride. He was picked up by Rabbi Shpatz and Emunah who were then returning home from the hospital. Two other hitchhikers entered the car with Yitzchak. The Shpatzes did not know any of their passengers. However, Emunah recognized one of them – Shalva Ozanah, who had studied in the same teachers college as Emunah. Y. Shpatz 1; E. Shpatz 1-2. The third hitchhiker was dropped off in an industrial zone on the outskirts of Jerusalem. Y. Shpatz 1.

The car proceeded north on Highway 60. Emunah Shpatz was sitting in the front passenger seat and Yitzchak and Shalva were sitting in the rear. Y. Shpatz 2. Emunah and Shalva struck up a conversation. Y. Shpatz 2.  As the car approached the Palestinian town of Al-Bireh, approximately 20 minutes outside of Jerusalem, the car's exhaust pipe broke and was dragging under the car. Rabbi Shpatz stopped the car to attempt a simple, if temporary, repair, and Yitzchak exited the car to help. Y. Shpatz 2.

The two were lying on their backs with their upper bodies under the chassis working on the car. Emunah and Shalva remained in the car and chatted. Rabbi Shpatz, heard the sound of a car approaching and slowing, almost to a stop. Suddenly, the sound of automatic gunfire erupted. Y. Shpatz 2. Rabbi Shpatz and Yitzchak both froze in place; it seemed the safest place was under the car. Y. Shpatz 2. The terrorists' car continued slowly forward as the shooters continued their

"blazing" gunfire. Shpatz 2. Rabbi Shpatz, who had previously served in a combat role in the military, recognized from the sound of the gunfire that there must have been at least two gunmen armed with automatic weapons. Y. Shpatz 2; E. Shpatz 2.

The bullets were flying around Rabbi Shpatz, and he was hit and injured in several places. Y. Shpatz 1. E. Shpatz 3. Fortunately, his injuries were not serious. Y. Shpatz 1. Rabbi Shpatz heard Yitzchak release a sigh. But, while the shooting continued, they were helpless. Y. Shpatz 3. Only an hour earlier, Yitzchak was visiting with his grandparents at their home in Jerusalem. Glasser 2.

Inside the car, Emunah heard the shooting, but, at first, she did not understand that she and her fellow travelers were the target. E. Shpatz 2. When she heard Shalva scream and saw her fall back on her seat, Emunah ducked for cover as close as she could to the floor of the car. Emunah covered her head with her hands and prayed. E. Shpatz 2.

Finally, the shooting stopped, Rabbi Shpatz saw that Yitzchak had been badly wounded. He was gushing blood from a large wound next to his shoulder. Y. Shpatz. Rabbi Shpatz attempted to stop Yitzchak's bleeding while simultaneously trying to flag cars for help. Y. Shpatz 3. A couple of civilian cars stopped, but none of the drivers knew first aid. This was before the widespread use of cell phones, and none of the drivers had any communications equipment. Y. Shpatz 3. A few minutes later, a military jeep stopped and the officer radioed for additional forces and ambulances. The officer had a small first aid kit. Rabbi Shpatz applied a tourniquet and bandages to stop Yitzchak's bleeding. He then joined Emunah who was unable to help Shalva, who had fallen to the floor in the back of the car. E. Shpatz 2; Y. Shpatz 3. The two administered CPR on Shalva until the ambulances arrived and the emergency medical technicians took over. E. Shpatz 3; Y. Shpatz 3.

10

Both Yitzchak and Emunah Shpatz were lightly wounded. E. Shpatz 3. Shalva Ozanah died of her wounds. Yitzchak Weinstock was taken to a hospital in Jerusalem and was rushed into surgery. His extended family and several friends and neighbors, and even some complete strangers who had heard about the shooting gathered at the hospital to await news and to pray. Sharon 2; Moshe 2; J. Dolgin 2; Horowitz 2. Yitzchak survived for 18 hours while the doctors fought to save his life. But he had multiple injuries and lost massive amounts of blood. Sharon 2. At approximately 1:00 am the following morning a doctor emerged from the operating room and approached Yitzchak's parents. He tried to break the horrific news slowly because he knew that Dov had previously had a heart attack. Sharon 2. But, as empathetic and gentle as the surgeon was, Yitzchak's death would forever shatter the lives of his parents, siblings and grandparents.

### B.  Iran provided material support and resources that enabled Hamas to carry out the Terrorist Murder of Yitzchak Weinstock.

#### 1.  Plaintiffs' experts on Iran's material support for Hamas.

Plaintiffs have submitted the verified reports of three renowned experts on Iran and its relationships with various terrorist organizations. Dr. Patrick Clawson is the Director of Research at the Washington Institute for Near East Policy (the "Washington Institute"). Clawson ¶ 2.  He has previously worked as senior research professor at the Institute for National Strategic Studies of the National Defense University and senior economist at the Foreign Policy Research Institute, the World Bank, and the International Monetary Fund. Dr. Clawson has spent most of his professional life studying the Middle East and, in particular, Iran. Clawson ¶ 2. Among other things, Dr. Clawson has performed in extensive research regarding the Iranian Ministry of Intelligence and Security ("MOIS"), the Iranian Revolutionary Guard Corps (the "IRGC") and its Qods Division ("IRGC-QF") and the Iranian financial and banking system. Clawson ¶ 3. Dr.

Clawson regularly briefs and receives briefings from senior United States military officials and senior officials of other governments friendly to the United States about the threats from Iran, Iranian support of terrorism and Iranian strategy regarding terrorism. Clawson ¶ 4. He has been qualified as an expert on Iran and Iran's support for terrorism in numerous federal cases. See Clawson ¶ 6 (citing cases).

Dr. Clawson's knowledge regarding Iran's sponsorship of terrorism is based upon his routine and in-depth access to facts concerning Iran and its support for terrorism, among other things, as detained in his declaration. Clawson ¶ 17.  Additionally, in formulating his opinion herein, Dr. Clawson relies heavily on U.S. government reports and designations of entities as being involved in terrorism, all of which are "particularly reliable and are widely used by scholars and policymakers," and are "the product of detailed and careful collection of information (much of it from classified sources) and drawing conclusions." Clawson ¶¶ 18-19. Dr. Clawson is also based upon his "education, research and experience, as well as [his] review and analysis of documents and sources typically relied upon by experts in [his] field." Clawson ¶ 20.

Dr. Matthew Levitt is a noted expert in international terrorism, with a focus on Middle East terrorist groups, with particular expertise in terrorist groups' logistical and financial support networks. Levitt ¶ 1. Dr. Levitt is presently the Director of the Program on Counterterrorism and Intelligence at the Washington Institute. Levitt ¶ 7. He holds a Ph.D. in International Relations from the Fletcher School of Law and Diplomacy at Tufts University. Levitt ¶ 2. Dr. Levitt was previously employed as a counterterrorism intelligence analyst with the Federal Bureau of Investigation, providing tactical and strategic analysis in support of counterterrorism operations. Levitt. ¶ 4. Dr. Levitt also served as Deputy Assistant Secretary for Intelligence and Analysis in the United States Department of the Treasury. Levitt. ¶ 6. There he was awarded the Treasury

12

department's "Exceptional Service Award" for his efforts to protect the United States financial system from abuse and to prevent terrorists, weapons proliferators and other rogue actors the ability to finance threats to United States national security. Levitt ¶ 6. Dr. Levitt served as an advisor on counterterrorism and intelligence for the State Department's Special Envoy Middle East Regional Security, where he was involved in efforts to resolve the Israeli-Palestinian conflict through a two-state solution. Levitt ¶ 6. Former CIA director R. James Woolsey described Dr. Levitt's book on the Hamas terrorist organization as "Far and away the best thing on this subject I've ever seen; well-written, careful, professional, fascinating." Levitt ¶ 9.

Dr. Levitt bases his opinion upon his academic studies, research including field research, travel in the Middle East, and work in counterterrorism intelligence, with a focus on Palestinian terrorist groups like Hamas and their state sponsors, led by Iran. Levitt. ¶ 18. His sources include "conversations with other experts, officials, academics and others, academic and professional lectures and review of books, newspapers, academic and policy journals, and research these materials on the internet (including the websites, video and audio clips and images on sites geared towards counterterrorism and those of terrorist groups and their sympathizers as well)." Levitt ¶ 18.

Dr. Ronni Shaked holds a Ph.D. from the Hebrew University in Middle Eastern and Social Psychology, with a focus on the psychological aspects of the Israeli-Palestinian conflict. Shaked ¶ 12. Between 1969 and 1982 Dr. Shaked worked for the Israeli government's intelligence and investigatory agency responsible for combating terrorism in Israel, the West Bank and Gaza Strip. Shaked ¶ 3. During his tenure there, he held various senior positions, including Commander of the Jerusalem Sector and Commander of the Ramallah Sector. In this capacity, he supervised agents who worked within terrorist organizations, conducted interrogations of terror-

13

ist operatives, and led operations aimed at defeating terrorist operations. Shaked ¶¶ 4-5. Dr. Shaked also worked as an analyst for a leading Israeli newspaper and in that capacity conducted interviews with several important Hamas leaders. Shaked ¶¶ 6-8. As part of his professional work and research, he still frequently interviews and speaks with operatives and other members of Hamas and other terrorist groups and exchanges information with American and Israeli security and intelligence officials. Shaked ¶ 23. Dr. Shaked enjoys access to documents and evidence gathered by American and Israeli intelligence and law enforcement officials, including statements and confessions made by Hamas and other terrorist operatives. Shaked ¶ 23.

Dr. Shaked  has been recognized as an expert on Palestinian terrorism and Hamas by numerous bodies within the United States and Israeli governments and has served as an expert witness in several United States federal civil actions. Shaked ¶¶ 13-17, 19, 20, 22. Between 1988 and 1999, Dr. Shaked was a lecturer in Palestinian affairs at the Hebrew University of Jerusalem. Shaked ¶ 24. He presently serves as the Head of the Middle East unit at the Harry Truman Institute for the Advancement of Peace at the Hebrew University. Shaked ¶ 25. Dr. Shaked states that he confirmed his findings and research by cross-referencing sources of information, comparing versions of events as described by sources representing conflicting sides of a conflict and different views. Shaked ¶ 9.

> **2. Iran supports Palestinian terrorism to further its revolutionary ideals, fight Israel and undermine American influence in the Middle East.**

Since its 1979 revolution, Iran has been "implacably opposed to the existence of the state of Israel." Clawson ¶ 24. Iran's leaders regularly refer to Israel as a "cancer." Id. Iran also views the United States as "a hostile power determined to overthrow the Iranian revolution. Clawson ¶

25. Thus, Iran's opposition to both Israel and the United States are among the "cornerstone[s] of its revolutionary ideology." Clawson ¶¶ 24-25.

Iran views Palestinian Islamist groups as "an important means to gain support for its Islamist revolutionary ideology among Sunni Muslims who may otherwise be hesitant to support the Shia Islamic Republic of Iran." Clawson ¶ 24. Palestinian terrorist groups help Iran fight Israel and undermine U.S. influence in the Middle East. Clawson ¶ 25-26. The CIA described Iran as "the foremost state sponsor or terrorism." Levitt 64.

For more than 30 years, Iran has provided funding and training for terrorism, including Hamas terrorism, that targets United States and Israeli citizens. Clawson ¶ 28. Since 1984 the Department of State has continuously listed Iran on its list of state sponsors of terrorism. Clawson ¶ 27. Under U.S. law, the Department of State is obligated to provide Congress with a report on terrorism with regard to counties meeting certain criteria. Clawson ¶ 27. These reports were originally titled Patterns of Global Terrorism and are now titled, "Country Reports on Terrorism." Clawson ¶ 27. The Patterns of Global Terrorism report for 1993 states:

> Iran supports many other radical organizations that have resorted to terrorism, including the PIJ, the PFLP-GC, and HAMAS.  Iranian leaders have worked to develop a rejectionist front, compromising Hizballah and 10 Palestinian groups based in Damascus, to counter the Middle East process

Clawson ¶ 27.

### 3.   Hamas seeks to eliminate the State of Israel and to replace it with an Islamic state.

Hamas was established in 1987 by Palestinian militants opposed to the existence of Israel. Clawson ¶ 29; Levitt ¶ 19. Its founders were Sunni Islamist militants who were closely associated with the Egyptian militant Muslim Brotherhood organization. Clawson ¶ 29; Levitt ¶ 19.

Hamas was founded with the goal of eliminating the state of Israel and replacing it with an Islamic state. Levitt ¶ 19. In furtherance of this goal, Hamas has employed a three-pronged strategy, comprised of: (1) social welfare activity designed to build grass roots support for the organization, its ideology, and its commitment to violent opposition to Israel and the peace process; (2) political activity to compete for influence with the secular Palestinian Authority; and (3) guerilla and terrorist attacks that target Israeli soldiers and civilians as well as Palestinians who oppose Hamas. Levitt ¶ 19. Thus even in its early years Hamas engaged in terrorist attacks that claimed the lives of nationals of many countries. Levitt ¶ 21; Clawson ¶ 30; Shaked ¶ 28. However at that time Hamas was focused more on the social and political prongs than on terrorism. Clawson ¶ 30; Shaked ¶ 28.

### 4. Iran induces Hamas to increase its terrorist activities in an ongoing campaign to prevent peace between Israel and its Arab neighbors.

Beginning in late 1991, Hamas shifted its focus towards terrorist activity and initiated "a systematic, on-going and active campaign of terrorist armed struggle." Clawson ¶ 38. Furious with the American efforts to forge peace between Israel and the Palestinians represented by the October 1991 Madrid Peace Conference, Iran convened its own anti-peace conference – the International Conference for the Support of the Muslim Palestinian People's Revolution. Clawson ¶ 32. During its conference, Iran offered $2 million per month in support to organizations that would declare their opposition to peace negotiations with Israel. Clawson ¶ 33.

The Iran-Hamas alliance was further enhanced when, in December 1992, Israel deported to Lebanon approximately 300-400 Hamas activists to an area in southern Lebanon. Levitt ¶ 47, Clawson ¶ 39-40. The Lebanese army prevented the Hamas terrorists from proceeding further north, and they were forced to remain in an area called Marj al-Zuhur, which placed them in close proximity to strongholds occupied by Iranian proxy, Hizballah. Clawson ¶ 39. While there,

16

the Hamas terrorists came into direct contact with Iranian representatives, including both the Iranian Revolutionary Guards and Hizballah (which is itself an Iranian "proxy"), who began providing the Hamas terrorists with financial support and military training. Shaked ¶¶ 28-29; Clawson ¶¶ 39, 40 (Dr. Clawson notes that these facts were accepted by the United States District Court for the District of Columbia in *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 293 (D.D.C. 2003)).

Dr. Levitt quotes from the State Department's Patterns in Global Terrorism for 1992, which explicitly discussed "a considerable upsurge in violence carried out by [Hamas]." Levitt ¶ 51. The State Department report acknowledged Iran's growing role in Hamas's terrorism: "In October, Tehran hosted a series of high-profile meetings with Hizballah and Hamas with the stated goal of coordinating their efforts against Israel and bringing the Arab-Israeli peace talks to a halt." Levitt ¶ 51. Those meetings bore fruit.

> **5.  Iran deliberately induces Hamas to escalate terrorist attacks against Israel by increasing its financial and military support for the terrorist organization**.

Iran's provision of material support to Hamas was a matter of official government policy. Clawson ¶ 42. The meetings between Iran and Hamas were announced publicly by the government, demonstrating that the support Iran provided was the result of deliberate government policy. Clawson ¶ 42. This policy was adopted and implemented by Iranian government officials including those at the highest levels of government. These officials included, President Rafsanjani, Foreign Minister Velayati, and Supreme Leader Ayatollah Khamenei, among others. Clawson ¶ 42. The Iranian officials and representatives acted in accordance with their "approved roles and pursuant to official Iranian government policy directives." Clawson ¶ 42.

In a now-declassified report from December 1992, the CIA recognized that "[t]errorism was a key component of Iranian foreign policy in 1992 and will remain so in the year ahead."

17

Levitt ¶ 43. A State Department report found that "Iranian leaders have worked to develop a re-jectionist front" that included Hamas among ten other radical terrorist organizations. Levitt ¶ 44. In December 1992, Hamas and Iran entered into an agreement under which Hamas would esca-late attacks against Israel and Iran would provide Hamas financial and military assistance. Levitt ¶ 37. In accordance with this understanding, the Iranian government budget for 1993 included financial support for Hamas in an amount estimated at between $15 million and $30 million. Clawson ¶¶ 33-36; Levitt ¶¶ 46, 48-50. The brother of Iran's then-President Hashemi Rafsanjani headed the department of the Iranian foreign ministry that coordinated the funding of Hamas. Levitt ¶ 41. U.S. government officials noted that Iran was using its vast resources, including fi-nancial and military resources to encourage and enable the Hamas terrorist attacks. Levitt ¶ 45, 46. The State Department report noted Hamas's leading role in the "violent opposition to the peace efforts, with civilians serving as frequent targets." Levitt ¶ 44.

To appreciate the significance of the new Iranian financial support, began in 1993 to flow annually to Hamas, these numbers must be contrasted with Hamas's foreign support until that point. A January 1993 Israeli government report estimated the external financial support for Ha-mas to be a mere $1 million. Levitt ¶ 47.  During the 1980s only 10% of Hamas's funding came from Iran. But, by the beginning of 1993, Iran contributed the lion's share of Hamas's multi-million dollar budget. Levitt ¶34. Iranian financing enables Hamas "to cover operational costs – weapons, intelligence, sanctuary, safe haven, operational space, and training – as well as long-term organizational costs, such as leadership ideology, human resources and recruitment, media, propaganda, public relations and publicity. Levitt ¶¶ 33, 56.

The new Iranian support for Hamas was not limited to money. Levitt ¶ 42 (Iran's support for Hamas included "financing, weapons, training, intelligence and more."), ¶ 55; Clawson ¶ 36

18

(quoting  a December 1992 article saying "Iran is training, arming, and financing militants" including Hamas). In October 1992, Iran committed to providing Hamas with office space in a Tehran office building across from the Foreign Ministry. Levitt ¶ 59. Additionally, Iran began providing military training to Hamas at three different centers in Iran as well as centers in the Sudan, and in Lebanon, where the training was provided by Iran's proxy, Hizballah. Shaked ¶¶ 28, 30; Levitt ¶ 49-50, 60. And, as acknowledged by U.S. government officials, Iran was also arming Hamas at that time. Levitt ¶ 55.

Dr. Shaked provides examples of the type of military training Iran provided the Hamas operatives. Shaked ¶¶ 28-30. In a statement provided to Israeli police, Hamas operative, Sharif Dehabrah, stated that after being recruited in Chicago, he was sent for training in Lebanon. Shaked ¶ 28.  Dehabrah describes being provided with a false passport and transported to a Hizballah[4] training camp in Lebanon via Germany, Jordan, and Syria. Dehabrah remained in the Hizballah training camp for two months and learned how to use a broad range of weapons, including "Kalashnikov, M-16, a Val rifle, a PKS rifle, a 500 machine-gun, a 9 -millimeter pistol, an Israeli Galil rifle, RPG, anti-tank-missiles. Also explosives, including TNT and plastic explosives. During the course we moved from buildings to tents, depending on the training; part of the time we slept in regular rooms and sometimes in tents. Rizak and I each received a Kalashnikov as a personal weapon." Shaked ¶ 28. After completing the training, he was returned to Damas-

---

[4] Dr. Clawson states that Hizballah is an Iranian creation, proxy and agent. Clawson ¶ 41-43. He provides extensive support for this conclusion. Thus, material support from Hizballah equates to material support from Iran itself because Hizballah is a mere Iranian. Other courts have reached the same conclusion. "Iran's control over Hizballah is so far-reaching that this Court has repeatedly held Iran vicariously liable, under the doctrine of respondeat superior, for actions of Hizballah." *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 292 n.5 (D.D.C. 2003) (citing cases). *See also e.g. Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 61 (D.D.C. 2018) ("Consistent with numerous other decisions from this Court, the Court … finds that Hezbollah is an Iranian proxy.") (citing cases)

cus, Syria. Shaked ¶ 28. Dehabrah was informed that following his training he would be sent back to the Ramallah area of the West Bank with instructions to set up an infrastructure for the Hamas military organization and to recruit more terrorist cells to carry out attacks. Shaked ¶ 28.

Dr. Shaked quotes another Hamas operative who underwent three months of training in Iran in 1993. Shaked ¶ 30.

> We trained with weapons, preparing and building bombs, and ambushes. We had maybe 10 instructors, all Iranians, and a translator translated what they said.

> We also learned how to shoot, how to prepare bombs and mines; we also learned to prepare bombs with TNT We fired a LAW missile, an RPG and an M-16. We fired an Iranian weapon called a G-3, an Uzi, a Grinov which is a Russian weapon, and a Dushka which is a heavy machine-gun. We fired a Baretta pistol, and others. We learned how to disassemble mines in order to extract the explosives for our use. We trained to throw grenades, and we threw different types of grenades. We also learned about ambushes against soldiers on foot, or against vehicles, about passing by the site of ambush and about collecting intelligence about the site of the ambush.

Shaked ¶ 30. Dr. Shaked found that the "combination of Iranian training and complementary massive Iranian funding provided to Hamas in 1992-1993 served together to qualitatively 'elevate' Hamas into the ranks of the 'major league' terrorist organizations, making it far more effective and deadly. Shaked ¶ 36.

### 6.   Iranian material support is critical to Hamas's ability to function.

Since 1992, Iran has played a critical role in financing, providing material support, arming and training Hamas and its terrorist operatives. Levitt ¶ 23; Shaked ¶ 37. Indeed, without Iranian funding, training, intelligence, and other support, Hamas could not have become the "major

league" terrorist operation that it is. Shaked  ¶¶36, 37; Levitt ¶ 24. "In the late 1980s and early 1990s, prior to receiving professional terrorist training from Iran and its proxy, Hizballah, the operational terrorist capabilities of Hamas were limited; it could not mount sustained, organized or focused terrorist activities." Shaked ¶ 37. Iranian financial support that increased so dramatically in late 1992 or early 1993 enabled Hamas to expand greatly all of its activities. Shaked ¶¶ 33-34. Additionally, once the "Iranian funds began to flow to Hamas, Hamas was able to recruit more members and hire more employees, spread more propaganda indoctrination and incitement, purchase more matériel, and carry out more terror attacks." Shaked ¶ 34. The dramatic increase in Iranian funding also enabled Hamas to "seriously exploit and implement the terrorist knowledge and skills acquired by the cadre of Hamas operatives trained by Iran." Shaked ¶ 35. "Having a professional 'officer corps' newly-trained by Iran would have been of limited use to Hamas without the massive financial resources necessary to fund this new cadre of terrorist "officers," and to place both me and matériel at their disposal." Shaked ¶ 35. By 1993, Iran was underwriting Hamas's operations and covering its expenses, including those for weapons and ammunition, explosive precursors, chemicals for bombs and poisoning, safe houses, communications, travel, transportation, bribes, intelligence payments, and training." Levitt ¶ 25.

The military training Iran provided transformed Hamas as a terrorist force. Until it began to receive professional military training from Iran, and from Iran's proxy in Lebanon, Hezbollah in the early 1990's, Hamas was unable to translate its call for *jihad*, or holy war, into systematic and sustained campaigns of terrorism. Shaked. ¶ 28. The Hamas operatives who were trained by Iran and Hizballah returned to the West Bank and Gaza strip in 1992-1993, where they assumed roles as commanders and military instructors. They organized, planned and carried out hundreds of deadly attacks in the years since, and taught thousands of local Hamas operatives what they

21

had learned from their Iranian training. Shaked ¶ 31. "Simply stated, starting in 1992, Iran trained the terrorist 'officer corps' of Hamas." Shaked ¶ 32.

Funds that may have been directed to Hamas's social services network contributed to its terrorist goals by procuring group loyalty, facilitating recruitment and enabling Hamas to "'harvest' specific talent within its membership." Levitt ¶ 54, 55. Moreover, Iranian support for Hamas's political and social activities has always been primarily intended to boosts Hamas's abilities as a terrorist organization. Levitt ¶¶ 25, 37. And because money is fungible, funds raised for Hamas's social services in fact benefits all of Hamas's activities. Levitt ¶ 25.

Dr. Levitt explains that an isolated terrorist attack may be relatively inexpensive. Levitt ¶ 27. However, Dr. Levitt concludes that to achieve an accurate accounting, one cannot isolate the cost incurred in the executing a single attack. Levitt ¶ 27. A true accounting of the cost of an attack must factor in "the high cost of maintaining the financial and logistical support network that terrorists carrying out such attacks must draw upon time and again." Levitt ¶ 27. The excerpts quoted by Dr. Shaked from the two Hamas confessions demonstrate the extent of the support necessary to recruit and train operatives to undertake what may appear to be a simple attack. See Shaked ¶¶ 28, 30. Thus, the real cost of any given attack includes long term expenses such as rent for safe houses, buying loyalties, maintaining the physical infrastructure  of the terrorist network, paying member salaries, printing posters and banners and other costs. Levitt ¶ 27. Other expenses that are critical to sustain a terrorist organization and that contribute to each terrorist attack include indoctrination and propaganda, recruitment, training, and logistical support. Levitt ¶ 27.

Dr. Levitt cites the State Department for his conclusion that "Iranian state sponsorship of Hamas is critical not only in terms of providing the material and funds with which to carry out

terrorist operations, but also the rhetorical support necessary to keep up the pace of such operations." Levitt ¶ 27. Dr. Levitt opines that "Hamas would be nowhere near as capable a terrorist organization as it has become were it not for the funding, training, and weapons it has received from Iran.: Levitt ¶ 28; Shaked ¶ 39. Dr. Shaked concluded (Shaked ¶ 37):

> As a result of this training, which was passed on to innumerable other Hamas operatives in the West Bank and Gaza, and the huge influx of Iranian funds, Hamas became a highly competent terrorist organization, able to deploy and task tightly compartmentalized terror cells in different regions of the West Bank and Gaza, that successfully planned and executed repeated attacks against Israeli and Jewish targets (sometimes without being apprehended or interdicted for months or years, if at all).

As the facts of the Terrorist Murder demonstrate, Iran's policy of investing in Hamas to turn it into a "an organized, disciplined, well-funded and highly-trained terrorist army" paid off.

### 7. Iranian support enabled and facilitated the Terrorist Murder of Yitzchak Weinstock.

Iranian support, both financial and military "transformed Hamas into an organized, well-funded, and highly trained terrorist army" that was capable of carrying out numerous terrorist attacks like the Terrorist Murder of Yitzchak Weinstock. Shaked ¶ 38; Levitt ¶ 58-60. By the time Hamas murdered Yitzchak Weinstock, Iran was providing Hamas with money, weapons and training for the purpose of enabling and encouraging Hamas to carry out attacks like the Terrorist Murder. Levitt ¶ 59-60. Iran's provision of military training to Hamas vastly improved Hamas's operational capabilities as a terrorist organization. Shaked ¶¶ 36-39. Indeed, the training Hamas received from Iran in 1992 was the watershed event in Hamas's development as a professional and effective terrorist organization. Shaked ¶¶ 36-39; Clawson ¶ 40.

By December 1993, nearly all of the hundreds of Hamas members that Israel had ex-

pelled to Lebanon had returned to the West Bank and Gaza Strip. These returning members were armed with professional, Iranian-supplied training in munitions and explosives and quickly established an operational and organizational infrastructure far more deadly and effective than that which Hamas had previously been capable of maintaining. Shaked ¶¶ 28-31. This sharp rise in operational ability was coupled with the massive increase in Iranian funding that began at the end of 1992 and turned Hamas into a major terrorist force that carried out the Terrorist Murder of Yitzchak Weinstock and countless other attacks in the following years. Shaked ¶¶ 36-39.

### C. Hamas perpetrated the Terrorist Murder of Yitzchak Weinstock.

#### 1. Plaintiff's Expert, Arieh Dan Spitzen.

Plaintiffs have submitted the verified expert report of Arieh Dan Spitzen, an expert on Palestinian affairs and society and the structure, leadership, personnel, and activities of various Palestinian terror groups, including Hamas. Spitzen ¶ 1. Between 1976 and 2009, Mr. Spitzen served in various positions in which his work focused on Palestinian Affairs. Spitzen ¶ 3. Most of these positions were within in duties within the Israel Defense Forces ("IDF") where he reached the rank of Colonel.  Spitzen ¶¶ 3, 6, 7.

From 1981 to 1993, Mr. Spitzen served as Head of the Research Section in the IDF's Office for the Advisor for Arab Affairs in the West Bank, and as Deputy Advisor. In these capacities, he was involved in researching the socio-economic and political situation of the Palestinian population; he supervised a team of approximately ten researchers; he prepared and supervised the preparation of hundreds of research papers, staff papers, articles, anthologies and studies in Palestinian matters, which were used and relied upon by high level officials in the Israeli government and military. Spitzen ¶ 4.

Between 1993 and 1996, Mr. Spitzen participated in the negotiations between Israel and the Palestinians that resulted in the Oslo Pease Accords, and participated in the negotiation of the transfer of authority from the IDF Civil Administration to the Palestinian Authority. Between 1998 and 2000 Mr. Spitzen served as the IDF Civil Administration's Department Head for Palestinian Affairs in the West Bank. Spitzen ¶ 6. From 2001 to 2009, Mr. Spitzen was Department Head for Palestinian Affairs in the West Bank and Gaza and the Advisor to the Coordinator of Government Activities in the Territories (COGAT). Spitzen ¶ 7.

In his various roles, Mr. Spitzen researched and supervised research relating to Palestinian affairs; drafted and presented research an policy papers, and briefed senior Israeli and foreign governmental and military officials on Palestinian affairs. Spitzen ¶¶ 7. Mr. Spitzen became the top authority on the socio-economic civilian situation in the West Bank and Gaza, and was responsible for writing or supervising the writing of hundreds of surveys and studies about political and social trends, the economic atmosphere and its influence, and other diverse issues connected to the Palestinian realm. Spitzen ¶ 7. In this capacity, his research included the activities of Hamas and other terror organization, and he was responsible for writing an annual comprehensive survey regarding the civilian infrastructure of Hamas. Spitzen ¶ 7. During his military service, Mr. Spitzen frequently lectured on Palestinian affairs in various forums, including meetings sponsored by universities and research institutes. Spitzen ¶ 11.

Mr. Spitzen continues to serve in the IDF Reserves as an emergency Department Head for Palestinian Affairs in COGAT. He is currently an independent consultant in matters of Palestinian affairs. His clients include government agencies, research institutes, and private parties. Spitzen ¶ 9. Mr. Spitzen is a popular media commentator on Palestinian affairs and is often interviewed on Arabic television networks. Spitzen ¶ 12.  He has served as an expert witness in Pales-

tinian affairs in numerous United States civil lawsuits and in dozens of cases in Israel, including cases in the Israeli Supreme Court. Spitzen ¶10, 13.

**2.  Hamas carried out the attack in which Yitzchak Weinstock was murdered**.

The individual perpetrators of the Terrorist Murder escaped capture and were never positively identified or tried for the attack. Spitzen ¶ 18 n.1. However, Hamas claimed responsibility for the attack in an official proclamation issued by its military wing, the Izz a-din al-Qassem Brigades and distributed throughout the West Bank. Spitzen ¶ 31. The proclamation is not dated. However, Mr. Spitzen opines that it was probably issued by Hamas a short time after December 6, 1993. Spitzen ¶ 32 n.2.

Mr. Spitzen explains why the proclamation constitutes compelling evidence of Hamas's responsibility for the attack:

> Between June 1967 and early 1994 (when the Palestinian Authority was established) the entire West Bank and Gaza Strip were governed by Israel. Initially, Israel governed these territories through its Ministry of Defense and the IDF. Israel later created separate, dedicated bodies, the "Coordinator of Government Activities in the Territories" (COGAT) (established 1970) and the "Civil Administration" (established 1981) to govern the West Bank and Gaza. COGAT and the Civil Administration are subordinate to the Defense Ministry, but, unlike the IDF, they are specialized entities specifically created and operated for the dedicated purpose of governing these areas. Spitzen ¶ 19.

> During this period, Palestinian organizations that were hostile toward Israel could not operate openly and "above ground," much less maintain radio or television stations to communicate with the Palestinian public or the world at large. Nor could they use the internet, which was then in its infancy, for that purpose. Spitzen ¶ 20.

Rather, the main method of public communication utilized during those years by the Palestinian nationalist, Islamic and other anti-Israel political organizations in the West Bank and Gaza (including Hamas, the various factions of the PLO, and others) were official typewritten proclamations, which were surreptitiously printed by the respective groups in the thousands or tens of thousands, and physically distributed in Palestinian towns and villages.  Spitzen ¶ 21.

These organizational proclamations were typically published several times a week, sometimes daily, by the various groups. They addressed a very large spectrum of topics, including general or specific statements of policy, and statements responding to current events, including the actions and statements of rival groups, of Israel, or of foreign leaders or nations. The proclamations frequently contained instructions or directives from the various groups to the Palestinian public – or at least to their specific constituencies. For example, if one or more Palestinian groups wanted to initiate or terminate a public commercial strike (a tactic frequently used in those years to pressure Israel), they would so instruct the Palestinian public, through these printed proclamations. Spitzen ¶ 22.

Likewise, these proclamations were used by the different Palestinian organizations, including Hamas, to take "credit" for the terrorist attacks they carried out, to explain the reasons behind such attacks and the goals they were trying to achieve, and to threaten additional attacks. Spitzen ¶ 23.

In light of all the above, these organizational proclamations were of extreme interest to Israel, and particularly to the Israeli entities specifically responsible for governing the West Bank and Gaza Strip, i.e., COGAT and the Civil Administration. Since 1967, the Israeli Defense Ministry, including the IDF, COGAT and the Civil Administration, have

dedicated enormous human and material resources to researching and seeking to understand political, social and economic developments and trends in the West Bank and Gaza. By systematically collecting and analyzing these proclamations, Israel could track political trends and developments in the West Bank and Gaza, anticipate and meet threats of terrorism and violence, and formulate policies. Spitzen ¶ 24.

Accordingly, the Civil Administration did exactly that: it collected these proclamations on an on-going basis, translated them in whole or in part as necessary, analyzed them in writing, and circulated these analyses internally. Moreover, between 1988 and 1995, the Civil Administration published an internal serial periodical regarding these Palestinian organizational proclamations, which eventually comprised more than 20 bound volumes and many thousands of pages, entitled: "**The Proclamations as a Means of Social Guidance**" (hereinafter: the "Proclamations Series"). Spitzen ¶ 25.

The Proclamations Series contained actual reproductions (photostats) of the organizational proclamations distributed throughout the West Bank and Gaza by the respective Palestinian groups, accompanied by partial translations, summaries, and analysis by Civil Administration specialists. The Series is chronological, and is subdivided by organization during each time period. Because it contains extensive analysis, and to shield the identity of sources who provided the proclamations to the Israeli Civil Administration, the Proclamations Series is classified. Spitzen ¶ 26.

The Court notes that Mr. Spitzen has unique insight into the significance of these "proclamations" and the "Proclamation Series." He served for several years in very senior roles within COGAT and the Civil Administration during his military career and reserve duty. Spitzen ¶¶ 6-8. His primary duties involved researching and assessing Palestinian affairs and reporting on those

28

affairs to the Head of COGAT, who, in turn, answered only to the Defense Minister and the Chief of Staff. Spitzen ¶ 7.

After unsuccessful efforts to find an extant copy of the Proclamation Series, Mr. Spitzen learned that while none of the IDF, the Civil Administration, nor COGAT retained copies of the Proclamation Series, a single copy had been deposited in the National Library. Spitzen ¶¶ 28-29. Mr. Spitzen applied for permission to view the Proclamation Series, which as of May 2017, remained classified. Spitzen ¶ 30. Mr. Spitzen was granted authority and found the proclamation published by Hamas's Izz a-din al Qassem Brigades claiming responsibility for the attack. Spitzen 31.

The Hamas proclamation includes details of the attack (an ambush on a vehicle) including the location of the shooting (near El Bireh), the number of terrorists who carried it out (3), and the number of victims (2 fatalities and 2 injured). Spitzen ¶ 33 and n.3. Mr. Spitzen is certain that the Hamas proclamation is an authentic copy of what it purports to be – a formal statement published by Hamas in December 1993, confirming that it carried out the attack in which Yitzchak Weinstock was murdered (and five other attacks). Spitzen ¶ 33.

Mr. Spitzen concluded that there is no reason to doubt the veracity of the Hamas claim of responsibility in the proclamation. Mr., Spitzen stated that Palestinian terrorist groups in general, and Hamas in particular do not falsely claim credit for attacks they did not commit. Spitzen ¶ 34. *First*, a false claim of credit can be easily exposed resulting in a loss of credibility for the organization in the eyes of the Palestinian public and the world. Mr. Spitzen states that Hamas, which has always prided itself on transparency, honesty and credibility would surely want to avoid such an embarrassment. Spitzen ¶ 34. This concern would be magnified here because the claim of responsibility was made through an official proclamation by Hamas leadership distributed directly

to the Palestinian public. Spitzen ¶ 34. *Second*, terrorist attacks against Israeli targets carry the very real danger of a harsh Israeli response against the leadership and operatives of the organization involved. Palestinian terror groups therefore do not lightly admit to carrying out such attacks. Spitzen ¶ 34.

The Court credits Mr. Spitzen's report and accepts its description of the purpose of proclamations for Hamas, the authenticity of the proclamation claiming responsibility for the Terrorist Murder, and the reliability of Hamas's proclamation. Accordingly, the Court finds that Hamas carried out the attack and murdered Yitzchak Weinstock.

D. **The Plaintiffs suffered grievous injuries as a result of Iran's conduct**.

1. **Yitzchak Weinstock**.

Yitzchak Weinstock grew up in a "dynamic, boisterous, warm and loving family." T. Dolgin 1; Aryeh 4. Family gatherings were loud and lively, and punctuated by excited conversations and "exchanges of ideas." T. Dolgin 1. As a strong and confident teenager, Yitzchak was often at the center of the action. T. Dolgin 1.

In addition to being both assertive and poised, Yitzchak was also sensitive and considerate. Luwisch 1-2; T. Dolgin 1. Tamara Kay Dolgin, Yitzchak's aunt by marriage, recalls a particularly loud family gathering that left her, as a young woman from Indiana, feeling lost and confused. T. Dolgin 1. "Yitzchak glanced at me … and I could see that he felt all kind of sorry for me, and his look told me that he understood it all." Id. "*Parlez vous Francais*?" Yitzchak asked his new aunt. Surprised, she asked in return, "Yitzhak, do you speak French?!" Yitzchak answered "No, but I don't want you to feel alone. That's all the French I know.  Don't feel bad. You're family. You'll get it." T. Dolgin 1.

30

Yitzchak Weinstock was charismatic and full of life. Luwisch 1; Aryeh 1. He enjoyed hiking, rappelling, scuba diving and hang gliding. Moshe 1; Aryeh 1;  Luwisch 1. He was an outstanding athlete who excelled in basketball. Aryeh 1; Luwisch. 1. As a good ball-player, Yitzchak used his influence to include weaker players who could have easily been left on the sidelines. Sharon 2.

Yitzchak used his many talents to help others. Luwisch 2. Yitzchak volunteered to help farmers with their agricultural work. Luwisch 2. He also joined the search and rescue organization that his father had established to help hikers lost in the dessert. Luwisch 2. And, when a teacher shared with Yitzchak the news that the teacher was leaving the school and relocating his family, Yitzchak traveled to the teacher's new home and voluntarily upgraded the electrical infrastructure in the house. Luwisch 2.

Yitzchak's family were high-achievers. His father, Dov Weinstock, was blessed with many talents. He was a "brilliant man" who had obtained patents for several of his own inventions. Moshe 4. Dov was also charismatic and eloquent, and used his natural skills to serve his community. Sharon 4. As a volunteer project, Dov established and directed a search and rescue team to rescue hikers who would occasionally lose their way while trekking in the Judean Dessert. Luwisch 2.   Dov earned a living running a company that installed and repaired heaters. Sharon 1.

Yitzchak's mother, Sharon Weinstock, is an occupational therapist who holds a Master's degree in education. Berenblut 3. Prior to the terrorist attack, Sharon was an educator and worked in special education as the vice principal of a school in Jerusalem. Sharon 1-2. She described her work prior to Yizchak's murder as "very challenging and satisfying." Sharon 1-2. In

addition to her work, Sharon managed to raise her five children, one of whom – daughter Geula ("Gili") – suffered from severe developmental disabilities. Sharon 1.

Yitzchak inherited his parents' intelligence. Aryeh 1; Sharon 6. He was an inquisitive student. Luwisch 1. Even outside of school, during his frequent visits to his grandparents, Rabbi Simon and Shirley Dolgin Yitzchak would study Talmud or Bible with Rabbi Dolgin. Harel. Yitzchak had figured out how to construct his own stereo system from pieces of old, broken sets. Aryeh 1. Yitzchak's former teacher, Rabbi Baruch Luwisch described Yitzchak as a student leader and "trailblazer." Yitzchak was "considerate, fun to be around, and had a great sense of humor." Aryeh 1; Luwisch 1; Tamara Kay Dolgin 1; Sharon Weinstock 2.

Once, while hiking in the Judean hills, Yitzchak and his friends discovered an old dried-up spring. Aryeh 2. Yitzchak and his friends excavated the site, and eventually, they succeeded in reviving the spring, which has since been renamed in Yitzchak's memory. Aryeh 2. Although Yitzchak had many varied interests, his mother said that Yitzchak likely would have pursued a career in engineering or computer science. Sharon 7; Berenblut 3.

**2. Yitzchak's anticipated lost earnings**.

The Plaintiffs have introduced the verified economic report of Mark Berenblut, a forensic and investigative accountant educated at the London School of Economics, and qualified in the United States and Canada. Berenblut Appx I. Mr. Berenblut's CV is attached to his report. *Id*. Mr. Berenblut authored a text called, "Proving Economic Loss," which was a loose-leaf service updated semi-annually, and dealt very significantly with the calculation of economic losses in personal injury, fatality, medical malpractice, and similar cases. See Berenblut 1; Appx I.  Mr. Berenblut has testified on numerous occasions as an expert witness on economic losses, and submitted a list of his appearances in that capacity over the last four years. Berenblut 1 Appx I.

In an unrelated case that involved tragically similar facts to the case at bar, Mr. Berenblut's expert testimony regarding the lost income of another American teenager murdered in a Hamas terrorist attack. *See Estate of Hirshfeld v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 148416 (D.D.C. 2018).

In calculating Yitzchak Weinstock's lost earnings, Mr. Berenblut considered two scenarios. ***First***, he calculated a range for Yitzchak's projected lost earnings based upon an assumption that he would have made his career in Israel. ***Second***, because Yitzchak was an American citizen, Mr. Berenblut calculated an alternative income based upon the possibility that Yitzchak would have made his career in the United States.[5] Mr. Berenblut calculated lost earning ranges under both scenarios by reducing the projected future income to present value after reducing it to account for taxes and personal consumption. Berenblut 3. Mr. Berenblut considered Yitzchak's skills and interests in calculating his anticipated future earnings. *Id*. Mr. Berenblut's methodology is further detailed in his report.

Mr. Berenblut concluded that the total adjusted lost earning amount based upon a career in the United States would have been approximately $2,720,000 U.S. dollars. Berenblut 2. Under the scenario in which Yitzchak would have pursued a career in Israel, Mr. Berenblut calculated the loss to be approximately$1,271,000 U.S. dollars. Berenblut 2.

In addition to his superior academic performance, Yitzchak demonstrated strong interpersonal and leadership skills, initiative and a solid work ethic. Yitzchak would have likely been very successful in any career he would have chosen. However, because the Court finds that Yitzchak would likely have remained in Israel where most of his family continue to reside, the

---

[5] As Yitzchak's brother Aryeh testified, Yitzchak was more "American" than Israeli in his ways and personality. Aryeh 1.

Court accepts the calculation of lost earnings based upon a career in Israel rather than one in the United States.

### 3.  Sharon Weinstock, Yitzchak's Mother.

Sharon Beth Weinstock was born and raised in Los Angeles, California. Her father, Rabbi Simon Dolgin, was the rabbi of one of the most prominent Orthodox Jewish synagogues in Los Angeles. He was a community leader and an educator. Sharon's mother, Shirley Dolgin, shared with her husband the yoke of community leadership until 1970, when Rabbi Dolgin was offered a pulpit in Jerusalem and the family relocated to Israel. Sharon 1.

Sharon met and married Dov Weinstock, an Israeli citizen, and the young couple settled in Alon Shvut, just outside of Jerusalem. Dov earned a good living installing and repairing heaters, and Sharon, an occupational therapist, had a job at a hospital in Jerusalem.

Their first son, Moshe, was born in 1972, followed by Yitzchak in 1974. Daughter Geula ("Gili") was born in 1978. Gili suffered from various developmental disorders, and Sharon was forced to leave her job to care for the baby. But she returned to work one year later as life fell back into a routine. Sharon and Dov had two more sons, Aryeh, born in 1979 and Mishael[6], born in 1988. Sharon 1.

Despite her responsibilities as a mother of a large family, including a child with severe disabilities, Sharon advanced in her profession, was hired by the Ministry of Education to work in special education, and eventually became the vice principal of a school. Sharon says her work at the school was "very challenging and satisfying." Sharon 2.

The Weinstocks family was very close and happy. Aryeh 3. Aryeh Weinstock relates,

---

[6] Plaintiff, Chaim Mishael Weinstock, goes by his middle name, "Mishael." In the Complaint he was referred to by his first name, "Chaim." But, in the declarations he is referred to as "Mishael." And his own declaration is cited to using the name "Mishael." The Certificate of Birth Abroad, which was filed as exhibit A to his declaration, reflects both names.

"there was a sense of togetherness that is hard to describe." Aryeh 3. The family would go away together on weekends and take camping trips, all sharing one big tent. Aryeh 3. And, when Moshe and Yitzchak grew older and started attending boarding school, the family would still be together for the Sabbath, times that were "filled with laughter and friends, long walks and story telling." Aryeh 3. The last night Yitzchak slept at home. Sharon went into Yitzchak's room and watched him sleeping. She reminisced about watching him, as a baby, sleeping in his bassinet; Sharon reflected on "what a beautiful young mand he had grown into." Sharon 2.

On the morning of December 1, 1993, Sharon was at work in Jerusalem when a social worker from her community called to tell her that there had been a terrorist attack and that she was coming to see Sharon. Sharon 2. Intuitively, Sharon understood that Yitzchak had been hurt. The social worker drove Sharon to the hospital, where Dov and some family friends and neighbors were already waiting. Sharon 2. That was when she heard that Yitzchak was in critical condition. Sharon 2.

Sharon caught only a glimpse of Yitzchak as the medical staff wheeled him into surgery. Sharon 2. Sharon. Dov, and their family and friends who gathered at the hospital began to pray and wait anxiously for news. Sharon.2. "We knew he was fighting for his life. They told us he had a chance. We had hope. None of us believed he wouldn't make it." Sharon 2.

Yitzchak fought for 18 hours. Sharon 2. But his injuries were too numerous and too severe. He lost so much blood. Sharon 2. Finally, at approximately 1:00 am, the next morning, the surgeon came out of the operating room. He stood at a distance from the family. Aware that Dov had suffered from a heart condition, the doctor broke the news slowly. Sharon 2.

Sharon went into the operating room by herself to say goodbye to her son. Sharon. 2. She looked at Yitzchak's face, which she said looked, "whole, uninjured, beautiful." Sharon 2. She

kissed Yitzchak and told him how much she loved him. Dov also came into the room, but could not bring himself to come close. Sharon 2. Today, Sharon says, "It was the worst moment of my life. I felt like I was giving up a part of me. He will always be a part of me." Sharon 2. Jonathan David Bachrach, a life-long close family friend, says that since Yitzchak's murder, he has not once heard Sharon Weinstock laugh. Bachrach 4.

When Yitzchak was murdered, Sharon, who had been "such a strong and good parent," completely fell apart. Moshe 3; Aryeh 3. Her daughter-in-law, Miriam says, "Sharon was completely shattered." Miriam 2.  Sharon became a mere shadow of her former self. Miriam 2.  Sharon, herself, agrees. "When Yitzchak was killed, my whole world crashed down around me." Sharon 3.  I functioned like a robot, just going through the motions. Sharon 3. Sharon was overwhelmed by the realization that "I no longer knew where one of my children was." Sharon 3. Sharon spoke with rabbis and mental health professionals. Sharon 3. One counselor told her that "parents are like the walls of a home, and if the parents fall, the home falls apart." Sharon 3. But that advice did not help.

For at least a month after Yitzchak's murder, Sharon "stayed in bed and slept or cried all the time." Moshe 3; see also Miriam 2. Her son, Aryeh states, "It seemed to me as if she was almost blacked out for two years or more, before she finally started to regain her footing." Aryeh 2. Sharon recalls that for approximately two years, "I was totally out of it," Sharon 3. She could neither work nor function at home. Sharon 3. "It was as if I had been hit by a steamroller." Sharon 3.

Moshe relates that because his parents were "completely unable to deal with day-to-day responsibilities," he paid the costs of his own college education, without asking them to help. Years after he completed his university studies, his mother asked him, "Hey, how did you pay

for college?" Moshe explains that his mother had been completely oblivious as a result of the shock and grief following Yitzchak's murder. Moshe 3.

Sharon's break-down as a mother was manifest most prominently for her son, Mishael, who was five years old at the time. Mishael 1. He "saw the impact on his parents every single day." Mishael 2. He remembers coming home from school only to find his mother asleep. Mishael 2. There was an atmosphere of tension and sadness, a heavy, dark cloud over her." Mishael 2. "She took care of the basic things, such as paying the bills, making the meals, and other aspects of the daily routine. Emotionally, she was never there." Mishael 2. Sharon, herself, recalls that even "the basic things" required herculean effort: "[o]ne morning soon after the funeral, I needed to pick out clothing for my youngest son, Mishael, who was five and a half. It was an ordinary task, the kind of thing I had done every single day for so many years. But suddenly, it took all the energy I could possibly muster to do it. Sharon 3. Sharon recalls another time when Aryeh unexpectedly returned home from school only to find her collapsed into bed. "I was terribly embarrassed; I didn't want him to see me like that." Sharon 3.

Sharon and Dov "were so shattered by the loss of Yitzchak that they could not bring themselves to participate in Moshe and Miriam's wedding. Moshe 2; Miriam 2. In fact, Sharon disappeared for much of the celebration. Moshe 2. Aryeh says that the photos from his wedding also show the "sadness in my mother's face." Aryeh 3. Sharon relates that her deep enduring sadness caused by Yitzchak's death made it impossible for her to enjoy any of her children's weddings. Sharon 6.

Since Yitzchak's murder, Sharon's life has been filled with fear and sorrow. Miriam 2; Aryeh 3. Sharon lives in constant fear that something terrible will happen. Sharon 6. Her feelings of loss are always with her. Yitzchak's death created "a void that cannot be filled." Sharon 7.

"Every family occasion is haunted by the knowledge that Yitzchak should be there, but isn't."
Sharon 7. As Aryeh observes, since Yitzchak's death, "a tremendous sadness took over her life
and all of our lives." Aryeh 3.

### 4.  Dov Weinstock, Yitzchak's now-deceased father.

Yitzchak Weinstock's father, Dov was not a United States national. However, he was en-
titled to bring suit under Section 2333 as the survivor of a victim of the terrorist attack. See 18
U.S.C. § 2333(a). Dov Weinstock passed away in 2007. Sharon and Moshe Weinstock, the wid-
ow and eldest son of Dov Weinstock pursue Dov's claims on behalf of his estate[7].

Dov Weinstock suffered immeasurably as a result of Yitzchak's murder. In the words of
Moshe Weinstock, Yitzchak's murder caused Dov "to go completely off the rails." Moshe 3. Ar-
yeh states that "[t]he impact of Yitzchak's death on my father was very obvious and dramatic. It
felt like we lost a big part of our father along with our brother." Aryeh 3. Mishael states that their
father "was completely unable to cope." Mishael 2. Sharon agrees. "Yitzchak's death hit [Dov]
like a ton of bricks." Sharon 3. It was not only the initial shock and grief that derailed Dov. He
suffered from his intense grief and was haunted by Yitzchak's violent death for the remaining
years of his own life.

After the murder, Dov said that one of his contacts in the Israeli security establishment
shared with him photographs of the terrorists suspected of committing the murder. With the pho-
tos in hand, Dov would spend his nights driving into Arab villages, claiming he was searching
for his son's killers. Moshe 3. This was obviously exceedingly dangerous, and had almost no
chance of success. Dov would later confide to Moshe that he "had a kind of death wish. With the

---

[7] The administrators of the Estate of Dov Weinstock are Co-Plaintiffs, Sharon Weinstock and
Moshe Weinstock.  Sharon 1.

loss of Yitzchak, he lost his own will to live." Moshe 3. Aryeh confirms that Dov said things to him that demonstrated this "death wish." Aryeh 3. "He simply didn't care whether he died or not. He could no longer enjoy any aspect of life. For him, every day was another day of unhappiness." Aryeh 3.

Dov became withdrawn from the children – an "absentee father." Sharon 4; Mishael 2-3. Dov's emotional breakdown was so complete that he approached his oldest son, Moshe, and asked him to "take over" as father of the family. Miriam 3. Dov claimed that he had lost the emotional strength to fulfil his parental obligations. Miriam 3. Moshe declined. Miriam 3. Moshe was only 21 at the time of Yitzchak's murder and was about to get married and establish his own home. Nonetheless, as a practical matter, with Dov unable to function, Moshe was forced to step up and serve as a sort of "surrogate father" for his brothers and sister. Moshe 2; Miriam 3-4.

For years after Yitzchak's murder, Dov continued to spend his nights driving around nearby villages and the dessert, often with his young son, Mishael, asleep in the back seat. Mishael 3; Miriam 2; Sharon 4. Dov's heart problems worsened significantly. Miriam 2. He gained weight and began smoking heavily. Sharon 4. "[H]e was constantly tormented." Miriam 2. When he was home, he was "constantly tense," and had angry outbursts. Sharon 4; Aryeh 3. He would often become frustrated and angry – in particular, with Gili. Mishael 3. Dov's daughter-in-law, Miriam, relates that Dov would "come frequently to our … home, sit on the sofa, and unburden himself to me." Miriam 2. However, Dov refused to see a therapist consistently. Sharon 4. "[H]e was too preoccupied and unable to be receptive to their suggestions." Sharon 4.

"Dov never recovered from [Yitzchak's] murder." Miriam 2. In 2007, Dov suffered from his final, fatal heat attack. Aryeh 3.  Dov died, grief-stricken and tormented by his son's murder at the hands of the Hamas terrorists.

### 5.  Moshe Weinstock, Yitzchak's older brother.

Moshe Weinstock was only a year and a half older than Yitzchak. Moshe 1. Moshe says "we were always together; it was like being twins." When they were young, they shared a bed-room; played together, shared the same friends, walked to school together. Moshe 1; Sharon 5. The brothers were so close, Moshe says, "It's hard for me to remember any time without him." Moshe 1; See also Jess Dolgin 3.. Even after Moshe and then Yitzchak left home to attend boarding school for high school, the two remained close. Moshe 1. They participated in wilderness activities, including hiking and camping, together. Moshe 1. "We had many heart-to-heart talks and came to rely on each other." Moshe 1. During their late teen-age years, Moshe and Yitzchak remained close, taking advantage of their weekends at home and breaks from school to spend time together. Moshe 1.

Moshe and his wife had decided to become engaged, and the two chose December 2, 1993 as the date on which they would share the happy news with their families. Moshe 1. But, Yitzchak was murdered the day before the hoped-for joyous announcement. Moshe 2.

On December 1, 1993, Moshe Weinstock was in southern Israel performing his mandatory military service when he heard a news report of a terrorist attack outside of Jerusalem. Moshe 2. After someone informed Moshe that Yitzchak had been wounded in the attack, he attempted to call home, but nobody answered the phone, so Moshe rushed to Jerusalem, "first to one hospital, and then to another before I found them." Moshe 2. Moshe recalls that the family were all shocked and frightened. Moshe 2. Moshe joined the family crying and praying throughout the night as the surgeons fought to save Yitzchak. Moshe 2. The shock of Yitzchak's death hit Moshe so hard, he cannot clearly recall the events at the hospital or Yitzchak's funeral. Moshe 2.

Yitzchak's death was a terrible blow to Moshe. Sharon 5. He did not know how to pro-

40

cess his grief. Moshe 2. After the funeral and the traditional mourning period, Moshe thought that the way to deal with his grief was to throw himself back into his military service. Moshe 2. He returned as soon as he could to his base. But, Moshe says, "I couldn't handle it. I turned around and went home." Moshe was in "deep shock" and remained at home for several weeks. Moshe 2.

For many months following the murder, Moshe felt anxious and tense. Moshe 2. Indeed, to this day, Moshe finds if very difficult to talk about Yitzchak's death or his own suffering that resulted from his best friend and brother. Miriam 3; Sharon 5; Jess Dolgin 3. For several years Moshe could not bring himself to speak at annual memorial services for Yitzchak. Miriam 3. "[H]e carried much pain and unresolved issues that he had had with Yitzchak, which weighed heavily upon him." Miriam 3.

Moshe continues to live with the pain. It is very difficult for him to talk about or otherwise engage in the subject of Yitzchak's murder. Miriam 3; Jess Dolgin 3. Moshe says, " The loss of Yitzchak hangs over our entire family to this day and affects many things. I continue to think about him all the time." Moshe 3. Moshe and Miriam named their first son, "Yitzchak," in memory of Moshe's brother.  Moshe 3; Sharon 4. But, even this gesture, which was intended to honor Yitzchak, was met with fierce opposition by Dov, causing strife and conflict between Moshe and Dov. Sharon 4.

**6.  Geula ("Gili") Weinstock, Yitzchak's sister**.

Geula ("Gili") Weinstock is the severely disabled sister of Yitzchak Weinstock. Sharon 2; Moshe 2; Miriam 4. She is not legally competent and has not submitted her own declaration. See Sharon 1. Gili was approximately four years younger than Yitzchak, and was born with developmental disabilities, severe learning disabilities, and mildly poor cognitive functioning. Sha-

ron 2, Miriam 4; Dr. Pollak 1. She required a hearing aid from a very young age. Dr. Pollak 1.

Her disabilities were severe enough that after Gili was born, Sharon felt the necessity to take a

year off from her career to seek proper help for Gili. Sharon 2.

Gili has trouble expressing herself and she did not provide a declaration for this matter.

However, others discussed in their declarations the impact Yitzchak's death had on Gili. Gili felt

very close to Yitzchak. Moshe 2. The emotional impact of the loss of her brother was very obvi-

ous to others. Sharon 5; Moshe 2; Miriam 4. Following Yitzchak's murder, Gili began displaying

"terrible behavioral problems." Sharon 5; Moshe 2. Previously, Gili was "a warm, cooperative

and very pleasant and well-liked child with much charm." Dr. Pollack 1. But as a result of

Yitzchak's murder, Gili began having emotional outbursts,  and displayed rigidity, and obsessive

behavior. Dr. Pollack 2; Sharon 5; Moshe 2 ("Gili began having frequent and very extreme emo-

tional outbursts. She became irritable and nervous all the time."); Miriam 4. Whereas prior to

Yitzchak's murder, Gili got along well with others and was cooperative in school, as a result of

Yitzchak's death, Gili "completely changed; now the learning problems were compounded by

serious emotional problems." Sharon 5. Mishael Weinstock states that Yitzchak's absence creat-

ed much chaos in Gili's mind. Mishael 3.

Dr. Sarah Pollak was Gili's physician from her birth in 1978 until 2008. Pollak 1. Addi-

tionally, Dr. Pollak is a neighbor of the Weinstock family, and Dr. Pollak's own daughter was a

classmate and friend of Gili's. Pollak 2. Growing up, Gili spent much time at Dr. Pollak's home

and Dr. Pollak knows Gili well on a personal level as well as in her professional capacity. Pollak

2. Dr. Pollak recalls that Gili was warm, cooperative and very pleasant and well-liked as a child.

She had "much charm." Pollak 1. However, when Gili was 15 years old, Yitzchak was killed and

the "shock and of the tragedy and magnitude of the loss took a terrible toll on the entire Wein-

42

stock family, including Gili. Pollak1.

Gili had been studying in a main-stream school where she made much progress. Sharon 5; Moshe 2; Pollack 1. But after Yitzchak's death, she refused to continue. Sharon 5; Pollak 1. Ultimately, Sharon had no choice but to transfer Gili to a less favorable school in another city. Sharon 5; Pollak 1. Her new program was for children with much more severe disabilities. Moshe 2. In the aftermath of Yitzchak's murder, Gili developed many behavioral difficulties, including, severe anxiety, outbursts of anger, obsessive behaviors, and other manifestations that compounded her physical disabilities. Pollack 1-2. Gili transferred schools several times, eventually finding some stability when she moved into a residential community for special-needs young adults. Sharon 5. But, ultimately, Gili moved back home. Sharon 5.

Gili's personal loss of her brother Yitzchak, was compounded by the fact that her previously warm and happy home was suddenly and permanently filled with "tremendous tension." Miriam 4. Sharon and Dov, were no longer fully functioning as parents. Miriam 4. After, Yitzchak's death, Dov became frustrated and angry. Mishael remembers that Gili suffered from Dov's angry outbursts. Mishael 2-3.

Dr. Pollak notes that Gili does not express her feelings verbally. But, her deep sadness and post-trauma symptoms are frequently apparent. Pollak 2. For example, "to this day, if you say the word, "Yitzchak" within her ear-shot, Gili often starts crying. Mishael 3. Gili continues to react to emotional triggers that remind her of Yitzchak. Once, a friend of Yizchak's mentioned that he liked a particular song. Now, when Gili hears that song, she reacts very emotionally and sometimes even cries. Sharon 5; Pollak 2. Gili spends several hours on Israeli Memorial Day watching television as the names of all the victims of terrorism scroll by. She is just waiting for the moment when she can see Yitzchak's name. Sharon 5; Pollak 2; Zamir 2. Gili has suffered

from deep depression and sleeps for long periods of time. Sharon 5. Sharon explains that Gili's emotional difficulties trace back to the loss of Yitzchak. At one point, recently, Gili began asking her mother to adopt a boy friend of hers from the residential village. When asked why, Gili responded, "I miss my brother." Sharon 5.

Dr. Pollak concludes, "I have observed her difficulties over the years, and can confidently say that after her brother's murder, [Gili] suffered a definite deterioration in her emotional and behavioral state, and that she and her family continue to struggle with the painful manifestations of [Gili's] emotional state. Pollak 2. Dr. Pollak's assessment is confirmed by Inbal Sharvit Zamir, a licensed psychotherapist, who treated Gili from 2009 until 2012. Zamir 1. Zamir states that Gili's "severe emotional difficulties" were "compounded by the grief she suffered as a result of the murder of her older brother, Yitzchak." Zamir 1. According to Zamir, Gili's primary issues were her "inability to cope with her bereavement over Yitzchak, and the processing of her intense emotional pain." Zamir 1-2. This intense and persistent emotional pain and mourning prevent Gili from engaging in ordinary life activities. Zamir. 2.

Zamir concludes that Gili's enduring bereavement has impacted Gili's life tremendously. Zamir 2. Gili suffers from symptoms of Complex Post Traumatic Stress Disorder ("CPTSD"). Zamir 2, which is caused by continuous exposure to traumatic events that accumulate within the human psyche over a period of months or years. Zamir 2. In Gili's case, CPTSD has led to difficulty in emotional regulation and somatization (complaints of physical ailments). Zamir 2. Gili's trauma has impeded her ability to develop interpersonal relationships, and hindered her ability to establish purpose and meaning in her life. Zamir 2.

**7. Aryeh Weinstock, Yitzchak's younger brother**.

Aryeh Weinstock was in the Seventh grade when Yitzchak was murdered. He was ex-

tremely close with Yitzchak, and Aryeh admired him tremendously. Aryeh 1. Aryeh recalls Yitzchak as being considerate, fun to be around, and possessing a great sense of humor. Aryeh 1. Aryeh learned to play basketball by watching Yitzchak and, later, by playing with him. Aryeh 1. Aryeh took a rappelling course because Yitzchak was into rappelling. Yitzchak also took Aryeh scuba diving and running with him. Aryeh 1. Aryeh remembers Yitzchak and Moshe including him when they sold willow branches for ritual use outside of their grandparents' home in Jerusalem. Aryeh 2. When Yitzchak and some friends discovered and excavated an ancient spring in the Judean hills, they allowed Aryeh to tag along, and Aryeh reciprocated by bringing them food from their house. Aryeh 2. Aryeh says of Yitzchak, "He was everything anybody could ever want from an older brother." Aryeh 1.

Aryeh was devastated by Yitzchak's murder. Aryeh 2. Aryeh remembers a neighbor taking him to the hospital after the attack. But, Yitzchak was in surgery and Aryeh was taken to his grandparents' house to spend the night. Aryeh 2. Today, Aryeh maintains: "The single worst memory of my life was when my father came to the house in the morning and said to us, 'it's over,' I started shouting uncontrollably and breaking things all over the house." Aryeh 2.

Aryeh remembers going to a synagogue to pray on the night of the attack. According to Jewish custom, prayers for the sick refer to the patient by name and include the name of the patient's mother. Aryeh neglected to include Sharon's middle name in his prayer, and as he describes his feelings at the time, "[i]n my childish mind, I thought that my slip-up was the cause of Yitzchak's death. For a log time after that, I blamed myself, thinking that if I had remembered the name, he would have survived." Aryeh 2.

Following Yitzchak's murder, Aryeh, who was 14 years old, began experiencing severe difficulties in school. Moshe 2. Miriam recalls that that she was doing her clinical internship at

the school Aryeh attended, and whenever she saw him, he was in the corridors rather than in a classroom. Miriam 5. "He actually completely stopped functioning in school." Miriam 5. Aryeh began spending time with friends who had their own behavior issues. Miriam 5. But, due to their own suffering, Sharon and Dov, were unaware of Aryeh's difficulties. Miriam 5. When Aryeh became involved in events that required parental intervention, the neighbors contacted Miriam rather than Aryeh's parents, who were not in an emotional state to address Aryeh's issues. Miriam 5. Miriam asserts that Aryeh required help, but "did not receive a fraction of what he needed." Miriam 5.

Despite his decline in academic performance and other difficulties, Aryeh was accepted into the Ohr Etzion high school where Yitzchak had studied. Aryeh 2, Moshe 2. However, he started suffering from panic attacks and, on several occasions, Aryeh required hospitalization. Aryeh 2. Unable to focus on school work, Aryeh fell behind in his studies and eventually left Ohr Etzion. Aryeh 2; Moshe 2.

The family have different recollections as to why Aryeh left the high school. Aryeh says that he was expelled. Aryeh 2. Moshe and Miriam recall that he dropped out or simply left. Moshe 2; Miriam 5. Sharon recalls that Aryeh's doctor advised him to leave the school due to the extreme pressure he felt living in Yitzchak's shadow. Sharon 6. "His whole identity was attached to Yitzchak – he was known as 'Yitzchak's brother.'" Sharon 6. Sharon states that Aryeh's doctor advised him to leave the school. "The whole environment was putting tremendous stress on Aryeh." Sharon 6. Regardless of the cause of his departure, Aryeh left Ohr Eztion after one year, and had no apparent school alternatives.

Moshe realized that his parents were not fully functioning as parents, and took it upon himself to find a new school for Aryeh. He drove to the remote northern Israeli town of Hispin,

and convinced the principal of a *yeshiva* high school there to accept Aryeh -- as an act of charity. Moshe 2. Moshe sees this event as stark evidence of the devastation and disfunction that overtook the Weinstock household as a result of Yitzchak's death. Moshe 2. Aryeh was no more successful in Hispin than he had been in his prior school. He recalls a meeting with the school psychologist where the doctor asked Aryeh why he was failing. Aryeh replied, "Yitzchak studied and that didn't help him. I know I'm going to die whether I study or not." Aryeh 2. Aryeh says that he spent his high school years "drifting around" to various schools and communities, and that the years from 9th through 12th grades "have been almost completely blacked out of my memory. Aryeh 2.

Aryeh was drafted into the Israeli army, and volunteered for an elite unit. Aryeh 2. He remembers being reckless to the point where his fellow-soldiers said he had a death wish. Aryeh 2.  In hindsight, Aryeh agrees with this assessment. He relates that in one operation, while his unit was pursuing a group of terrorists through their headquarters, Aryeh jumped into a room where it was believed the terrorists had taken cover. Aryeh says, "I didn't care if I died. I felt like I had nothing to lose." Aryeh 2. During his military service, Aryeh injured his back severely but made no effort to seek treatment, and he continues to suffer terribly from those back injuries today. Aryeh 3.

Following his military service, Aryeh continued to drift. He traveled in remote areas of South American and Europe, mostly alone. Aryeh 3; Moshe 2. Moshe relates that "Aryeh disappeared, traveling to various countries for long periods. We didn't see him for a very long time." Moshe 2. Aryeh recalls that at one point during his travels, he was paddling a canoe in a river when a flash flood struck. Rather than looking for safety, Aryeh jumped out of the canoe into the water. "At the very last second" he grabbed onto a rope and was saved. Aryeh 3. "I realize now

that it was all a futile attempt to escape the tragedy of losing Yitzchak." Aryeh 3.

Aryeh suffered from despair for many years. He says he had no desire to marry, settle down, or have children who he thought would be doomed to suffer. Aryeh 3. His frustration caused him to clash with Dov, and for a period "of several years" the two did not even speak to one another. Aryeh 3. Aryeh says that at the time of Yitzchak's murder, support organizations for terrorism victims did not yet exist. He says, "We didn't know how to handle the shock and the grief." Aryeh 3.

Aryeh continues to have difficulty processing his emotions. Once, his wife was crying about something, and he admonished her, "Did somebody die? If not, there's nothing to cry about." Aryeh 4. He says "That kind of hardness sometimes overtakes me." Aryeh 4. Aryeh feels that his pessimism adversely affects his relationships with his children as well. Aryeh 4. The impact of Yitzchak's death is a constant in his life; it is "a kind of undercurrent to everything I say and do." Aryeh 4.

 Aryeh describes a before-and-after life that was turned by 180 degrees by Yitzchak's murder. Before the murder, "we were a family that was close and happy." Aryeh 4. The family would spend weekends together and with friends laughing, telling stories, and taking long walks. Aryeh 4. "There was a sense of togetherness that is hard to describe. That was all taken away from us with Yitzchak's death. Now, there's always something in our hearts that hurts." Aryeh 4. "It was as if we were taken from one life and just dropped into another." Aryeh 3.

**8.  Chaim Mishael Weinstock ("Mishael"), Yitzchak's youngest brother.**

Chaim Mishael ("Mishael") was only five years old when Yitzchak was murdered. Sharon 6. The terrorists deprived him of a brother whom Aryeh describes as "everything anybody could ever want from an older brother." Aryeh 1. Moreover, as Sharon put it, "[s]uddenly his

whole family changed." His parent and siblings who had been strong, happy, and supportive were suddenly severely depressed and absent. "Everything around him was filled with sadness and difficulty. He was deprived of a normal childhood." Sharon 6; Mishael 2.

Mishael states that he remembers his parents expressions and reactions from the time of the murder, and he preserved the feelings he experiences at that time for years. "It was like I kept living that grieving period without end." Mishael 1.  He was "overwhelmed by feelings of confusion and stress that lasted a very long time afterwards." Mishael 1. Sharon sent Mishael for therapy, but he says that he did not continue with any of the therapists. "They all said I was suffering from post-traumatic stress disorder because of Yitzchak's death. Mishael 1.

Soon after Yitzchak's murder, Mishael began suffering from a sleep disorder and bed wetting. This lasted until he was 10 years old. Mishael 1. Dov, who was completely unable to cope with his own grief, started taking Mishael with him as he drove through Arab villages and the Judean Dessert on his "hunt for the terrorists." Mishael 3. Even as a child, Mishael understood that Dov "just wanted to escape." Mishael had to live with his mother's depression as well. He remembers Sharon being "constantly tired" and sad. Mishael 2. He remembers an "atmosphere of tension and sadness, a heavy, dark cloud" that hovered over his mother. "Emotionally, she was never there." Mishael 2.

Mishael describes his own emotional state in similar terms. He says that between third and eighth grades, "I was depressed most of the time. I slept a lot and was barely interested in anything. I missed a lot of school; I would show up late to class, and leave when I wanted. The teachers made allowances for me because they knew I was Yitzchak's brother." Mishael 1-2.

When Mishael became a teenager he started developing a life outside of the family home, especially through sports. He joined the local basketball league. Mishael 2. Other children's par-

ents would attend the games. But Mishael's parents did not. "They just couldn't do normal things like that." Mishael 2. At the same time, Mishael started to feel that he did not want his parents involved in his "other" life. And, Mishael wanted to separate from theirs. Mishael 2. When Mishael started high school, he enrolled in a school in a different town and moved into the dorm. He describes feeling confused and alienated from his parents. Mishael 2.

Mishael's feelings of alienation were intensified by what he describes as a sort of bond that his parents and siblings shared, and he was not a part of. "They knew Yitzchak, they lost Yitzchak… I had been too young to really know him. I didn't even attend his funeral; my mother thought it would be too hard on me." Mishael 3. Mishael "felt like an outsider in my own family." Mishael 3. Mishael attempted to bridge the distance from his family by imagining what Yitzchak was like and what it would have been like to have been his brother. Mishael 3. "I realize now that I was developing a kind of derivative identity as 'the brother of Yitzchak the victim,' instead of an identity of my own." Mishael 3.

Mishael continued to deal with depression. When he reached his late teens, Mishael could not even conceive of being alive at age 20 or 21. But, he was not disturbed by that feeling. "I felt it was part [of] my destiny, just another part of life." Mishael 2. He recalls a hiking trip when he deliberately ate a certain plant that someone had warned might be poisonous. At the same time, Mishael says that he lives in a perpetual survival mode, where he is constantly thinking about possible dangers. Mishael 3. For example, when his wife does a mundane activity such as taking a shower, he fears that she might slip and get hurt. Every day he fears that he will receive a call informing him of some family catastrophe. Mishael 3.

Yitzchak's murder has left Mishael without his brother and deprived him of the positive, nurturing and empowering family relationships that he should have had – and that his siblings in

fact had. He continues to suffer from depression and fear that were caused by Yitzchak's murder and the collective breakdown suffered by his entire family.

9.   **Rabbi Simon and Mrs. Shirley Dolgin, Yitzchak's maternal grandparents**.

Yitzchak had shared an unusually close relationship with his maternal grandparents. Sharon 6. Yitzchak often visited his grandparents, both with his family and on his own. Sharon 6; Harel 2; Horowitz 3. Rabbi Dolgin's long-time, close friend Israel Harel recalls that on several occasions when he visited the Dolgins he found Yitzchak at their home engaged in Talmudic or Biblical study with his grandfather. Harel 2. Yitzchak's proficiency in these studies was a great source of pride for Rabbi Dolgin. Harel 2.

Tzirl Horowitz, who had been a close childhood friend of Sharon Weinstock and her sisters in Los Angeles, and who as an adult developed a close friendship with Mrs. Dolgin as well, states that the Dolgins saw Yitzchak as the apple of their eye. Horowitz 3. Long-time family friend Jonathan Bachrach used the same expression to describe the Dolgins' tremendous love and esteem for Yitzchak. Bachrach 3. He adds: The Dolgins thought of Yitzchak as their best expression of everything to which they had dedicated their lives. They spoke of Yitzchak as if he were a young King David, bearing hope and promise." Bachrach 3. At some point prior to Yitzchak's death, Mrs. Dolgin told Jonathan Bachrach, "I think Yitzchak is destined to make us all laugh at the troubles we have suffered in this world so far, and we will go smiling into the future." Bachrach 4. While the reference to "laughter" was a reference to the Hebrew root for the name Yitzchak, which means "laughter," the statement reflects Mrs. Dolgin's limitless hope and expectation Yitzchak's realization of his great potential. But, as Mr. Bachrach relates, after Yitzchak's murder, he "never saw Rabbi or Mrs. Dolgin smile again." And he "never again heard Sharonbeth, [his] lifelong friend, laugh." Bachrach 4. Tzirl Horowitz says that both Rabbi and

Mrs. Dolgin were "destroyed by Yitzchak's death. Horowitz 3.

Immediately after the terrorist attack, Mrs. Dolgin joined the family in the hospital wait-ing room. Horowitz 2. As the surgery continued late into the night, Yitzchak's grandmother grew tired and eventually fell asleep. Horowitz 2. When someone woke Mrs. Dolgin and told her what had happened, she screamed in horror, "What have I done?!" Horowitz 2. According to Tzirl Horowitz, Mrs. Dolgin was speaking to G-d and blaming herself for her grandson's death. Hor-owitz 2. Yitzchak's grandmother felt so connected to him that she was sure that his death must have been because of some flaw in her.

Rabbi Dolgin did not go to the hospital that night. He had been diagnosed with Parkin-son's disease and his children tried to shield him from the news as long as possible. They were concerned that Rabbi Dolgin could not bear to hear that Yitzchak had been shot and grievously wounded. Glasser 3. They hoped that perhaps Yitzchak's condition would improve. Glasser 3. But by early the next morning, Yitzchak had died. Saralee Glasser went to the Dolgin home to break the news to her father. She remembers gently waking him and telling him that Yitzchak had died. Saralee remembers her father's eyes widening in shock and she remembers his pained expression as he exclaimed, "Oh my G-d, NO!" Glasser 3. Mrs. Dolgin joined them in the room, and the three sat, "speechless and unbelieving, trying to absorb the horrible news." Glasser 3. Saralee says she could feel the last of her father's strength oozing out during those moments. Glasser 3.

The day after the attack, Rabbi Dolgin's old friend, Israel Harel rushed to the Dolgin's home when he heard the news on the radio. Mr. Harel says this was the first time he had ever seen Rabbi Dolgin cry. Harel 3. Rabbi Dolgin, who had been a strong man with a sharp mind, began to rapidly deteriorate. "At once he looked like and old man…. He lost his drive for life."

Harel 3.

Yitzchak's murder was not the first tragedy that befell the Dolgins. Their daughter, Gaola had died just after turning 14 following years of illness. Another daughter, Marcia, died after a 6-year battle with cancer when she was 35, leaving her husband and three young children. Glasser 1-2; M. Dolgin 2-3; J. Dolgin 2. The Dolgins managed to persevere. Bachrach 2. They "carried their pain within and continued to live active and fruitful lives." Glasser 2. Despite the heart-breaking deaths of two of their daughters, the Dolgins continued to provide a loving, fun and protective home for their remaining children and grandchildren. T. Dolgin 2. "Yitzchak's death changed that in a second." T. Dolgin 2. The Dolgins home instantly and irreversibly "became a home of sorrow and tears." T. Dolgin 2. Their son, Jess Dolgin says, "For my parents, Yitzchak's murder was the coup de grace – a final, fatal emotional blow that, for all intents and purposes, ended their lives." J. Dolgin 2.

Jess Dolgin relates, "I remember my mother saying that there is nothing more painful than losing a child, except perhaps watching your own child lose her child." Helplessly witnessing Sharon suffer the loss of her son tormented Shirley Dolgin. Jonathan Bachrach recalls driving Mrs. Dolgin home one night a couple of years after Yitzchak's death. They discussed the deaths of Gaola and Marcia. Then, Mrs. Dolgin related Sharon's reaction to Yitzchak's murder: "Sharonbeth put her head on my shoulder and sobbed, 'Mommy, I cannot survive this! Tell me Mommy! Tell me how you survived Gaola's death! What did you do when Marcia died? How did you keep on living? Tell me now! Otherwise, I cannot go on!" Bachrach 3.

E.  **Procedural history.**

Plaintiffs filed the instant action on August 29, 2017. Defendant Iran is a foreign state, and therefore "must be served in accordance with 28 U.S.C. § 1608." Fed. R. Civ. P. 4(j)(1). Sec-

tion 1608(a) provides four different methods for service on a foreign state. Importantly, "the provisions for service under Section 1608(a) are hierarchical, and a plaintiff must attempt the methods of service in the order in which they appear in the statute." *Fly Brazil Group, Inc. v. Gov't of Gabon*, 709 F. Supp. 2d 1274, 1281 (S.D. Fla. 2010) (citing cases). The first two methods provided by § 1608(a)(1)-(2) are unavailable in respect to defendant Iran since there exists no "special arrangement for service" between the plaintiffs and Iran, and Iran is not a party to any "international convention on service of judicial documents." Accordingly, the Plaintiffs attempted to serve Iran under the next method listed in the hierarchy, i.e. under § 1608(a)(3). *Cf. Fly Brazil Group*, 709 F. Supp. 2d at 1281 (where Gabon had no special arrangement for service with the plaintiffs and was not party to any service convention, plaintiffs were required to proceed under § 1608(a)(3)).

Section 1608(a)(3) provides that where, as here, "service cannot be made under paragraphs (1) or (2)," plaintiffs must attempt to effectuate service on the foreign state "by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." 28 U.S.C. § 1608(a)(3). The Plaintiffs properly drafted a "notice of suit" in the form required by 22 C.F.R. § 93.2, and had the Complaint, the Summons and the notice of suit all professionally translated into Farsi, which is the official language of Iran, as mandated by §1608(a)(3). 22 C.F.R. § 93.2 also requires that a copy of the Foreign Sovereign Immunities Act ("FSIA") as currently in force be attached to the notice of suit. Plaintiffs included the FSIA translation in the package of documents for service.

Pursuant to Section 1608(a)(3) Plaintiffs properly requested that the clerk of the court "address[] and dispatch[]" the service documents to the foreign minister of Iran in Tehran. Also pursuant to Section 1608(a)(3) Plaintiffs arranged for DHL (the only courier company that provides return-receipt service to Iran) to deliver the service documents to the foreign minister at the office of the Iranian Foreign Ministry in Tehran[8].

On December 3, 2017, the Iranian Foreign Ministry refused delivery of the service documents, which were returned to the Court. The clerk of the court docketed the service materials returned by DHL. *See* Status Report of Service Upon Defendants, D.E. 18.

Plaintiffs then proceeded to the next hierarchical method of service under § 1608(a) – service through diplomatic channels effected by the Secretary of State. See 28 U.S.C. § 1608(a)(4). *See* Status Report of Service Upon Defendants, D.E. 18 and exhibits thereto. On May 18, 2018, the United States Department of State filed a certified copy of a diplomatic not establishing that service of the service documents were all successfully served upon Iran as of April 10, 2018. *See* Letter dated May 14, 2018, D.E. 22; Verified Motion for Clerk's Entry of Default, D.E. 24.

Foreign states are afforded 60 days from the date of service to file an answer or otherwise respond to a complaint. 28 U.S.C. § 1608(d). Iran failed to enter any appearance, or otherwise file or serve any response to the Complaint. See Verified Motion for Clerk's Entry of Default, D.E. 24. On June 12, 2018, the clerk of the court entered default against Iran. See Clerk's Default, D.E. 25. And, on November 6, 2018, Plaintiffs filed their Motion for Entry of Default Judgment.

---

[8] See Plaintiffs' Response to Notice of Upcoming Deadline to Serve under Federal Rule of Civil Procedure 4(m), D.E. 12; Clerk's Notice of International Service, D.E. 14; Status Report of Service Upon Defendants, D.E. 18.

III.    **CONCLUSIONS OF LAW AS TO LIABILITY**

    **A.  The Court has subject matter jurisdiction over this case**.

    Under the FSIA, the Court has original jurisdiction over nonjury civil actions against for-
eign states "without regard to amount in controversy" if the claims seek "relief *in personam* with
respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of
this title or under any applicable international agreement." 28 U.S.C. § 1330(a). Sections 1605-
1607 establish the exceptions to the FSIA's statutory grant of foreign sovereign immunity. The
Plaintiffs do not seek a jury trial; this is a civil action; and Iran is a foreign state against which
the Plaintiffs seek relief *in personam* relief. Thus, the only jurisdictional question under §
1330(a) is whether Iran lacks immunity under 28 U.S.C. § 1605A(a), the terrorism exception to
foreign sovereign immunity. If this immunity exception applies the Court has subject matter ju-
risdiction over the action.

    Section 1605A, withdraws foreign sovereign immunity, grants jurisdiction, and authoriz-
es suits against state sponsors of terrorism for "personal injury or death" arising from torture, ex-
trajudicial killing, aircraft sabotage, hostage taking, and the provision of material support. *Owens
v. Republic of Sudan*, 864 F.3d at 765. Section 1605A(a) provides in part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States …
> in any case … in which money damages are sought against a foreign state for personal in-
> jury or death that was caused by an act of … extrajudicial killing … or the provision of
> material support or resources for such an act if such act or provision of material support
> or resources is engaged in by an official, employee, or agent of such foreign state while
> acting within the scope of his or her office, employment, or agency.

28 U.S.C.S. § 1605A(a)(1).

    1.    **The terrorism exception applies to Iran**.

    The terrorism exception does not apply to every foreign state. Rather, it allows claims to
be heard only as against foreign states that were designated as state sponsors of terrorism at the

time of the act of terrorism and that remain so designated. See 28 U.S.C. § 1605A(a)(2)[9]. The

term "state sponsor of terrorism" refers to countries, the governments of which have been desig-

nated by the Secretary of State as having repeatedly provided support for acts of international

terrorism. 28 U.S.C. § 1605A(h)(6). Iran is presently designated a state sponsor of terrorism and

has been so designated since 1984[10].  It is one of only four states that are so designated.

2. **The Terrorist Murder was an "extrajudicial killing."**

The Plaintiffs allege that Iran provided material support and resources for the commission

of acts of extrajudicial killing, including the Terrorist Murder of Yitzchak Weinstock. Complaint

¶ 17. Section 1605A adopts the definition of "extrajudicial killing," that is codified in the Torture

Victim Protection Act of 1991, 28 U.S.C. § 1350 note ("TVPA"). 28 U.S.C. § 1605A(h)(7). The

TVPA defines "extrajudicial killing to mean:

> a deliberated killing not authorized by a previous judgment pronounced by a regularly
> constituted court affording all the judicial guarantees which are recognized as indispen-
> sable by civilized peoples. Such term, however, does not include any such killing that,
> under international law, is lawfully carried out under the authority of a foreign nation.

28 U.S.C.S. § 1350.

"On its face, this definition contains three elements: (1) a killing; (2) that is deliberated;

and (3) is not authorized by a previous judgment pronounced by a regularly constituted court."

*Owens*, 864 F.3d at 770. The Terrorist Murder of Yitzchak Weinstock satisfies all three ele-

ments, and it "does not fall within the exception for killings carried out under the authority of a

---

[9] This description is slightly narrower than the grant of authority found in § 1605A(a)(2). How-
ever it suffices for purposes of this action.

[10] See Clawson ¶ 27; see also U.S. Department of State Country Reports on Terrorism 2017,
https://www.state.gov/j/ct/rls/crt/2017/282847.htm. *See also* 31 C.F.R. § 596.201 note ("The
name of each country that has been designated under section 6(j) of the Export Administration
Act, 50 U.S.C. App. 2405, as a country supporting international terrorism is published in the
Federal Register by the Department of State, and a complete list of countries currently so desig-
nated can be found via the Web site of the Department of State at http://www.state.gov/j/ct/").

foreign nation acting in accord with international law." *See id*. The attack involved the killing of two people: American Yitzchak Weinstock and the Israeli school teacher, Shalva Ozanah.

The attack was "deliberated." The Eleventh Circuit has held that "deliberate" under the TVPA refers to killings that were "undertaken with studied consideration and purpose." *Mamani v. Berzaín*, 654 F.3d 1148 (11th Cir. 2011). Yitzchak Weinstock was shot at close-range from a car from which at least two shooters fired automatic weapons and had time and munitions to re-load their weapons and to escape capture. An attack of this nature requires careful planning, funding of operational costs, including salaries, weapons, intelligence, logistical support, preparation, and training. Levitt ¶¶ 27.

Moreover, the attack was part of a broad conspiracy involving Iran and Hamas under which Hamas was expressly required to increase its terrorist activities in exchange for increased support from Iran. Neither Hamas nor Iran made any effort to conceal the deliberate nature of their terrorism, and Hamas proudly claimed credit for the attack. Levitt ¶¶ 19-22; 32, 35, 37, 40-41, 43; Spitzen ¶¶ 23, 31, 32, 34  As discussed above, in December 1992, Hamas and Iran entered into an agreement under which Hamas would escalate attacks against Israel and Iran would provide Hamas financial and military assistance. Levitt ¶ 37. The State Department's annual report on terrorism stated that in 1992, "Iran [was] also the world's principal sponsor of extremist Islamic and Palestinian groups, providing them with funds, weapons, and training." Levitt ¶ 41. The 1992 State Department report (published in 1993) identified Hamas by name as one of the terrorist groups receiving support from Iran. Levitt ¶ 41. In October 1992, "Tehran hosted a series of high-profile meetings with Hizballah and HAMAS with the stated goal of coordinating their efforts against Israel and bringing the Arab-Israeli peace talks to a halt." Levitt ¶ 41. Hamas leader Khaled Mishal maintained that terrorism was justified in its efforts to destroy Israel and

create in its place an Islamic state. Levitt ¶ 20. The State Department's terrorism report for 1993, the year of the Terrorist Murder, stated: "The Izz al-Din al-Qassam Forces arm of the Islamic Resistance Movement (HAMAS) and the Palestinian Islamic Jihad (PIJ) have led the violent opposition to the peace efforts, with civilians serving as frequent targets." Levitt ¶ 44. And, the CIA recognized that "terrorism was a key component of Iranian foreign policy in 1992 and will remain so in the year ahead. Levitt ¶43. There is no doubt that the attack was "deliberated" and was a manifestation of Iran's and Hamas's explicit policy of using terrorism to achieve their goals.

The killing of Yitzchak Weinstock and Shalva Ozanah was not "authorized by a previous judgment pronounced by a regularly constituted court." This was a planned and professionally executed drive-by shooting attack directed at random civilians. "Clearly, this killing was not authorized by a prior judgment affording judicial guarantees or due process, nor is such deliberate killing lawful under any international law. It is a quintessentially extrajudicial killing." *Estate of Hirshfeld v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 148416 (D.D.C. 2018).

### 3. Iran provided Hamas with material support and resources for the Terrorist Murder.

Iran provided Hamas with material support and resources for the extrajudicial killing of Yitzchak Weinstock and Shalva Ozanah. "Material support or resources" is a defined term under the FSIA's terrorism exception. Section 1605A(h)(3) incorporates the definition provided under the Anti-Terrorism Act (ATA), 18 U.S.C. § 2339A(b)(1):

> The term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials

As detailed by Plaintiffs' expert witnesses, Iran provided Hamas with substantial amounts of nearly every form of "material support or resources" included in the statutory definition. These were provided for the explicit purpose of promoting, enabling, assisting, and executing terrorist attacks like the murder of Yitzchak Weinstock and Shalva Ozanah. Indeed, Iran and Hamas had entered into an agreement in December 1992 under which Iran agreed to provide financial and military assistance in exchange for Hamas's agreement to step up its attacks against Israel. Levitt ¶ 37. Iran followed through on its promise, and from 1992 to 1993, increased its financial contribution to Hamas from approximately $1 million annually to $30 million, by one estimate. Levitt ¶ 48. Even the more conservative estimates of Iranian financial support place the amount for 1993 at no less than $15 million. Clawson ¶¶ 35-36; Levitt ¶¶ 46, 48-50.

In addition to vast financial support, Iran provided Hamas with weapons, intelligence, logistical support, and military training all with the purpose of enabling and encouraging Hamas to carry out terrorist attacks like the Terrorist Murder of Yitzchak Weinstock. Levitt ¶¶ 29, 32, 59. Iran trained Hamas at three different centers in Iran and at other centers in Sudan and Lebanon where Iran provided training through its proxy, Hizballah. Levitt ¶¶ 49-50. Iran had committed to train 3,000 Hamas terrorists. Levitt ¶ 50. Iran provided Hamas with Tehran office space across the street from its own foreign ministry. Levitt ¶ 49. Dr. Clawson states that Iran had agreed to allow Hamas to open an "embassy" in Tehran. Clawson ¶ 35. Iran also provided Hamas terrorists with ideological indoctrination. Levitt ¶ 56. Plaintiffs have established that Iran provided Hamas with material support and resources for the purpose of carrying out extrajudicial killings including the murder of Yitzchak Weinstock.

4. **Iran acted through its officials, employees, or agents who were acting within the scope of their offices, employment, or agencies**.

60

Iran, provided the material support and resources to Hamas through its officials, employ-ees and agents acting within the scope of their official duties. The cooperation between Iran and Hamas was a matter of Iranian government policy and was being directed from the highest levels of the Iranian government. Levitt ¶ 42-44. These officials included, President Rafsanjani, For-eign Minister Velayati, and Supreme Leader Ayatollah Khamenei, among others. Clawson ¶ 42. The Iranian officials and represented acted in accordance with their "approved roles and pursuant to official Iranian government policy directives." Clawson ¶ 42. Additionally the brother of Iran's then-presented Rafsanjani headed the department of the Iranian foreign ministry that coor-dinated the funding of Hamas. The amount of arming, training, indoctrinating, and provision of logistical support Iran provided to Hamas could have only been carried out by the government through its officials, employees and agents (including foreign agents such as the Hizballah mem-bers who also provided substantial support and resources to Hamas at the direction of Iranian government officials).

5. **Iranian material support and resources provided to Hamas caused the extra-judicial killing**.

Plaintiffs must demonstrate that the killing of Yitzchak Weinstock was caused by Iranian material support. 28 U.S.C. § 1605A(a). includes a proximate causation element. *See Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 54 (D.D.C. 2008) (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya,*, 376 F.3d 1123, 1128-29 (D.C. Cir. 2004)). The causation el-ement of § 1605A, does not require that Plaintiffs prove that the injury would not have happened but for the defendant's actions. *Kilburn*, 376 F.3d at 1128.  Neither must they establish a close temporal or spatial proximity between the harm and the action that caused it. *Rux v. Republic of Sudan*, 461 F.3d 461, 473 (4th Cir. 2006), citing *Kilburn*, 376 F.3d at 1128. Rather, proximate cause under §1605A is established by demonstrating "some reasonable connection between the

act or omission of the defendant and the damage which the plaintiff has suffered." *Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017); *Valore v Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010). And, the mere fact that Hamas and its operatives may have themselves been but for causes of the Plaintiffs' injuries does not break the causal chain of Iran's actionable conduct. "Such a case, in which application of a 'but for' standard to joint tortfeasors could absolve them all, is precisely the one for which courts generally regard 'but for' causation as inappropriate." *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 346 (D.C. Cir. 2018) *citing Kilburn* 376 F.3d at 1129.

Finally, proximate cause does not require the Plaintiffs to show the defendant specifically intended or directly advanced their injuries. *Owens*, 864 F.3d at 799; *Kilburn*, 376 F.3d at 1128-29. As the Kilburn court noted, material support is difficult to trace. 376 F.3d at 1128. Accordingly, the D.C. Circuit, in a unanimous decision by Judges Garland, Ginsburg, and then-Judge John Robert, adopted a flexible standard for causation under the terrorism exception to jurisdictional immunity[11]. *Kilburn*, 376 F.3d at 1128-29. The Court noted that material support is difficult to trace *Id.* at 1129*cf.*, *Boim v. Holy Land Foundation for Relief and Development*, 596 F.3d 685, 695-698 (7th Cir. 2008) (*en banc*) (finding causation and liability under the Anti-Terrorism Act against a U.S.-based organization that provided funds to Hamas, which killed an American teenager in a drive-by shooting).

In *Owens,* the D.C. Circuit held that proximate cause requires (a) that the defendant's actions must be a "substantial factor" in the sequence of events leading to the plaintiff's injury, and (b) that the injury must have been a reasonably foreseeable or anticipated consequence of the de-

---

[11] *Kilburn* was decided under an earlier version of the terrorism exception that was then codified at 28 U.S.C. § 1605(a)(7). However, in *Owens*, 864 F.3d at 794, the D.C. Circuit reaffirmed *Kilburn*'s analysis of the causation standard for the jurisdictional immunity exception, and applied it to the current terrorism exception found in 1605A(a).

fendant's conduct. 864 F.3d at 794. Iranian material support was certainly a substantial factor in the sequence of events leading to the murder of Yitzchak Weinstock. Until 1992, Hamas had engaged in sporadic terrorist attacks and lacked the money, training, logistical support and other resources necessary to execute attacks of this nature. At the end of that year, Iran summoned Hamas leaders for meetings in Iran and reached agreements pursuant to which Iran would provide material support for Hamas attacks, which Iran made clear it wanted to increase. Both Dr. Levitt and Dr. Clawson confirmed that the very extensive, all-encompassing Iranian support for Hamas was *at least* a substantial factor in the sequence of events leading to the Terrorist Murder. Levitt. ¶ 58, 59, 60.

The Terrorist Murder was also both a reasonably foreseeable *and* anticipated consequence of Iran's policy of providing material support to Hamas. The very purpose of the Iranian support was to enlist Hamas to engage in terrorist attacks against Israel in an attempt to scuttle the peace process, attack Israel and undermine the West. Levitt ¶¶56, 57. Iran passed a law that established an account used to fund Palestinian terrorism. Levitt ¶ 35. Iran entered into agreements with Hamas the purpose of which were to increase terrorist activities. Levitt ¶37; Clawson ¶ 35. This intent, coupled with the extensive efforts made by Iran through its officials, employees and agents to maintain Hamas as a menacing terrorist organization (as discussed at length above) easily demonstrates that the Terrorist Murder was a reasonably foreseeable and anticipated consequence of Iran's conduct.

6. **Iran conspired with Hamas to commit acts of terrorism including the Terrorist Murder**.

The agreements between Iran and Hamas (Levitt ¶ 37, Clawson ¶ 35) and Iran's comprehensive involvement with Hamas's development as a terrorist organization and its terrorist ac-

63

tivities demonstrate that Iran was not only a supporter of Hamas, but that the two were co-conspirators. "The very sponsorship of terrorist activities inherently involves conspiracy to commit terrorist acts." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 21-22 (D.D.C. 2009) (quoting *Bodoff v. Islamic Republic of Iran*, 424 F.Supp.2d 74, 84 (D.D.C. 2006) and *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998)) (quotation marks omitted)). See also Acosta v. Islamic Republic of Iran, 574 F. Supp. 2d 15, 26-27 (D.D.C. 2008) (same). Because Iran and Hamas were co-conspirators Iran is liable not only for providing material support and resources for the Terrorist Murder; it is also directly for the extrajudicial killing of Yitzchak Weinstock.

The Plaintiffs have established the elements of the FSIA's terrorism exception with evidence that is satisfactory to the Court. *See* 28 U.S.C § 1608(e).

**B.  The Court properly asserts personal jurisdiction over Iran.**

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject matter] jurisdiction … where service has been made under Section 1608 of this title." 28 U.S.C. § 1330(b); *S & Davis Int'l, Inc. v. Yemen*, 218 F.3d 1292 (11th Cir. 2000) (personal jurisdiction under the FSIA established by subject matter jurisdiction plus valid service of process); *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venez.*, 863 F.3d 96 (2d Cir. 2017) (same). "Neither compliance with the forum state's long-arm statute nor minimum contacts between the defendant and the forum state are required." *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1553 (11th Cir. 1993) (*citations omitted*).

Moreover, every federal court of appeals to have addressed the issue has held that "[t]he jurisdictional protections of the Due Process Clause do not apply to 'foreign states and their instrumentalities.'" *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir.

2002) (foreign states are not "persons" entitled to due process); *see also*, *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 694 (7th Cir. 2012) (same); *Frontera Res. Azer. Corp. v. State Oil Co. of the Azer. Republic*, 582 F.3d 393, 399 (2d Cir. 2009) (same); cf., *People's Mojahedin Org. of Iran v. United States Dep't of State*, 182 F.3d 17, 22 (1999) ("No one would suppose that a foreign nation had a due process right to notice and a hearing before the Executive imposed an embargo on it for the purpose of coercing a change in policy."). The Eleventh Circuit has not held whether foreign states have due process rights. For example, in *S & Davis Int'l*, 218 F.3d, the court of appeals found it unnecessary to address the question because due process requirements were met.

Finding no contrary authority in the Eleventh Circuit or among the other federal courts of appeal, the Court follows the analysis of the Second, Seventh and District of Columbia Circuits and holds the personal jurisdiction inquiry as to foreign state defendants does not require due process analysis. However, even if a foreign state is deemed a "person" for purposes of due process analysis, "a foreign state that sponsors terrorist activities which causes the death or personal injury of a United States national will invariably have sufficient contacts with the United States to satisfy Due Process." *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 23 (D.D.C. 1998).

As discussed above, the Plaintiffs have properly served defendant Iran and have established that this Court may assert subject matter jurisdiction in this matter. Accordingly, the Court asserts personal jurisdiction over Iran.

### C. By establishing subject matter jurisdiction, the United States National Plaintiffs established their substantive claims under the FSIA's statutory cause of action for terrorism.

As discussed above, other than narrowing the class of claimants who may benefit from its provisions, the elements of the private right of action of § 1605A(c) are identical to those of the

terrorism immunity exception of subsection 1605A(a). *Fritz v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 130008 (D.D.C. 2018), *quoting*, *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017); *see also Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d at 163; *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010).  Thus, by offering proof "sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a)" the United States national Plaintiffs have also established [their] entitlement to relief as a matter of federal law." *Fritz*, 2018 U.S. Dist. LEXIS at *86. Based upon the findings above, the Court finds Iran liable to the Plaintiffs under the private right of action found in 28 U.S.C. § 1605A(c).

### D.  The Estate of Dov Weinstock established its Israeli law claim.

The terrorism exception to jurisdictional immunity is unique in that it includes a statutory cause of action. The FSIA contains no other private rights of action. *Republic of Austria v. Altmann*, 541 U.S. 677, 695 (2004); *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 564 (7th Cir. 2012). Any other action against a foreign state must (a) satisfy the requirements of a jurisdictional immunity exception, and (b) seek relief pursuant to causes of action that are based upon general law outside of the FSIA. *Leibovitch*, 697 F.3d 564. Thus, when the FSIA was amended by among other things, adding the private right of action found in § 1605A(c), it merely added a statutory basis for relief to the set of possible causes of action that could be brought against foreign state sponsors of terrorism. *Leibovitch*, 697 F.3d 572 n.6.

Dov Weinstock was not a United States national and therefore his estate cannot benefit from the private right of action of §1605A(c). *Id*. However the jurisdictional immunity exception enables Dov's estate to bring its claim under Israeli law. *Leibovitch*, 697 F.3d at 572 n.6; *Owens*, 864 F.3d at 808-809. The Estate of Dov Weinstock brings a claim under the Israeli law of negligence. Complaint 15, Second Cause of Action.

To establish Dov Weinstock's tort claim and the basis for relief for Dov's estate, Plaintiffs have filed the expert opinion of Dr. Boaz Shnoor, an Israeli tort law expert who holds LL.D, LL.M and LL.B degrees from the Hebrew University and has been a senior lecturer at the Academic Center of Law and Business in Ramat Gan, Israel. Shnoor ¶¶ 1, 3. Dr. Shnoor is a member of the Israeli Bar and is licensed to practice law in the State of Israel. Shnoor ¶ 3. Dr. Shnoor has previously served as an expert witness on matters relating to Israeli tort law and liability for terrorist attacks in numerous federal and state cases in the United States. Shnoor ¶ 4.

In a very thorough and balanced opinion, Dr. Shnoor opines that under Israeli law, Iran would be directly liable to Dov Weinstock under what is referred to in Israel as a "negligence" theory. Under Israeli law, the tort of "negligence" includes any unreasonable conduct that causes foreseeable harm, even where the conduct is intentional. Shnoor ¶ 12. Thus, the Israeli Supreme Court has found defendants directly liable under negligence for *assisting* a terrorist who carries out an attack. Shnoor ¶ 13, citing CA 2144/13 *Mentin v. The Palestinian Authority* ¶ 94 (12.6.2017). Dr. Shnoor also found that Iran would be liable under the secondary liability theories of vicarious liability and aiding and abetting the Hamas terrorist attack. Shnoor ¶¶ 10, 54-62. Finally, Dr. Shnoor concluded that Dov would be entitled to compensation for both pecuniary and non-pecuniary losses, including his mental anguish and suffering. Shnoor ¶ 40, 41. The Estate of Dov Weinstock does not seek pecuniary damages.

The Court finds Dr. Shnoor's opinion credible and holds that Iran is liable to the Estate of Dov Weinstock under Israeli law. The findings regarding an award of damages are included in the general damages discussion below.

**E.  Iran has waived any defense based upon the statute of limitations or is equitably estopped from having such a defense asserted on its behalf.**

Section 1605A of the FSIA contains a 10-year statute of limitations. *See* 28 U.S.C §
1605A(b). However, this time limitation is a non-jurisdictional affirmative defense, which is
waived when, as here, the defendant foreign state fails to appear and assert it. *See e.g. Owens v.
Republic of Sudan*, 864 F.3d 751, 804 (D.C. Cir. 2017) (finding that "the limitation period in §
1605A(b) is not jurisdictional[]" and that, "by failing to raise it in the district court[,]" defendant
forfeits the defense); *Akins v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 153445, at *68, n.
10 (D.D.C. Sept. 10, 2018) ("Although this suit falls beyond the ten-year statute of limitations
for actions brought under the FSIA's terrorism exception established at 28 U.S.C. § 1605A(b),
the limitation period in § 1605A(b) is not jurisdictional, and the defendants have forfeited their
affirmative defense by failing to raise it in this Court.") (quotation marks, brackets and ellipsis
omitted); *Spaulding v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 110165, at *6 (N.D.
Ohio July 2, 2018) (declining to raise limitations defense *sua sponte* on Iran's behalf).

Moreover, even if Iran had appeared and sought to interpose a limitations defense, the
plaintiffs would be entitled to rely on equitable tolling. No one was prosecuted for the attack in
which Yitzchak Weinstock was killed, and there were thus no confessions, trial testimony, or
convictions identifying the perpetrators and the organization to which they belonged. Spitzen
Decl. at ¶ 18, n. 1. Admissible proof that Hamas carried out the attack (absent which plaintiffs
would not have a claim against Iran) became available to the plaintiffs only recently, after their
expert consultant, Mr. Spitzen, tracked down and received special permission to view and copy
an obscure, classified Israeli government publication, which fortuitously contained a photostat of
the original December 1993 Arabic-language Hamas proclamation in which Hamas took credit
for the attack. *Id*. at 17-34.

Equitable tolling is available in such circumstances. "The general rule is that equitable tolling principles apply to all federal causes of action where time limits are in the character of a true statute of limitations." *Julin v. Chiquita Brands Int'l, Inc. (In re Chiquita Brands Int'l, Inc.)*, 690 F. Supp. 2d 1296, 1305 (S.D. Fla. 2010). A plaintiff may invoke equitable tolling when the evidence necessary to support her claim is not reasonably available to her, even absent any fraudulent concealment by the defendant. *See In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1320-1321 (S.D. Fla. 2018) (fraudulent concealment "is not essential to equitable tolling[]" and equitable tolling is available when a plaintiff is "unable to obtain vital information bearing on the existence of his claim.") (citation omitted). *Cf. Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832-834 (11th Cir. 1999) (Mere "newspaper articles" about facts relating to a claim neither trigger an obligation to file suit nor prevent tolling).

## IV. <u>CONCLUSIONS OF LAW AS TO DAMAGES</u>

Iran is liable to all Plaintiffs other than the Estate of Dov Weinstock under Section 1605A(c). In addition to creating a federal statutory cause of action, §1605A(c) specifies that plaintiffs may recover damages including "economic damages, solatium, pain and suffering, and punitive damages." The D.C. Circuit held in *Owens* that the punitive damages provision of 1605A(c) does not apply retroactively to conduct occurring before the passage of § 1605A in 2008. *Owens*, 864 F.3d at 812, 815. Accordingly, the Court does not award punitive damages against Iran. Additionally, the record does not include evidence supporting a claim for any conscious pain and suffering Yitzchak Weinstock may have endured before he died of his injuries. However, the plaintiffs are entitled to damages for Yitzchak Weinstock's lost earnings and their for solatium claims.

### A. The Estate of Yitzchak Weinstock is entitled to an award of $1,291,000 for lost earnings.

69

Based upon the findings above, the court awards damages to the Estate of Yitzchak Hirshfeld for lost earnings in the realistic and conservative amount of $1,291,000 million. *See Estate of Hirshfeld v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 148416 (D.D.C. 2018).

B. **The Remaining Plaintiffs are entitled to solatium damages**.

The remaining plaintiffs may recover damages for the severe emotional injuries they suffered, otherwise known as solatium damages. 28 U.S.C. § 1605(c); *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 84 (D.D.C. 2018); Shnoor ¶¶33-43. Solatium claims compensate plaintiffs for the "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as a result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort." *Braun*, 228 F. Supp. 3d at 84 (citations omitted). "Solatium damages are available to FSIA plaintiffs when extreme and outrageous conduct has caused grief and anguish to plaintiffs closely related to a victim of terrorism. Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 273 (D.D.C. 2003).

Courts addressing the availability and amount of solatium damages in terrorism cases have traditionally looked to prior similar cases awarding solatium or emotional damages. *Braun*, 228 F. Supp. 3d at 85; *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010). Applying this methodology, courts have formulated a widely-accepted framework for calculations of damages awarded to victims of international terrorism. In *Heiser*, 466 F. Supp. 2d at 269 (D.D.C. 2006), the court surveyed past terrorism awards in the context of deceased victims of terrorism, and found that parents of those killed in terrorist attacks typically received damages awards of $5

million and siblings received $2.5 million. The court also specified "baseline" amounts awarded to other relatives, such as spouses. *See id*. In *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 86 (D.D.C. 2017), the court awarded $2.5 million in compensatory damages to each of the four grandparents of a baby killed in a terrorist attack. Many courts have applied the *Heiser* framework, which bases terrorism damages awards upon typical prior terrorism awards. See e.g., *Braun*, 228 F. Supp. 3d at 85 (citing cases); *Valore*,  700 F. Supp. 2d at 85 (holding that the *Heiser* framework is "an appropriate measure of damages for the family members of victims."). The D.C. Circuit recently agreed that that *Heiser* framework reflects reasonable baseline awards, and reaffirmed that "past solatium awards from comparable cases are appropriate sources of guidance for district courts." *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 361-62 (D.C. Cir. 2018). The *Fraenkel* court held that while *Heiser* is not binding on other courts, it provides a "useful reference point" to which courts may adhere or depart upwards or downwards in their damages awards, depending upon the circumstances of the case and the discretion of the judge. 892 F.3d at 351. This Court too finds that the *Heiser* framework should be applied to the calculation of non-economic damages in the instant case.

### 1.  Sharon Weinstock and The Estate of Dov Weinstock.

The Court applies the *Heiser* framework and awards Sharon Weinstock and the Estate of Dov Weinstock $5,000,000 in solatium damages, each, for the loss of their son to the terrorist murders. *See Braun v. Islamic Republic of Iran*, 228 F. Supp 3d 64, 85 (D.D.C. 2017); *Estate of Hirshfeld v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 148416 (D.D.C. 2018).

### 2.  Moshe, Geula, Aryeh, and Chaim Mishael Weinstock.

The Court applies the *Heiser* framework and awards Yitzchak Weinstock's siblings (Moshe, Geula, Aryeh, and Chaim Mishael) $2,500,000 each in solatium damages for the loss of

71

their brother to the terrorist murders. *See Estate of Hirshfeld*, 2018 U.S. Dist. LEXIS 148416 (D.D.C. 2018). The Court notes also that even though Plaintiff Chaim Mishael Weinstock was only five years old at the time of his brother's murder, he has demonstrated that he has suffered mental anguish, bereavement and grief as well as the loss of the society and comfort of his brother. *See Estate of Hirshfeld*, 2018 U.S. Dist. LEXIS 148416 (D.D.C. 2018) (granting siblings who were only 4 and 7 years old at the time of their brothers murder damages awards in amount identical to that granted to older siblings who shared more mature relationships with decedent).

### 3.   The Estates of Rabbi Simon and Mrs. Shirley Dolgin.

U.S. nationals who are the relatives of a person killed by terrorists are themselves "victims" under § 1605A of the terrorist attack. *See, Leibovitch*, at 572; *Valore*, 700 F. Supp. 2d at 68 (including among the "victims" the family members who alleged injuries from intentional infliction of emotional distress). Thus, with the exception of Dov, who was not a U.S. national, Yitzchak Weinstock's entire family are deemed victims of the Terrorist Murder. Similarly, surviving U.S. national grandparents like Rabbi and Mrs. Dolgin, who shared an unusually close relationship with Yitzchak, are considered to be victims of international terrorism and are entitled to damages under the ATA. Thus, in *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 86 (D.D.C. 2017), the court awarded damages to U.S. national grandparents for the terrorist killing of their infant granddaughter. *See also, Smith v. Islamic Emirate of Afg.*, 262 F. Supp. 2d 217 (S.D.N.Y. 2003).

In the instant case, an award to Yitzchak's grandparents' estates is particularly appropriate for the additional reason that the Dolgins were especially susceptible to emotional harm and suffering due to the premature deaths of two of their daughters, one at the age of 14 and the other as a 35-year old mother of three young children. Several witnesses noted that the Dolgins' own

experience of losing children, made them agonizingly (hyper)empathetic to their own daughter's (Sharon's) loss of her son Yitzchak. Sharon 6; Glasser 2-3 J Dolgin 2-3; M Dolgin 2-3; Bachrach 2-3. In other words, the Dolgins were classic "eggshell plaintiffs."

For Rabbi and Mrs. Dolgin, Yitzchak's grandparents, the devastation of their grandson's murder was exacerbated by witnessing the unspeakable anguish of their daughter, Sharon. Bachrach 3; Jess Dolgin 2-3. Moreover, following the premature deaths of two daughters, Yitzchak's sudden and violent death was the last straw. It fell upon the Dolgins with the combined weight of all of their prior tragedies. As Michael Dolgin explained, following their daughters' deaths, Yitzchak's murder had "an exponential impact" on the Dolgins. "Imagine a parent standing by and witnessing helplessly, fully and graphically their child's pain and suffering – the ultimate pain and suffering – which they themselves had known and endured with the untimely deaths of two of their own children." M. Dolgin 3. "The death of a child is traumatic for any parent. By this standard, my parents were victims of trauma, multiple trauma, and exponential re-traumatization."

It is well established that federal tort statutes incorporate the "eggshell plaintiff" rule, i.e., that a defendant must take the plaintiffs as he finds them. "FELA and other federal statutes incorporate the 'eggshell skull' rule to prevent defendant from avoiding liability in certain cases." *Stevens v. Bangor & Aroostook R.R.*, 97 F.3d 594, 602 n.8 (1st Cir. 1996) (citing *Jordan v. Atchison, T. & S.F. Ry.*, 934 F.2d 225, 228-29 (9th Cir. 1991) (FELA case noting that it is a well-settled principle of tort law that the defendant must take the plaintiff as it finds him); *Avitia v. Metropolitan Club of Chicago*, 49 F.3d 1219, 1227-28 (7th Cir. 1995) (same under Fair Labor Standards Act); *Doty v. Sewall*, 908 F.2d 1053, 1059 (1st Cir. 1990) (same under Landrum-Griffin Act)).

The evidence shows that the Dolgins shared an unusually close relationship with Yitzchak. It also shows that they were devastated not only by Yitzchak's death, but also by having to witness the impact of Yitzchak's death on their daughter, Sharon, who was also a victim of the attack. *Valore*, 700 F. Supp. 2d at 68. The *Heiser* framework is based upon awarding similarly situated terrorism victims similar damages awards for their emotional damages. In accordance with the *Heiser* framework and the holding in *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d at 86,  the Court awards to each of the estates of Rabbi and Mrs. Dolgin damages in the amount of $2.5 million.

## CONCLUSION

The Terrorist Shooting and murder of Yitzchak Weinstock was a cataclysmic event from which no member of the Weinstock-Dolgin family has fully recovered. Aside from the horror of the murder, and aside from the never-ending grief, bereavement, and frustration over their loss, Yitzchak's death caused the family to descend into severe disfunction as a Sharon and Dov lost their ability to function as parents. This, in turn, compounded the impact of Yitzchak's murder on his siblings. Sharon, Dov, and their remaining children never recovered; "even now, the Weinstock family itself, remains ***defined*** by the murder of Yitzchak." J. Dolgin 3. For Rabbi and Mrs. Dolgin, Yitzchak's grandparents, the physical and emotional effects of Yitzchak's murder were more than they could bear.

For the foregoing reasons, it is ORDERED AND ADJUSGED as follows:

1. The Court GRANTS default judgment against Defendant the Islamic Republic of Iran.

2. Damages are awarded to the Plaintiffs as follows: The Estate of Yitzchak Weinstock is awarded $1,291,000 in compensatory damages. Sharon Weinstock and the Estate of

Dov Weinstock are each awarded $5 million in compensatory damages. Each of Yitzchak's siblings are awarded $2,500,000 in compensatory damages, and the Estates of Rabbi Simon and Mrs. Shirley Dolgin, Yitzchak's maternal grandparents are each awarded $2,500,000 in compensatory damages.

3. An appropriate Judgment accompanies this memorandum opinion.

DONE AND ORDERED at Miami, Florida this _ day of _____, 2018.


/s/ Robert N. Scola_____
United States District Judge