United States District Court
for the
Southern District of Florida

| Sharon Weinstock, et al., | ) | |
|---|---|---|
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-23272-Civ-Scola |
| | ) | |
| Islamic Republic of Iran, | ) | |
| Defendant. | ) | |

### **Final Default Judgment**

This cause comes before the Court on Plaintiffs' Motion for Default Judgment with Incorporated Memorandum of Law filed on November 6, 2018 (the "Motion"). Defendant, Iran has failed to file an answer or otherwise defend, and on June 12, 2018, the clerk entered default (ECF No. 25). The Court has considered the allegations of the Complaint, the Motion, and supporting documentation submitted by the Plaintiffs. For the reasons that follow, the Court **grants** Plaintiffs' Motion for Default Judgment (**ECF No. 39**) and enters final judgment in favor of the Plaintiffs.

**1. Background**

This is a civil action under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602, et seq., the FSIA's terrorism exception, 28 U.S.C. § 1605A, and foreign law tort claims. The Plaintiffs' claims arise from the shooting murder (the "Terrorist Murder") of the 19-year old U.S. citizen Yitzchak Weinstock by the terrorist group Hamas, Islamic Resistance Movement ("Hamas") on December 1, 1993, near Jerusalem. The Plaintiffs are Yitzchak's estate, mother, and siblings, and the estates of his late father and maternal grandparents. Defendant Iran provided substantial material support to Hamas leading up to, and immediately before and including, the date of the Terrorist Murder. Iran's material support enabled, facilitated and caused the murder of Yitzchak Weinstock and the life-shattering emotional harm suffered by the Plaintiffs.

Iran was served with process in this action as of April 10, 2018. (ECF No. 22.) However, Iran "failed to plead or otherwise defend" this action. *See* Fed. R. Civ. P. 55(a). After its time to do so expired, the Clerk of the Court entered default against Iran on June 12, 2018. (ECF No. 25.) The Plaintiffs then filed the current Motion for Default Judgment as to Defendant Iran. (ECF No. 39.)

## 2. Legal Standards

"A defendant, by his default, admits the plaintiff's well-pleaded allegations of fact," as set forth in the operative complaint. *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009) (internal quotation marks and citations omitted). However, "a sufficient basis must still exist in the pleadings to state a claim before a court may enter a default judgment." *Under Armour, Inc. v. 51nfljersey.com*, No. 13–62809–CIV, 2014 WL 1652044, at *4 (S.D. Fla. Apr. 23, 2014) (Rosenbaum, J.) "A defendant's default does not in itself warrant the court entering a default judgment." *Luxottica Grp. S.p.A. v. Individual, P'ship or Unincorporated Ass'n*, No. 17-CV-61471, 2017 WL 6949260, at *2 (S.D. Fla. Oct. 3, 2017) (Bloom, J.) (quotation marks, alterations, and citations omitted). A defendant is "not held to admit facts that are not well pleaded or to admit conclusions of law." *Id.* The court must also establish that it has subject matter jurisdiction and personal jurisdiction over the defendant. *TracFone Wireless v. Anadisk LLC*, 685 F. Supp. 2d 1304, 1310 (S.D. Fla. 2010) (King, J.).

Before a court may enter a default judgment against a foreign state, the "claimants must establish their claim or right to relief by evidence that is satisfactory to the Court." *Alejandre v. Republic of Cuba*, 996 F. Supp. 1239, 1242 (S.D. Fla. 1997) (King, J.) (internal quotations omitted) (citing 28 U.S.C. 1608(e) (1994); *Compania Interamericana Export–Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 951 (11th Cir. 1996); 28 U.S.C. § 1608(e). This standard is identical to the standard for the entry of default judgment against the United States under Federal Rule of Civil Procedure 55(d), which provides that default judgment "may be entered against the United States, its officers, or its agencies only if the claimant establishes a claim or right to relief by evidence that satisfies the court." *Wachsman v. Islamic Republic of Iran*, 537 F. Supp. 2d 85, 91 (D.D.C. 2008); Fed. R. Civ. P. 55(d).

In cases brought against a foreign government or citizens, the claim must establish that "(1) there has been a waiver of sovereign immunity and (2) the source of substantive law upon which the claimant relies provides an avenue for relief." *Reed v. Islamic Republic of Iran*, 439 F. Supp. 2d 53, 59 (D.D.C. 2006) (internal quotations omitted) (citing *FDIC v. Meyer*, 510 U.S. 471, 484, 114 S. Ct. 996, 127 L.Ed.2d 308 (1994)).

With the Motion for Default, Plaintiffs submitted twenty-six affidavits in support of their substantive claims and claims for intentional inflection of emotional distress. (*See* ECF Nos. 42-1–42-26.) Because Iran has presented no defense, the Court accepts as true Plaintiffs' uncontroverted factual evidence. *See Alejandre*, 996 F. Supp. at 1243.

### 3. Analysis

According to the Eleventh Circuit, the Foreign Sovereign Immunities Act (FSIA) is "the exclusive source of subject matter jurisdiction over all civil actions against foreign states." *Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*, 183 F.3d 1277, 1282 (11th Cir. 1999). Under section 1604 of the FSIA, unless a FSIA statutory exception to immunity applies, a foreign state is immune from the jurisdiction of federal or state courts. *Id.*; *see* 28 U.S.C. § 1604(1); 28 U.S.C. § 1330(a). As such, this Court only has subject matter jurisdiction in an action against a foreign state if one of the FSIA statutory exceptions to immunity applies. *Calzadilla v. Banco Latino Int'l*, 413 F.3d 1285, 1286 (11th Cir. 2005) (affirming the dismissal of a case against arm of Venezuelan government for lack of subject matter jurisdiction). Accordingly, the Court must first determine whether this Court has subject matter jurisdiction over Iran based on one of the FSIA statutory exemptions.

Section 1605A, withdraws foreign sovereign immunity, grants jurisdiction, and authorizes suits against state sponsors of terrorism for "personal injury or death" arising from torture, extrajudicial killing, aircraft sabotage, hostage taking, and the provision of material support. *Owens v. Republic of Sudan*, 864 F.3d at 765. Section 1605A(a) provides in part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States … in any case … in which money damages are sought against a foreign state for personal in- jury or death that was caused by an act of … extrajudicial killing … or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C.S. § 1605A(a)(1). As discussed below, Plaintiffs have shown that Iran falls under Section 1605A(a) exception.

#### A. Iran is a designated state sponsor of terrorism

The terrorism exception allows claims to be heard only as against foreign states that were designated as state sponsors of terrorism at the time of the act of terrorism and that remain so designated. *See* 28 U.S.C. § 1605A(a)(2). The term "state sponsor of terrorism" refers to countries, the governments of which have been designated by the Secretary of State as having repeatedly provided support for acts of international terrorism. 28 U.S.C. § 1605A(h)(6). Iran is presently designated a state sponsor of terrorism and has been so designated

since 1984. (Clawson Decl., ECF No. 42-3 at ¶ 27); *see also* U.S. Department of State, State Sponsors of Terrorism, https://www.state.gov/j/ct/list/c14151.htm.

### B. Yitzchak Weinstock's killing was extrajudicial

Section 1605A adopts the definition of "extrajudicial killing," that is codified in the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note ("TVPA"). 28 U.S.C. § 1605A(h)(7). The TVPA defines "extrajudicial killing to mean:

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

28 U.S.C.S. § 1350(Section 3)(a).

"On its face, this definition contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens v. Republic of Sudan*, 864 F.3d 751, 770 (D.C. Cir. 2017). The terrorist murder of Yitzchak Weinstock satisfies all three elements, and it "does not fall within the exception for killings carried out under the authority of a foreign nation acting in accord with international law." *See id.*

Rabbi Shpatz and Yitzchak were driving north as the car approached the Palestinian town of Al-Bireh, approximately 20 minutes outside of Jerusalem. The car's exhaust pipe broke and was dragging under the car. Rabbi Shpatz stopped the car to attempt a repair, and Yitzchak exited the car to help. (Y. Shpatz Decl., ECF No. 42-14 at 2.) A second car slowly approached and suddenly, the sound of automatic gunfire erupted. (*Id.*)

When the shooting stopped, Rabbi Shpatz saw that Yitzchak had been badly wounded. He was gushing blood from a large wound next to his shoulder. (*Id.* at 3.) Rabbi Shpatz attempted to stop Yitzchak's bleeding while simultaneously trying to flag cars for help. (*Id.*) Yitzchak was taken to the hospital where he passed shortly after.

The attack on Yitzchak was "deliberated." The Eleventh Circuit has held that "deliberate" under the TVPA refers to killings that were "undertaken with studied consideration and purpose." *Mamani v. Berzaín*, 654 F.3d 1148, 1155 (11th Cir. 2011). Yitzchak Weinstock was shot at close range from a car from which at least two shooters fired automatic weapons and had time and munitions to reload their weapons and to escape capture. (Y. Shpatz Decl., ECF No. 42-14 at 1–3.) An attack of this nature requires careful planning, funding of

operational costs, including salaries, weapons, intelligence, logistical support, preparation, and training. (Levitt Decl., ECF No. 42-2 at ¶ 27.)

In a proclamation issued by Hamas, the terrorist organization claimed responsibility for the attack. (Spitzen Decl., ECF No. 42-5 at ¶ 18 n.1.) The Plaintiffs submitted the verified report of Arieh Dan Spitzen, an expert on Palestinian affairs and society and the structure, leadership, personnel, and activities of various Palestinian terror groups, including Hamas. (*Id.* at ¶ 1.) Mr. Spitzen explains in his detailed report that proclamations of this sort were routinely used by the various terrorist organizations, including Hamas, that the claims of responsibility for acts of terrorism made in these proclamations are credible; and that the proclamation he reviewed is what it purports to be an authentic proclamation issued by Hamas's militant wing, the Izz al-Din al-Qassem Brigades claiming responsibility for the murder of Yitzchak Weinstock and Shalva Ozanah. (*Id.* at ¶¶ 21-23, 33, 34.)

Additionally, the killing of Yitzchak Weinstock was not "authorized by a previous judgment pronounced by a regularly constituted court." *See* 28 U.S.C. § 1350; *Owens*, 864 F.3d at 770. This was a planned and professionally executed drive-by shooting attack directed at random civilians. "Clearly, this killing was not authorized by a prior judgment affording judicial guarantees or due process, nor is such deliberate killing lawful under any international law. It is a quintessentially extrajudicial killing." *See Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 134 (D.D.C. 2018).

Thus, Yitzchak Weinstock's murder was a deliberate killing, that was not authorized by a pervious judgment by a constituted court.

### C. Iran Provided material support for the commission of the killing

Iran provided Hamas with material support and resources for the extrajudicial killing of Yitzchak Weinstock. "Material support or resources" is a defined term under the FSIA's terrorism exception. Section 1605A(h)(3) incorporates the definition provided under the Anti-Terrorism Act (ATA), 18 U.S.C. § 2339A(b)(1):

> The term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

As detailed by the Plaintiffs' expert witnesses' affidavits, Iran provided Hamas with substantial amounts of nearly every form of "material support or resources" included in the statutory definition. These were provided for the explicit purpose of promoting, enabling, assisting, and executing terrorist attacks like the murder of Yitzchak Weinstock.

Iran provided the material support and resources to Hamas through its officials, employees and agents acting within the scope of their official duties. The cooperation between Iran and Hamas was a matter of Iranian government policy and was being directed from the highest levels of the Iranian government. (Levitt Decl., ECF No. 42-2 at ¶¶ 42–44.) These officials included, President Rafsanjani, Foreign Minister Velayati, and Supreme Leader Ayatollah Khamenei, among others. (Clawson Decl., ECF No. 42-3 at ¶ 42.) The Iranian officials and representatives acted in accordance with their "approved roles and pursuant to official Iranian government policy directives." (*Id.*) Additionally, the brother of Iran's then President, Rafsanjani, headed the department of the Iranian foreign ministry that coordinated the funding of Hamas. The amount of arming, training, indoctrinating, and provision of logistical support Iran provided to Hamas could have only been carried out by the government through its officials, employees and agents (including foreign agents such as the Hizballah members who also provided substantial support and resources to Hamas at the direction of Iranian government officials). (*Id.*)

Thus, the Court finds that Iran provided material support to Hamas with the purpose of promoting and enabling terrorist attacks like the murder of Yitzchak Weinstock.

### D. Causation

Section 1605A(a) includes a proximate causation element. *See Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 54 (D.D.C. 2008) (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128–29 (D.C. Cir. 2004)). The causation element of § 1605A, does not require that the Plaintiffs prove that the injury would not have happened but for the Defendant's actions. *Kilburn*, 376 F.3d at 1128. Proximate cause under §1605A is established by demonstrating "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Owens*, 864 F.3d at 794; *Valore v Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010). As the *Kilburn* court noted, material support is difficult to trace. 376 F.3d at 1128; *Boim v. Holy Land Foundation for Relief & Development*, 596 F.3d 685, 695–698 (7th Cir. 2008) (en banc) (finding causation and liability under the Anti-Terrorism Act against a U.S.-based organization that provided funds to Hamas, which killed

an American teenager in a drive-by shooting).

In *Owens,* the D.C. Circuit held that proximate cause requires (a) that the defendant's actions must be a "substantial factor" in the sequence of events leading to the plaintiff's injury, and (b) that the injury must have been a reasonably foreseeable or anticipated consequence of the defendant's conduct. 864 F.3d at 794. Iran's material support was certainly a substantial factor in the sequence of events leading to the murder of Yitzchak Weinstock. Until 1992, Hamas had engaged in sporadic terrorist attacks and lacked the money, training, logistical support and other resources necessary to execute attacks of this nature. At the end of that year, Iran summoned Hamas leaders for meetings in Iran and reached agreements pursuant to which Iran would provide material support for Hamas attacks, which Iran made clear it wanted to increase. Both Dr. Levitt and Dr. Clawson confirmed that the very extensive, all-encompassing Iranian support for Hamas was at least a substantial factor in the sequence of events leading to the Terrorist Murder. (Levitt Decl., ECF No. 42-2 at ¶¶ 58–60.)

The Terrorist Murder was also both a reasonably foreseeable and anticipated consequence of Iran's policy of providing material support to Hamas. The very purpose of the Iranian support was to enlist Hamas to engage in terrorist attacks against Israel in an attempt to scuttle the peace process, attack Israel and undermine the West. (*Id.* at ¶¶56–57.) Iran passed a law that established an account used to fund Palestinian terrorism. (*Id.* at ¶ 35.) Iran entered into agreements with Hamas the purpose of which were to increase terrorist activities. (*Id.* at ¶ 37; Clawson Decl., ECF No 42-3 at ¶ 35.) This intent, coupled with the extensive efforts made by Iran through its officials, employees and agents to maintain Hamas as a menacing terrorist organization demonstrates that the Murder of Yitzchak Weinstock was a reasonably foreseeable and anticipated consequence of Iran's conduct.

Therefore, because Iran's material support to Hamas was the proximate cause of Yitzchak Weinstock's murder and Iran's classification as a state sponsor of terrorism, the Court finds that it has subject matter jurisdiction for the current case under 28 U.S.C. §§ 1330 and 1605A.

### E. Personal Jurisdiction

The Plaintiffs must also establish the Court's personal jurisdiction over Iran. Section 1330(b) provides that personal jurisdiction over a foreign state defendant exists as to every claim for which the district court has subject matter jurisdiction so long as service has been made under 28 U.S.C. § 1608. Thus, personal jurisdiction against a foreign state is dependent upon a finding of subject matter jurisdiction and proper service. 28 U.S.C. § 1330(b*); S & Davis Int'l, Inc. v. Yemen,* 218 F.3d 1292 (11th Cir. 2000) (personal jurisdiction under

the FSIA established by subject matter jurisdiction plus valid service of process).

As recounted in the Plaintiffs' several status reports on service of process, service upon Iran was made properly under 28 U.S.C. § 1608(a)(4). (*See* Plaintiffs' Response to Notice of Upcoming Deadline to Serve under Federal Rule of Civil Procedure 4(m), ECF No. 12); Clerk's Notice of International Service, ECF No. 14; Status Report of Service Upon Defendants, ECF No. 18; Letter dated May 14, 2018, ECF No. 22; Verified Motion for Clerk's Entry of Default, ECF No. 24.)

Accordingly, the Court may also exercise personal jurisdiction over Iran.

### F. Damages

Iran is liable to all Plaintiffs other than the Estate of Dov Weinstock under Section 1605A(c). In addition to creating a federal statutory cause of action, §1605A(c) specifies that plaintiffs may recover damages including "economic damages, solatium, pain and suffering, and punitive damages." The D.C. Circuit held in *Owens* that the punitive damages provision of 1605A(c) does not apply retroactively to conduct occurring before the passage of § 1605A in 2008. *Owens*, 864 F.3d at 812, 815. Accordingly, the Court does not award punitive damages against Iran. Additionally, the record does not include evidence supporting a claim for any conscious pain and suffering Yitzchak Weinstock may have endured before he died of his injuries. However, the plaintiffs are entitled to damages for Yitzchak Weinstock's lost earnings and for their solatium claims.

The remaining plaintiffs may recover damages for the severe emotional injuries they suffered, otherwise known as solatium damages. 28 U.S.C. § 1605(c); *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 84 (D.D.C. 2018); (Shnoor Decl., ECF No. 42-6 at ¶¶ 33–43.) Solatium claims compensate plaintiffs for the "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as a result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort." *Braun*, 228 F. Supp. 3d at 84 (citations omitted). "Solatium damages are available to FSIA plaintiffs when extreme and outrageous conduct has caused grief and anguish to plaintiffs closely related to a victim of terrorism. Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 273 (D.D.C. 2003).

Courts addressing the availability and amount of solatium damages in terrorism cases have traditionally looked to prior similar cases awarding solatium or emotional damages. *Braun*, 228 F. Supp. 3d at 85; *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006); *Valore*, 700 F. Supp. 2d at 85. Applying this methodology, courts have formulated a widely-accepted framework for calculations of damages awarded to victims of international

terrorism. In *Heiser*, the court surveyed past terrorism awards in the context of deceased victims of terrorism and found that parents of those killed in terrorist attacks typically received damages awards of $5 million and siblings received $2.5 million. 466 F. Supp. 2d at 269. The court also specified "baseline" amounts awarded to other relatives, such as spouses. *See id.* In *Braun*, the court awarded $2.5 million in compensatory damages to each of the four grandparents of a baby killed in a terrorist attack. 228 F. Supp. 3d at 86. Many courts have applied the *Heiser* framework, which bases terrorism damages awards upon typical prior terrorism awards. *See e.g.*, *Braun*, 228 F. Supp. 3d at 85 (citing cases); *Valore*, 700 F. Supp. 2d at 85 (holding that the *Heiser* framework is "an appropriate measure of damages for the family members of victims."). The D.C. Circuit recently agreed that that *Heiser* framework reflects reasonable baseline awards and reaffirmed that "past solatium awards from comparable cases are appropriate sources of guidance for district courts." *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 361–62 (D.C. Cir. 2018). The *Fraenkel* court held that while *Heiser* is not binding on other courts, it provides a "useful reference point" to which courts may adhere or depart upwards or downwards in their damage's awards, depending upon the circumstances of the case and the discretion of the judge. 892 F.3d at 351. This Court too finds that the *Heiser* framework should be applied to the calculation of non-economic damages in the instant case.

### 1. The Estate of Yitzchak Weinstock is entitled to an award of $1,291,000 for lost earnings.

The Plaintiffs have introduced the verified economic report of Mark Berenblut, a forensic and investigative accountant educated at the London School of Economics and qualified in the United States and Canada. (Berenblut Decl., ECF No. 42-7.) Mr. Berenblut's CV is attached to his report. *Id.* In calculating Yitzchak Weinstock's lost earnings, Mr. Berenblut considered two scenarios. First, he calculated a range for Yitzchak's projected lost earnings based upon an assumption that he would have made his career in Israel. Second, because Yitzchak was an American citizen, Mr. Berenblut calculated an alternative income based upon the possibility that Yitzchak would have made his career in the United States.

Mr. Berenblut concluded that the total adjusted lost earning amount based upon a career in the United States would have been approximately $2,720,000 U.S. dollars. *Id.* at 4. Under the scenario in which Yitzchak would have pursued a career in Israel, Mr. Berenblut calculated the loss to be approximately $1,291,000 U.S. dollars. (*Id.*)

Because the Court finds that Yitzchak would likely have remained in Israel where most of his family resides, the Court accepts the calculation of lost

earnings based upon a career in Israel rather than one in the United States. The Court awards damages for lost earnings in the amount of $1,291,000 million.

### 2. Sharon Weinstock is entitled to solatium damages in the amount of $5 million for the murder of her son.

On the morning of December 1, 1993, Sharon Weinstock was at work in Jerusalem when a social worker from her community called to tell her that there had been a terrorist attack and that she was coming to see Sharon. (Sharon Decl. at 2, ECF No. 42-10 at 2.) The social worker drove Sharon to the hospital, where her husband and some family friends and neighbors were already waiting. (*Id.*) That was when she heard that Yitzchak was in critical condition. (*Id.*)

Sharon caught only a glimpse of Yitzchak as the medical staff wheeled him into surgery. (*Id.*) Yitzchak fought for 18 hours. (*Id.*) But his injuries were too numerous and too severe. He lost so much blood. (*Id.*) Finally, at approximately 1:00 am, the next morning, the surgeon came out of the operating room and broke the news to the family. (*Id.*)

For at least a month after Yitzchak's murder, Sharon "stayed in bed and slept or cried all the time." (Moshe Decl., ECF No. 42-11 at 3.) Moshe relates that because his parents were "completely unable to deal with day-to-day responsibilities," he paid the costs of his own college education, without asking them to help. Years after he completed his university studies, his mother asked him, "Hey, how did you pay for college?" Moshe explains that his mother had been completely oblivious as a result of the shock and grief following Yitzchak's murder. (*Id.*)

The Court applies the *Heiser* framework and awards Sharon Weinstock $5,000,000 in solatium damages for the loss of her son to the terrorist murders. *See Braun*, 228 F. Supp. 3d at 85; *Estate of Hirshfeld*, 330 F. Supp. 3d at 147.

### 3. The Estate of Dov Weinstock is entitled to solatium damages in the amount of $5 million for the murder of Dov's son.

Dov Weinstock, Yitzchak Weinstock's now-deceased father, was not a United States citizen, and therefore his estate cannot benefit from the private right of action of §1605A(c). *Leibovitch v Islamic Republic of Iran*, 697 F.3d 561, 572 (7th Cir. 2012); *Owens*, 864 F.3d at 808-809. However, the jurisdictional immunity exception enables Dov's estate to bring its claim under Israeli law. *Leibovitch*, 697 F.3d at 572 n.6; *Owens*, 864 F.3d at 808–809. The Estate of Dov Weinstock brings a claim under the Israeli law of negligence. (Compl., ECF No. 1 at ¶¶ 67–76.)

To establish Dov Weinstock's tort claim and the basis for relief for Dov's estate, the Plaintiffs have filed the expert opinion of Dr. Boaz Shnoor, an Israeli

tort law expert who holds LL.D, LL.M and LL.B degrees from the Hebrew University and has been a senior lecturer at the Academic Center of Law and Business in Ramat Gan, Israel. (Shnoor Decl., ECF No. 42-6 at ¶¶ 1, 3.) Dr. Shnoor is a member of the Israeli Bar and is licensed to practice law in the State of Israel. (*Id.* at ¶ 3.) Dr. Shnoor has previously served as an expert witness on matters relating to Israeli tort law and liability for ter- rorist attacks in numerous federal and state cases in the United States. (*Id.* at ¶ 4.)

In a very thorough and balanced opinion, Dr. Shnoor opines that under Israeli law, Iran would be directly liable to Dov Weinstock under what is referred to in Israel as a "negligence" theory. Under Israeli law, the tort of "negligence" includes any unreasonable conduct that causes foreseeable harm, even where the conduct is intentional. (*Id.* at ¶ 12.) Thus, the Israeli Supreme Court has found defendants directly liable under negligence for assisting a terrorist who carries out an attack. (*Id.* at ¶ 13.)

Yitzchak Weinstock's father, Dov Weinstock passed away in 2007. Sharon and Moshe Weinstock, the widow and eldest son of Dov Weinstock pursue Dov's claims on behalf of his estate.

Dov Weinstock suffered immeasurably as a result of Yitzchak's murder. In the words of Moshe Weinstock, Yitzchak's murder caused Dov "to go completely off the rails." (Moshe Decl., ECF No. 42-11 at 3.) Aryeh states that "[t]he impact of Yitzchak's death on my father was very obvious and dramatic. (Aryeh Decl., ECF No. 42-12 at 3.) It felt like we lost a big part of our father along with our brother." *Id.* Mishael states that their father "was completely unable to cope." (Mishael Decl., ECF No. 42-13 at 2.) Dov became withdrawn from the children – an "absentee father." (Sharon Decl., ECF No. 42-10 at 4.) In 2007, Dov suffered from his final, fatal heart attack. (Aryeh Decl., ECF No. 42-12 at 3.)

The Court applies the *Heiser* framework and awards Dov Weinstock $5,000,000 in solatium damages for the loss of his son to the terrorist murders. *See Braun*, 228 F. Supp. 3d at 85; *Estate of Hirshfeld*, 330 F. Supp. 3d at 147.

### 4. Moshe Weinstock is entitled to an award of $2.5 million in solatium damages for the murder of his brother.

Moshe Weinstock is the older brother of Yitzchak. (Moshe Decl., ECF No. 42-11 at 1.) Moshe and Yitzchak remained close, taking advantage of their weekends at home and breaks from school to spend time together. (*Id.*)

On December 1, 1993, Moshe Weinstock was in southern Israel performing his mandatory military service when he heard a news report of a terrorist attack outside of Jerusalem. (*Id.* at 2.) After someone informed Moshe that Yitzchak had been wounded in the attack, he attempted to call home, but nobody answered the phone, so Moshe rushed to Jerusalem, "first to one hospital, and then to

another before I found them." (*Id.*) The shock of Yitzchak's death hit Moshe so hard he cannot clearly recall the events at the hospital or Yitzchak's funeral. (*Id.*)

Yitzchak's death was a terrible blow to Moshe. (Sharon Decl., ECF No. 42-10 at 5.) He continues to live with the pain. It is very difficult for him to talk about or otherwise engage in the subject of Yitzchak's murder. (Miriam Decl., ECF No. 42-26 at 3.)

The Court applies the *Heiser* framework and awards Moshe Weinstock $2,500,000 in solatium damages for the loss of his brother to the terrorist murders. *See Estate of Hirshfeld*, 330 F. Supp. 3d at 147.

### 5. Geula ("Gili") Weinstock is entitled to an award of $2.5 million in solatium damages for the murder of her brother.

Geula ("Gili") Weinstock is the severely disabled sister of Yitzchak Weinstock. (Miriam Decl., ECF No. 42-26 at 4.) She is not legally competent and has not submitted her own declaration. However, others discussed in their declarations the impact Yitzchak's death had on Gili. Gili felt very close to Yitzchak. (Moshe Decl., ECF No. 42-11 at 2.) The emotional impact of the loss of her brother was obvious to others. (*Id.*) Following Yitzchak's murder, Gili began displaying "terrible behavioral problems." (*Id.*) Previously, Gili was "a warm, cooperative and very pleasant and well-liked child with much charm." (Dr. Pollack Decl., ECF No. 42-8 at 1.) But as a result of Yitzchak's murder, Gili began having emotional outbursts, and displayed rigidity, and obsessive behavior. (*Id.* at 2.) Yitzchak's absence created much chaos in Gili's mind. (Mishael Decl., ECF 42-13 at 3.)

Gili had been studying in a main-stream school where she made much progress. (Dr. Pollack Decl., ECF No. 42-8 at 1.) But after Yitzchak's death, she refused to continue. (*Id.*) Ultimately, Sharon had no choice but to transfer Gili to a less favorable school in another city. (*Id.*) In the aftermath of Yitzchak's murder, Gili developed many behavioral difficulties, including, severe anxiety, outbursts of anger, obsessive behaviors, and other manifestations that compounded her physical disabilities. (*Id.* at 1–2.)

Dr. Pollak concludes, "I have observed her difficulties over the years, and can confidently say that after her brother's murder, [Gili] suffered a definite deterioration in her emotional and behavioral state, and that she and her family continue to struggle with the painful manifestations of [Gili's] emotional state. (*Id.* at 2.) Dr. Pollak's assessment is confirmed by Inbal Sharvit Zamir, a licensed psychotherapist, who treated Gili from 2009 until 2012. (Inbal Zamir Decl., ECF No. 42-9 at 1.) According to Zamir, Gili's primary issues were her "inability to cope with her bereavement over Yitzchak, and the processing of her intense

emotional pain." (*Id.* at 1–2). This intense and persistent emotional pain and mourning prevent Gili from engaging in ordinary life activities. (*Id.* at 2.)

The Court applies the *Heiser* framework and awards Geula Weinstock $2,500,000 in solatium damages for the loss of her brother to the terrorist murders. *See Estate of Hirshfeld*, 330 F. Supp. 3d at 147.

### 6. Aryeh Weinstock is entitled to an award of $2.5 million in solatium damages for the murder of his brother.

Aryeh Weinstock is Yitzchak's younger brother and was in the seventh grade when Yitzchak was murdered. Today, Aryeh maintains: "The single worst memory of my life was when my father came to the house in the morning and said to us, 'it's over,' I started shouting uncontrollably and breaking things all over the house." (Aryeh Decl., ECF No. 42-12 at 2.)

Following Yitzchak's murder, Aryeh, began experiencing severe difficulties in school. (Moshe Decl., ECF No. 42-11 at 2.) "He actually completely stopped functioning in school." (Miriam Decl., ECF No. 42-26 at 5.) In high school, he started suffering from panic attacks and, on several occasions, Aryeh required hospitalization. (Aryeh Decl., ECF No. 42-12 at 2.) Unable to focus on school work, Aryeh fell behind in his studies and eventually left his high school. (*Id.*)

Moshe realized that his parents were not fully functioning as parents and took it upon himself to find a new school for Aryeh. He drove to the remote northern Israeli town of Hispin and convinced the principal of a *yeshiva* high school there to accept Aryeh, as an act of charity. (Moshe Decl., ECF No. 42-11 at 2.) Moshe sees this event as stark evidence of the devastation and disfunction that overtook the Weinstock household as a result of Yitzchak's death. (*Id.*) Aryeh was no more successful in Hispin than he had been in his prior school. Aryeh says that he spent his high school years "drifting around" to various schools and communities, and that the years from 9th through 12th grades "have been almost completely blacked out of my memory." (Aryeh Decl., ECF No. 42-12 at 2.)

Aryeh describes a before-and-after life that was turned upside down by Yitzchak's murder. Before the murder, "we were a family that was close and happy." (*Id.* at 4.) The family would spend weekends together and with friends laughing, telling stories, and taking long walks. (*Id.*) "That was all taken away from us with Yitzchak's death. Now, there's always something in our hearts that hurts." (*Id.*)

The Court applies the *Heiser* framework and awards Aryeh Weinstock $2,500,000 in solatium damages for the loss of his brother to the terrorist murders. *See Estate of Hirshfeld*, 330 F. Supp. 3d at 147.

### 7. Chaim Mishael Weinstock ("Mishael") is entitled to an award of $2.5 million in solatium damages the murder of his brother.

Mishael was only five years old when Yitzchak was murdered. (Sharon Decl., ECF No. 42-10 at 6.) As a result, "[e]verything around him was filled with sadness and difficulty. He was deprived of a normal childhood." (Michael Dolgin Decl., ECF No. 43 at 3.)

Soon after Yitzchak's murder, Mishael began suffering from a sleep disorder and bed wetting. This lasted until he was 10 years old. (*Id.* at 2.) Michael says that between third and eighth grades, "I was depressed most of the time. I slept a lot and was barely interested in anything. I missed a lot of school; I would show up late to class and leave when I wanted. The teachers made allowances for me because they knew I was Yitzchak's brother." (*Id.* at 2–3.)

Mishael continued to deal with depression into his teen years. When he reached his late teens, Mishael could not even conceive of being alive at age 20 or 21. But, he was not disturbed by that feeling. "I felt it was part [of] my destiny, just another part of life." (*Id.* at 3.) He recalls a hiking trip when he deliberately ate a certain plant that someone had warned might be poisonous. At the same time, Mishael says that he lived in a perpetual survival mode, where he was constantly thinking about possible dangers. (*Id.* at 4.)

The Court applies the *Heiser* framework and awards Mishael Weinstock $2,500,000 in solatium damages for the loss of his brother to the terrorist murders. *See Estate of Hirshfeld*, 330 F. Supp. 3d at 147 (granting siblings who were only 4 and 7 years old at the time of their brother's murder damages awards in amount identical to that granted to older siblings who shared mature, developed relationships with decedent).

### 8. The estates of Rabbi Simon and Mrs. Shirley Dolgin are each entitled to awards of $2.5 million in solatium damages for the murder of their grandson.

Yitzchak shared an unusually close relationship with his maternal grandparents. (Sharon Decl., ECF No. 42-10 at 6.) Yitzchak often visited his grandparents, both with his family and on his own. (*Id.*) Rabbi Dolgin's long time, close friend Israel Harel recalls that on several occasions when he visited the Dolgins he found Yitzchak at their home engaged in Talmudic or Biblical study with his grandfather. (Isreal Harel Decl., ECF No. 42-21 at 2.) Yitzchak's proficiency in these studies was a great source of pride for Rabbi Dolgin. (*Id.*)

Immediately after the terrorist attack, Mrs. Dolgin joined the family in the hospital waiting room. (Tzirl Horowitz Decl., ECF No. 42-20 at 2.) As the surgery continued late into the night, Yitzchak's grandmother grew tired and eventually

fell asleep. (*Id.*) When someone woke Mrs. Dolgin and told her what had happened, she screamed in horror, "What have I done?!" (*Id.*) According to Tzirl Horowitz, Mrs. Dolgin was speaking to god and blaming herself for her grandson's death. (*Id.*) Yitzchak's grandmother felt so connected to him that she was sure that his death must have been because of some flaw in her.

The day after the attack, Rabbi Dolgin's old friend, Israel Harel rushed to the Dolgin's home when he heard the news on the radio. Mr. Harel says this was the first time he had ever seen Rabbi Dolgin cry. (Harel Decl., ECF No. 42-21 at 3.) Rabbi Dolgin, who had been a strong man with a sharp mind, began to rapidly deteriorate. "At once he looked like an old man…. He lost his drive for life." (*Id.*) The *Heiser* framework is based upon awarding similarly situated terrorism victims' similar damages awards for their emotional damages. In accordance with the *Heiser* framework and the holding in *Braun*, the Court awards to each of the estates of Rabbi and Mrs. Dolgin damages in the amount of $2.5 million. *Braun*, 228 F. Supp. 3d at 86.

### G. Conclusion

For the reasons stated, the Court **grants** the Plaintiffs' Motion for Default Judgment (**ECF No. 39**).

A total of $26,291,000 in damages is awarded as follows:
- The Estate of Yitzchak Weinstock is awarded $1,291,000 in compensatory damages.
- Sharon Weinstock and the Estate of Dov Weinstock are each awarded $5,000,000 in compensatory damages.
- Each of Yitzchak's four siblings are awarded $2,500,000 in compensatory damages for a total of $10,000,000.
- The Estates of Rabbi Simon and Mrs. Shirley Dolgin are each awarded $2,500,000 in compensatory damages.

**Done and ordered** in chambers, at Miami, Florida, on April 4, 2019.

_____
Robert N. Scola, Jr.
United States District Judge