United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Sharon Weinstock, et al., )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>Islamic Republic of Iran and )<br>Hamas-Islamic Resistance )<br>Movement, Defendants. ) | Civil Action No. 17-23272-Civ-Scola |

## Final Default Judgment

This cause comes before the Court upon Plaintiffs' Motion for Default Judgment with Incorporated Memorandum of Law against Defendant Hamas-Islamic Republic Movement ("Hamas"), filed on February 4, 2019 (the "Motion"). Hamas has failed to file an answer or otherwise defend, and on November 26, 2018, the Clerk entered default (ECF No. 47). The Court has considered the allegations of the complaint, the motion, and supporting documentation submitted by the Plaintiffs. For the reasons that follow, the Court **grants** Plaintiffs' Motion for Default Judgment (**ECF No. 49**) and enters final judgment in favor of the Plaintiffs.

### 1. Background

This is a civil action under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333, arising from the shooting murder of U.S. citizen Yitzchak Weinstock by the terrorist group Hamas – Islamic Resistance Movement ("Hamas") on December 1, 1993, near Jerusalem. The Plaintiffs are Yitzchak's estate, mother, and siblings, and the estates of his late father and maternal grandparents. Hamas carried out the terrorist attack in which Yitzchak was murdered. (Compl., ECF No. 1 at ¶¶ 17-35, 44.)

Defendant Hamas was served with process in this action as of August 31, 2018. (ECF Nos. 45, 46.) However, Hamas "failed to plead or otherwise defend" this action, Fed. R. Civ. P. 55(a), and after the time to do so expired, the Clerk of the Court entered default against Hamas on November 26, 2018 (ECF No. 47).

### 2. Legal Standard

"A defendant, by his default, admits the plaintiff's well-pleaded allegations of fact," as set forth in the operative complaint. *Eagle Hosp. Physicians, LLC v.*

*SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009) (internal quotation marks and citations omitted). However, "a sufficient basis must still exist in the pleadings to state a claim before a court may enter a default judgment." *Under Armour, Inc. v. 51nfljersey.com*, No. 13–62809–CIV, 2014 WL 1652044, at *4 (S.D. Fla. Apr. 23, 2014) (Rosenbaum, J.) "A defendant's default does not in itself warrant the court entering a default judgment." *Luxottica Grp. S.p.A. v. Individual, P'ship or Unincorporated Ass'n*, No. 17-CV-61471, 2017 WL 6949260, at *2 (S.D. Fla. Oct. 3, 2017) (Bloom, J.) (quotation marks, alterations, and citations omitted). A defendant is "not held to admit facts that are not well pleaded or to admit conclusions of law." *Id.* The court must also establish that it has subject matter jurisdiction and personal jurisdiction over the defendant. *TracFone Wireless v. Anadisk LLC*, 685 F. Supp. 2d 1304, 1310 (S.D. Fla. 2010) (King, J.).

### 3. Analysis

#### A. Subject Matter Jurisdiction

The Court has subject matter jurisdiction in this case. The Plaintiffs bring this civil action for damages under a federal statute, 18 U.S.C. § 2333. Pursuant to 18 U.S.C. § 2338, the "district courts of the United States shall have exclusive jurisdiction over an action brought under this chapter." Thus, this Court has original subject matter jurisdiction under 28 U.S.C. § 1331.

#### B. Personal Jurisdiction

The Court has personal jurisdiction over Hamas under Rule 4(k)(2) of the Federal Rules, which provides in relevant part that: "For a claim that arises under federal law, serving a summons . . . establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2).

Rule 4(k)(2) operates as a "national long-arm statute" which "permits a court to aggregate a foreign defendant's nationwide contacts" for jurisdictional purposes when the defendant does not show that he is subject to the personal jurisdiction of any individual U.S. state, provided that the Plaintiff's claims, "arise under federal law" and that the exercise of jurisdiction is consistent with due process. *Fraser v. Smith*, 594 F.3d 842, 848–49 (11th Cir. 2010). Thus, "[t]he applicable forum for purposes of Rule 4(k)(2) is the United States as a whole." *Barrocos of Fla., Inc. v. Elmassian*, 2012 U.S. Dist. LEXIS 64948, at *23 (S.D. Fla. May 9, 2012) (Scola, J.) (citing *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220 (11th Cir. 2009)). All of these conditions are met here:

*First*, the Plaintiffs' claims are brought under federal law, i.e. ATA § 2333.

*Second*, Hamas was properly served with process in this action. As explained in the Verified Application for Clerk's Entry of Default as to Defendant Hamas submitted by the Plaintiffs' undersigned counsel (ECF No. 46) ("Verified Application"), counsel delivered a request to serve process in this action on defendant Hamas, pursuant to the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Convention"), to the State of Israel's Administration of Courts, which is Israel's designated "Central Authority" for handling requests for service under the Hague Convention. (Verified Application, ECF No. 46, at 1.)

*Third*, to defeat the assertion of jurisdiction under Rule 4(k)(2), the defendant bears burden to show that he *is* subject to jurisdiction in another state's courts of general jurisdiction. *Barrocos*, 2012 U.S. Dist. LEXIS 64948, at *20 ("Because Heng Lee has not identified any other state where it might be subject to personal jurisdiction, this Court is authorized to assume that Heng Lee is not amenable to jurisdiction in the courts of any state, and it may proceed under Rule 4(k)(2).") (citing cases). *See also Jackson v. Grupo Indus. Hotelero*, 2008 U.S. Dist. LEXIS 88922, at *21 (S.D. Fla. Oct. 20, 2008) (Huck, J.) (same). By defaulting this action, Hamas has failed to meet his burden under Rule 4(k)(2). *See Mwani v. Osama Bin Laden*, 417 F.3d 1, 11 (D.D.C. 2005) (defaulted defendant forfeits opportunity to show amenability to jurisdiction in a particular state under Rule 4(k)(2)); *Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 89 (D.D.C. 2006) ("Hamas . . . has not appeared to defend against this suit, and therefore it has not conceded to the jurisdiction of any state. Hence, the Court will presume that Hamas is 'not subject to the jurisdiction of the courts of general jurisdiction of any state[,]' under Rule 4(k)(2)).

*Fourth*, the exercise of specific personal jurisdiction over Hamas in this case is fully consistent with due process. In their complaint, the Plaintiffs allege that Hamas' co-founder and senior leader Mousa Abu Marzook was continuously domiciled and resident in the United States from 1981 until early 1993. Plaintiffs further allege in detail that upon Hamas' establishment in late 1987, Hamas began to carry out extensive activities in the United States, through its leader Abu Marzook, which activities continued through the date of the terrorist attack in which Yitzchak Weinstock was murdered, December 1, 1993, and includedthe following: (a) Hamas raised millions of dollars in the United States during this period, which it transferred to Hamas leaders and operatives in the West Bank and Gaza Strip; (b) during this period Hamas built and organized its own permanent U.S.-based fundraising and recruitment apparatus, consisting of both individuals domiciled in the U.S. and U.S.-incorporated associations; (c) during this period Hamas recruited individuals domiciled in the U.S. and

elsewhere to serve as Hamas leaders and operatives; and (d) during this period Hamas sent operatives from the U.S. to the West Bank and Gaza, bearing instructions and funds supplied by Abu Marzook on behalf of Hamas, for the purpose of organizing and funding terrorist attacks. (*See* Compl., ECF No. 1 at ¶¶ 18–28.)

Moreover, in his expert declaration in the Plaintiffs' related action against Abu Marzook, *Weinstock v. Abu Marzook*, Civ. No. 17-cv-23202-RNS (S.D. Fla.) (Scola, J.), the Plaintiffs' expert on Hamas, Arieh Dan Spitzen, explained in detail the critical role played by Hamas' U.S.-based activities, conducted and directed by Abu Marzook, in preserving and building Hamas' organizational, human and material infrastructure in the West Bank and Gaza Strip during this period and concluded that "it is my expert opinion that without the extensive leadership, organizational and financial activities on behalf of Hamas initiated and conducted by Abu Marzook from the United States, Hamas would have had extremely limited organizational and operational capabilities, and it is very unlikely that the December 1, 1993 attack would have occurred." *Weinstock*, Civ. No. 17-cv-23202-RNS, Spitzen Decl., ECF No. 48-2, at ¶ 30.

Mr. Spitzen also cited numerous other Hamas experts who have similarly concluded that Hamas' U.S.-based activities during this period were crucial to its operational capabilities. *Id.* at ¶ 27 (quoting Hamas experts who concluded that Abu Marzook's activities in the U.S. during this period "restored to Hamas its operational ability" and provided "financial resources vital to renewal of Hamas' public and violent activity."); and at ¶ 29 (quoting conclusion of former U.S. Treasury terrorism finance analyst and Hamas expert that Abu Marzook's U.S.-based operation on behalf of Hamas "was critical to the group's survival."). And, as Mr. Spitzen confirms, Marzook's U.S. activities were conducted on behalf of and in coordination with Hamas. *Id.* at ¶¶ 22–23.

Thus, Hamas took actions in the United States, which resulted in the injuries to the plaintiffs. This is therefore a case for exercise of specific jurisdiction.

### C. The Complaint States a Claim under ATA § 2333

The Plaintiffs' allegations easily state a claim under ATA § 2333, which provides that: "Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a).

The Plaintiffs' have standing to sue as U.S. nationals or the survivors of U.S. nationals, and the allegations relating to the fact that they were injured by

reason of a terrorist attack are set forth throughout the complaint. (Compl., ECF No. 1 at ¶¶ 8–16.)

The phrase "act of international terrorism" used in § 2333(a) is defined in ATA § 2331 as "activities that (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; (B) appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." 18 U.S.C. § 2331(1).

The allegations regarding defendant Hamas' conduct satisfy each of these elements of "international terrorism" as defined in ATA § 2331(1). (*See, e.g.,* ECF No. 1 at ¶¶ 19–23, 79–85.)

### D. Damages

As an initial matter, courts hearing terrorism cases routinely accept verified or sworn declarations as competent evidence to establish damages. *See Stansell v. Revolutionary Armed Forces of Colom. (FARC)*, No. 8:09-cv-2308-T-26MAP, 2010 U.S. Dist. LEXIS 149212, at *11 (M.D. Fla. June 14, 2010) (citing *Securities & Exchange Comm'n v. Smyth,* 420 F.3d 1225, 1231 n.13 (11th Cir. 2005)) ("Where the record is sufficient, as is the case here, a court may be able to determine damages without a hearing.").

### 1. The ATA extends to the Plaintiffs the full array or tort remedies.

Section 2333 of the ATA provides: Any national of the United States injured in his or her person … by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees. 18 U.S.C. § 2333(a). Section 2333 allows actions by nationals of the United States, their estates, survivors, or heirs, which includes all the Plaintiffs herein. Even Dov Weinstock, who was not a United States citizen, is included among those permitted to bring claims under Section 2333. As Yitzchak's father, Dov, was a "survivor" of a United States national who was murdered in the terrorist attack. The ATA "contains no requirement that the survivors or heirs of a United States national killed by an

act of international terrorism must themselves be citizens of the United States, and this court will not read such a requirement into the statute." *Estates of Ungar v. Palestinian Auth.*, 304 F. Supp. 2d 232, 271 (D.R.I. 2004). *See also, Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 620 (E.D.N.Y. 2006) ("it is sufficient for plaintiffs to allege a familial relationship, such as that of child, parent, spouse, or sibling of a U.S. national.").

Further, U.S. nationals who are the relatives of a person killed by terrorists are themselves "victims of international terrorism." *Estates of Ungar*, 304 F. Supp. 2d at 263. *See also Biton v. Palestinian Authority*, 310 F. Supp. 2d 172, 182 (D.D.C. 2004) (U.S. citizen may assert direct claim under ATA for murder of family member, irrespective of decedent's nationality). Similarly, surviving U.S. national grandparents like Rabbi and Mrs. Dolgin, who shared an unusually close relationship with Yitzchak, are considered to be victims of international terrorism and are entitled to damages under the ATA. *See e.g., Lelchook v. Commerzbank*, 2011 U.S. Dist. LEXIS 106305, at *5 (S.D.N.Y. Aug. 1, 2011) ("Nothing in the statute limits the ability of [survivors] to sue; as long as the proximate cause of the injury is alleged to be 'by reason of an act of international terrorism,' *id.*, the claim may be brought."); *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 86 (D.D.C. 2017) (awarding damages to grandparents for terrorist killing of granddaughter under the terrorism exception to the Foreign Sovereign Immunities Act).

Section 2333 does not specify the nature of damages that can be recovered. However, courts construing this provision have found that it extends to the Plaintiffs the full array of tort remedies, including both "the broadest range of economic damages" as well as solatium and other non-economic damages. *See Estates of Ungar*, 304 F. Supp. 2d at 266–67. Thus, the estate of Yitzchak Weinstock is entitled to recover economic damages for lost earnings; and the remaining Plaintiffs may recover damages for the severe emotional injuries they suffered, otherwise known as solatium damages. *See id.* "Solatium damages are available to FSIA plaintiffs when extreme and outrageous conduct has caused grief and anguish to plaintiffs closely related to a victim of terrorism. Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 273 (D.D.C. 2003).

Courts addressing the availability and amount of solatium damages in terrorism cases have traditionally looked to prior similar cases awarding solatium or emotional damages. *Estates of Ungar*, 304 F. Supp. 2d at 270–77; *Stansell*, 2010 U.S. Dist. LEXIS 149212, at *13–14. Moreover, courts considering damages in cases decided under the Antiterrorism Act, 18 U.S.C. §§ 2331, et seq. have considered damages awards in other terrorism cases, including those

decided under the related terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A (and the former terrorism exception 1605(a)(7) for cases decided prior to 2008). *See e.g.*, *Estates of Ungar*, 304 F. Supp. 2d at 263; *Rubin v. HAMAS--Islamic Resistance Movement*, 2004 U.S. Dist. LEXIS 20883, at *10 (D.R.I. 2004); *Stansell*, 2010 U.S. Dist. LEXIS 149212, at *10.

Applying this methodology, courts have formulated a widely-accepted framework for calculations of damages awarded to victims of international terrorism. In *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006), the court surveyed past terrorism awards in the context of deceased victims of terrorism and found that parents of those killed in terrorist attacks typically received damages awards of $5 million and siblings received $2.5 million. The court also specified "baseline" amounts awarded to other relatives, such as spouses. *Id.* In *Braun*, the court awarded $2.5 million in compensatory damages to each of the four grandparents of a baby killed in a terrorist attack. The court found that the grandparents suffered greatly from witnessing the effects of the murder of the baby on the baby's parents. *Braun*, 228 F. Supp. 3d at 86.

### 2. The Estate of Yitzchak Weinstock is entitled to an award of $1,291,000 for lost earnings.

The Plaintiffs have introduced the verified economic report of Mark Berenblut, a forensic and investigative accountant educated at the London School of Economics and qualified in the United States and Canada. (Berenblut Decl., ECF No. 42-7.) Mr. Berenblut's CV is attached to his report. *Id.* In calculating Yitzchak Weinstock's lost earnings, Mr. Berenblut considered two scenarios. First, he calculated a range for Yitzchak's projected lost earnings based upon an assumption that he would have made his career in Israel. Second, because Yitzchak was an American citizen, Mr. Berenblut calculated an alternative income based upon the possibility that Yitzchak would have made his career in the United States.

Mr. Berenblut concluded that the total adjusted lost earning amount based upon a career in the United States would have been approximately $2,720,000 U.S. dollars. *Id.* at 4. Under the scenario in which Yitzchak would have pursued a career in Israel, Mr. Berenblut calculated the loss to be approximately $1,291,000 U.S. dollars. *Id.*

Because the Court finds that Yitzchak would likely have remained in Israel where most of his family resides, the Court accepts the calculation of lost earnings based upon a career in Israel rather than one in the United States. The Court awards damages for lost earnings in the amount of $1,291,000 million.

### 3. Sharon Weinstock is entitled to solatium damages in the amount of $5 million for the murder of her son.

On the morning of December 1, 1993, Sharon Weinstock was at work in Jerusalem when a social worker from her community called to tell her that there had been a terrorist attack and that she was coming to see Sharon. (Sharon Decl. at 2, ECF No. 42-10 at 2.) The social worker drove Sharon to the hospital, where her husband and some family friends and neighbors were already waiting. *Id.* That was when she heard that Yitzchak was in critical condition. *Id.*

Sharon caught only a glimpse of Yitzchak as the medical staff wheeled him into surgery. *Id.* Yitzchak fought for 18 hours. *Id.* But his injuries were too numerous and severe. Finally, at approximately 1:00 am, the next morning, the surgeon came out of the operating room and broke the news to the family. *Id.*

For at least a month after Yitzchak's murder, Sharon "stayed in bed and slept or cried all the time." (Moshe Decl., ECF No. 42-11 at 3.) Moshe Weinstock, Yitzchak's brother, relates that because his parents were "completely unable to deal with day-to-day responsibilities," he paid the costs of his own college education, without asking them to help. Years after he completed his university studies, his mother asked him, "Hey, how did you pay for college?" Moshe explains that his mother had been completely oblivious as a result of the shock and grief following Yitzchak's murder. *Id.*

The Court applies the *Heiser* framework and awards Sharon Weinstock $5,000,000 in solatium damages for the loss of her son to the terrorist murders. *See Braun*, 228 F. Supp. 3d at 85; *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 147 (D.D.C. 2018).

### 4. The Estate of Dov Weinstock is entitled to solatium damages in the amount of $5 million for the murder of Dov's son.

Yitzchak Weinstock's father, Dov was not a United States national. However, he was entitled to sue under Section 2333 as the survivor of a victim of the terrorist attack. See 18 U.S.C. § 2333(a). Dov Weinstock passed away in 2007. Sharon and Moshe Weinstock, the widow and eldest son of Dov Weinstock pursue Dov's claims on behalf of his estate.

Dov Weinstock suffered immeasurably as a result of Yitzchak's murder. In the words of Moshe Weinstock, Yitzchak's murder caused Dov "to go completely off the rails." (Moshe Decl., ECF No. 42-11 at 3.) Aryeh states that "[t]he impact of Yitzchak's death on my father was very obvious and dramatic. (Aryeh Decl., ECF No. 42-12 at 3.) It felt like we lost a big part of our father along with our brother." *Id.* Mishael states that their father "was completely unable to cope." (Mishael Decl., ECF No. 42-13 at 2.) Dov became withdrawn from the children – an "absentee father." (Sharon Decl., ECF No. 42-10 at 4.) In 2007, Dov suffered

from his final, fatal heart attack. (Aryeh Decl., ECF No. 42-12 at 3.)

The Court applies the *Heiser* framework and awards Dov Weinstock $5,000,000 in solatium damages for the loss of his son to the terrorist murders. *See Braun*, 228 F. Supp. 3d at 85; *Estate of Hirshfeld*, 330 F. Supp. 3d at 147.

### 5. Moshe Weinstock is entitled to an award of $2.5 million in solatium damages for the murder of his brother.

Yitzchak was Moshe Weinstock's little brother. (Moshe Decl., ECF No. 42-11 at 1.) Moshe and Yitzchak remained close, taking advantage of their weekends at home and breaks from school to spend time together. (*Id.*)

On December 1, 1993, Moshe Weinstock was in southern Israel performing his mandatory military service when he heard a news report of a terrorist attack outside of Jerusalem. (*Id.* at 2.) After someone informed Moshe that Yitzchak had been wounded in the attack, he attempted to call home, but nobody answered the phone, so Moshe rushed to Jerusalem, "first to one hospital, and then to another before I found them." (*Id.*) The shock of Yitzchak's death hit Moshe so hard he cannot clearly recall the events at the hospital or Yitzchak's funeral. (*Id.*)

Yitzchak's death was a terrible blow to Moshe. (Sharon Decl., ECF No. 42-10 at 5.) He continues to live with the pain. It is very difficult for him to talk about or otherwise engage in the subject of Yitzchak's murder. (Miriam Decl., ECF No. 42-26 at 3.)

The Court applies the *Heiser* framework and awards Moshe Weinstock $2,500,000 in solatium damages for the loss of his brother to the terrorist murders. See *Estate of Hirshfeld*, 330 F. Supp. 3d at 147.

### 6. Geula ("Gili") Weinstock is entitled to an award of $2.5 million in solatium damages for the murder of her brother.

Geula ("Gili") Weinstock is the severely disabled sister of Yitzchak Weinstock. (Miriam Decl., ECF No. 42-26 at 4.) She is not legally competent and has not submitted her own declaration. However, others discussed in their declarations the impact Yitzchak's death had on Gili. Gili felt very close to Yitzchak. (Moshe Decl., ECF No. 42-11 at 2.) The emotional impact of the loss of her brother was obvious to others. (*Id.*) Following Yitzchak's murder, Gili began displaying "terrible behavioral problems." (*Id.*) Previously, Gili was "a warm, cooperative and very pleasant and well-liked child with much charm." (Dr. Pollack Decl., ECF No. 42-8 at 1.) But as a result of Yitzchak's murder, Gili began having emotional outbursts, and displayed rigidity, and obsessive behavior. (*Id.* at 2.) Yitzchak's absence created much chaos in Gili's mind. (Mishael Decl., ECF 42-13 at 3.)

Gili had been studying in a main-stream school where she made much

progress. (Dr. Pollack Decl., ECF No. 42-8 at 1.) But after Yitzchak's death, she refused to continue. (*Id.*) Ultimately, Sharon had no choice but to transfer Gili to a less favorable school in another city. (*Id.*) In the aftermath of Yitzchak's murder, Gili developed many behavioral difficulties, including, severe anxiety, outbursts of anger, obsessive behaviors, and other manifestations that compounded her physical disabilities. (*Id.* at 1–2.)

Dr. Pollak concludes, "I have observed her difficulties over the years, and can confidently say that after her brother's murder, [Gili] suffered a definite deterioration in her emotional and behavioral state, and that she and her family continue to struggle with the painful manifestations of [Gili's] emotional state. (*Id.* at 2.) Dr. Pollak's assessment is confirmed by Inbal Sharvit Zamir, a licensed psychotherapist, who treated Gili from 2009 until 2012. (Inbal Zamir Decl., ECF No. 42-9 at 1.) According to Zamir, Gili's primary issues were her "inability to cope with her bereavement over Yitzchak, and the processing of her intense emotional pain." (*Id.* at 1–2). This intense and persistent emotional pain and mourning prevent Gili from engaging in ordinary life activities. (*Id.* at 2.)

The Court applies the *Heiser* framework and awards Geula Weinstock $2,500,000 in solatium damages for the loss of her brother to the terrorist murders. *See Estate of Hirshfeld*, 330 F. Supp. 3d at 147.

### 7. Aryeh Weinstock is entitled to an award of $2.5 million in solatium damages for the murder of his brother.

Aryeh Weinstock is Yitzchak's younger brother and was in the seventh grade when Yitzchak was murdered. Today, Aryeh maintains: "The single worst memory of my life was when my father came to the house in the morning and said to us, 'it's over,' I started shouting uncontrollably and breaking things all over the house." (Aryeh Decl., ECF No. 42-12 at 2.)

Following Yitzchak's murder, Aryeh, began experiencing severe difficulties in school. (Moshe Decl., ECF No. 42-11 at 2.) "He actually completely stopped functioning in school." (Miriam Decl., ECF No. 42-26 at 5.) In high school, he started suffering from panic attacks and, on several occasions, Aryeh required hospitalization. (Aryeh Decl., ECF No. 42-12 at 2.) Unable to focus on school work, Aryeh fell behind in his studies and eventually left his high school. (*Id.*)

Moshe realized that his parents were not fully functioning as parents and took it upon himself to find a new school for Aryeh. He drove to the remote northern Israeli town of Hispin and convinced the principal of a *yeshiva* high school there to accept Aryeh, as an act of charity. (Moshe Decl., ECF No. 42-11 at 2.) Moshe sees this event as stark evidence of the devastation and disfunction that overtook the Weinstock household as a result of Yitzchak's death. (*Id.*) Aryeh was no more successful in Hispin than he had been in his prior school. Aryeh

says that he spent his high school years "drifting around" to various schools and communities, and that the years from 9th through 12th grades "have been almost completely blacked out of my memory." (Aryeh Decl., ECF No. 42-12 at 2.)

Aryeh describes a before-and-after life that was turned upside down by Yitzchak's murder. Before the murder, "we were a family that was close and happy." (*Id.* at 4.) The family would spend weekends together and with friends laughing, telling stories, and taking long walks. (*Id.*) "That was all taken away from us with Yitzchak's death. Now, there's always something in our hearts that hurts." (*Id.*)

The Court applies the *Heiser* framework and awards Aryeh Weinstock $2,500,000 in solatium damages for the loss of his brother to the terrorist murders. *See Estate of Hirshfeld*, 330 F. Supp. 3d at 147.

### 8. Chaim Mishael Weinstock ("Mishael") is entitled to an award of $2.5 million in solatium damages the murder of his brother.

Mishael was only five years old when Yitzchak was murdered. (Sharon Decl., ECF No. 42-10 at 6.) As a result, "[e]verything around him was filled with sadness and difficulty. He was deprived of a normal childhood." (Michael Dolgin Decl., ECF No. 43 at 3.)

Soon after Yitzchak's murder, Mishael began suffering from a sleep disorder and bed wetting. This lasted until he was 10 years old. (*Id.* at 2.) Michael says that between third and eighth grades, "I was depressed most of the time. I slept a lot and was barely interested in anything. I missed a lot of school; I would show up late to class and leave when I wanted. The teachers made allowances for me because they knew I was Yitzchak's brother." (*Id.* at 2–3.)

Mishael continued to deal with depression into his teen years. When he reached his late teens, Mishael could not even conceive of being alive at age 20 or 21. But, he was not disturbed by that feeling. "I felt it was part [of] my destiny, just another part of life." (*Id.* at 3.) He recalls a hiking trip when he deliberately ate a certain plant that someone had warned might be poisonous. At the same time, Mishael says that he lived in a perpetual survival mode, where he was constantly thinking about possible dangers. (*Id.* at 4.)

The Court applies the *Heiser* framework and awards Mishael Weinstock $2,500,000 in solatium damages for the loss of his brother. *See Estate of Hirshfeld*, 330 F. Supp. 3d at 147 (granting siblings who were only 4 and 7 years old at the time of their brother's murder damages awards in amount identical to that granted to older siblings who shared mature, developed relationships with decedent).

**9. The estates of Rabbi Simon and Mrs. Shirley Dolgin are each entitled to awards of $2.5 million in solatium damages for the murder of their grandson.**

Yitzchak shared an unusually close relationship with his maternal grandparents. (Sharon Decl., ECF No. 42-10 at 6.) Yitzchak often visited his grandparents, both with his family and on his own. (*Id.*) Rabbi Dolgin's longtime, close friend Israel Harel recalls that on several occasions when he visited the Dolgins he found Yitzchak at their home engaged in Talmudic or Biblical study with his grandfather. (Isreal Harel Decl., ECF No. 42-21 at 2.) Yitzchak's proficiency in these studies was a great source of pride for Rabbi Dolgin. (*Id.*)

Immediately after the terrorist attack, Mrs. Dolgin joined the family in the hospital waiting room. (Tzirl Horowitz Decl., ECF No. 42-20 at 2.) As the surgery continued late into the night, Yitzchak's grandmother grew tired and eventually fell asleep. (*Id.*) When someone woke Mrs. Dolgin and told her what had happened, she screamed in horror, "What have I done?!" (*Id.*) According to Tzirl Horowitz, Mrs. Dolgin was speaking to god and blaming herself for her grandson's death. (*Id.*) Yitzchak's grandmother felt so connected to him that she was sure that his death must have been because of some flaw in her.

The day after the attack, Rabbi Dolgin's old friend, Israel Harel rushed to the Dolgin's home when he heard the news on the radio. Mr. Harel says this was the first time he had ever seen Rabbi Dolgin cry. (Harel Decl., ECF No. 42-21 at 3.) Rabbi Dolgin, who had been a strong man with a sharp mind, began to rapidly deteriorate. "At once he looked like an old man…. He lost his drive for life." (*Id.*)

The *Heiser* framework is based upon awarding similarly situated terrorism victims' similar damages awards for their emotional damages. In accordance with the *Heiser* framework and the holding in *Braun*, the Court awards to each of the estates of Rabbi and Mrs. Dolgin damages in the amount of $2.5 million. *Braun*, 228 F. Supp. 3d at 86.

**4. Conclusion**

For the reasons stated, the Court **grants** the Plaintiffs' Motion for Default Judgment (**ECF No. 49**).

Damages are awarded as follows:

- The Estate of Yitzchak Weinstock is awarded $1,291,000 in compensatory damages.
- Sharon Weinstock and the Estate of Dov Weinstock are each awarded $5,000,000 in compensatory damages.
- Each of Yitzchak's four siblings are awarded $2,500,000 in compensatory damages for a total of $10,000,000.

- The Estates of Rabbi Simon and Mrs. Shirley Dolgin are each awarded $2,500,000 in compensatory damages.

Pursuant to 18 U.S.C. § 2333(a), the amounts of compensatory damages are trebled for a total damages award of $78,873,000.

The Clerk is directed to **close** this case.

**Done and ordered** in chambers at Miami, Florida, on May 6, 2019

Robert N. Scola, Jr.
United States District Judge